**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CALIFORNIA PIZZA KITCHEN, INC., *et al.*,[1] | ) | Case No. 20-33752 (MI) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF JAMES HYATT,
CHIEF EXECUTIVE OFFICER OF CALIFORNIA PIZZA KITCHEN, INC.,
IN SUPPORT OF THE CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, James Hyatt, Chief Executive Officer of California Pizza Kitchen, Inc., hereby declare under penalty of perjury:

**<u>Introduction</u>**

1.      CPK is an iconic restaurant brand that is recognized for its creative and fresh menu, including pizza with a distinct California twist.  Since opening its doors in Beverly Hills in 1985,



CPK *Nashville, TN Location*

CPK has grown from a single location to more than 200 restaurants worldwide.  The Company's brand has become synonymous with pairing fresh ingredients with an adventurous,

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  California Pizza Kitchen, Inc. (0623); California Pizza Kitchen of Annapolis, Inc. (4806); CPK Holdings Inc. (2486); CPK Hospitality, LLC (3536); CPK Hunt Valley, Inc. (6751); CPK Management Company (1196); CPK Spirits, LLC (3614); and CPK Texas, LLC (3574).  The location of the Debtors' service address in these chapter 11 cases is: 12181 Bluff Creek Drive, 5th Floor, Playa Vista, California 90094.

welcoming, and fun dining environment.

2.      No restaurateur in the world, however, has been unaffected by the COVID-19 pandemic.  For many restaurants, the COVID-19 pandemic will be the greatest challenge they will ever face; for some, it may also be their last.  Experts predict that 25% of all restaurants in the United States will never open again, with many more never resuming their previous levels of operations.[2]  Though some states are beginning to allow indoor dining to recommence, and many have plans to do so in the near future, the restaurant industry faces a new reality, which includes the need to be able to adapt quickly to shifting regulations state-by-state and to endure an unpredictable volume of customers.  The viability of each restaurant or chain will depend on its ability to adapt and quickly pivot its operations as the world changes.

3.      Over the past several months, CPK's management team and employees have demonstrated their ability to persevere and have set the Company on a path to success in the wake of this unprecedented pandemic.  Beginning in late February, CPK's management team developed a plan of action and quickly mobilized to serve CPK's customers, even as states began to issue stay-at-home orders, social distancing protocols, and other restrictions.  In a matter of weeks, CPK navigated over 170 unique sets of federal, state, and local government operational rules, guidelines, and mandates to convert nearly 140 locations into off-premises options, including takeout and/or delivery-only offerings.  Despite its inability to serve its core functionality of in-store dining and sales, which accounted for 78% of CPK's total sales prior to the COVID pandemic, the Company managed sustainable margins through a series of swift operational changes, including an immediate shift in focus to off-premises takeout and delivery sales, the creation of a novel "CPK

---

[2]    Edward Ludlow, *One-Quarter of American Restaurants Won't Reopen, OpenTable Says*, BLOOMBERG (May 14, 2020),    https://www.bloomberg.com/news/articles/2020-05-14/one-quarter-of-american-restaurants-won-t-reopen-opentable-says (last visited July 26, 2020).

Market" selling innovative and exciting meal kits, and leveraging existing strong relationships with third-party delivery services.



4.      The CPK management team's swift, pivotal actions at all levels of the company positioned CPK to withstand the harsh business conditions resulting from the COVID-19 pandemic.  Examples of these actions by management include:

- close monitoring of demand and coordination of the delivery of perishable ingredient and other supplies between locations to avoid waste and decrease costs;

- temporary closure of 46 CPK locations where an off-premises-only model was not feasible due to government mandates and/or lower customer demand;

- reducing and modifying the menu to maximize efficiency;

- reducing store hours, reshuffling employee work schedules, and furloughing employees in order to avoid maximize the productivity of the resources expended across locations;

- reducing management corporate level payroll by over 35%;

-  freezing capital expenditure projects; and

- negotiating new agreements with various vendors and landlords to reflect the change in market conditions.

5.      And, hand-in-hand with its operational efforts, the Company immediately recognized as the COVID-19 pandemic was taking hold in mid-March that it would need a liquidity infusion and debt relief to address the revenue disruption and temporarily closed

3

locations.  The Company, with the assistance of its advisors, Kirkland & Ellis LLP, Guggenheim Securities, LLC (who both had previously been engaged in late 2019 to explore a potential sale of the business) and Alvarez & Marsal North America, LLC, quickly organized the Company's secured lenders.  An ad hoc group of CPK's first lien lenders engaged Gibson, Dunn & Crutcher LLP and FTI Consulting, Inc. while the agent under CPK's second lien debt agreement (the "Second Lien Agent") engaged Stroock, Stroock & Lavan LLP.  CPK quickly conveyed to the lenders its immediate need to access liquidity and for debt covenant and interest relief.  Within a matter of weeks, the Company and certain members of the first lien lender ad hoc group entered into a $30.0 million new money secured loan to fund the business and provide a bridge to negotiate a comprehensive restructuring.[3]

6.     All parties readily acknowledged that the $30 million lifeline was really a bridge; CPK's balance sheet and lease footprint are simply not manageable.  Moreover, the Company has just $13.5 million of cash on hand and has approximately four months of unpaid rent obligations at the majority of its locations, including numerous default notices from its landlords and court actions brought by CPK's landlords to obtain this unpaid rent.  The Company has spent the past several months reviewing and negotiating strategic alternatives to obtain additional financing and address its capital structure and lease footprint in a holistic manner.

7.     CPK's negotiations with the first lien lender ad hoc group have resulted in an agreement with holders of approximately 100% of CPK's priority first lien term loan and approximately 78% of CPK's first lien term loan on the terms of a restructuring transaction that will provide the Company with access to $46.9 million of additional financing pursuant to the DIP Facility and a reduction of approximately $230 million of outstanding prepetition debt.  CPK's

---

[3]     The first lien lender ad hoc group also provided forbearances of certain continuing and imminent events of default.

restructuring support agreement attached hereto as **Exhibit C** and the chapter 11 plan filed contemporaneously herewith also contemplates a simultaneous sale process—one that was already underway—to test the value proposition. This process will position CPK for success in the increasingly unpredictable casual dining environment, allowing the Company to support go-forward operations and preserve thousands of jobs. Notably, CPK does not yet have the support of the second lien lenders to the restructuring.

8. CPK must move swiftly through these chapter 11 cases. The restructuring support agreement contemplates completion of this process no later than 85-days from the petition date. CPK will use this time to generate as much consensus as possible with the rest of its capital structure, negotiate with lessors to rationalize its lease footprint, and prepare for emergence as a healthier company positioned for long-term success.

## Background

9. I am the Chief Executive Officer of California Pizza Kitchen, Inc., a limited liability company organized under the laws of Delaware and one of the above-captioned debtors and debtors in possession. I have more than 40 years of experience in the restaurant industry and I have served in this role at CPK since January 2018. Prior to joining CPK, I served as the CEO for Ruby Tuesday, the CEO of Church's Chicken, and the CEO of Cosi, Inc. Before that, I spent 32 years in a variety of roles at Burger King, including Global Chief Operating Officer.

10. I am generally familiar with the CPK's day-to-day operations, business and financial affairs, and books and records. Except as otherwise indicated, all facts in this declaration are based upon my personal knowledge, my discussions with other members of the Company's management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my

experience and knowledge.  I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this declaration.[4]

11.    To familiarize the Court with the Debtors, their business, the circumstances leading up to these Chapter 11 Cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this declaration into five sections as follows:

- **Part I** provides a general overview of CPK's corporate history and business operations;
- **Part II** provides an overview of the Company's prepetition capital structure;
- **Part III** describes the circumstances leading to the filing of these Chapter 11 Cases;
- **Part IV** provides an overview of the proposed restructuring and debtor-in-possession financing; and
- **Part V** sets forth the evidentiary basis for the relief requested in each of the First Day Motions.

## I.    General Background.

### A.    The Company's Corporate History.

12.    CPK was founded in 1985 by Rick Rosenfield and Larry Flax who had a simple vision for an upscale family restaurant in Beverly Hills.  CPK's founders believed that an open,



*The Original California Pizza Kitchen in Beverly Hills*

airy restaurant that offered healthy pizzas with unusual toppings would distinguish the Company from its competitors in Southern California. CPK's original location was a quick success, and the Company's dishes—

---

4    Capitalized terms used but not defined in this declaration shall have the meaning ascribed to them in the Plan or Disclosure Statement, as applicable.

including the Original BBQ Chicken Pizza—became instant classics.  The strength of the CPK brand put California pizza on the map alongside Chicago and New York, and all of CPK's unique menu items remain popular among nearly all customer demographics.  CPK's distinct Californian influence on global flavors resonated with guests, and CPK quickly became a bustling spot for business and family gatherings.  Through a series of licensing agreements, investments, and ventures with a variety of partners, including Pepsi (who owned a controlling interest the business from 1992 through 1996), Kraft (who entered into a licensing agreement to distribute CPK frozen pizzas in 1997), and Nestlé (who bought the frozen pizza business from Kraft in 2010), CPK grew from a single restaurant into an established franchise that is the worldwide authority on authentic California-style cooking.



13.     In 2000, CPK completed an initial public offering and traded on the NASDAQ National Exchange under the ticket "CPKI."  In 2011, Golden Gate Capital acquired CPK in a "take-private" transaction.

14.     CPK has continued to evolve and has remained at the cutting edge of the restaurant and dining experience.  Over the past 35 years, CPK has grown its business with a high-quality

26459697v.1

real estate portfolio and has implemented new ideas and strategies, including delivery and takeout friendly options, which drive customer engagement and attract a broad demographic of customers. CPK's commitment to its brand and core mission has resulted in continued annual recognition awarded by various associations as one of the strongest brands in the industry.

**B.     The Company's Operations.**

15.     Today, there are over 200 CPK locations worldwide.  Though the Company's dine-in restaurants are the primary way the Company serves its customers, CPK also has a number of "off-premises" services and licensing agreements that allow customers to get their favorite CPK dishes on the go.  The Company's primary scope of operations include: (1) dine-in restaurants; (2) takeout; (3) delivery; and (4) licensing.

**a.   Dine-In Restaurants.**

16.     CPK's traditional dine-in locations are full-service restaurants that serve pizza, salads, pastas and other California-inspired fare, alongside a curated selection of wines and a menu of handcrafted cocktails and craft beers.  Domestically, the Company owns and operates 163 locations across 28 states.  Additionally, the Company has 16 franchised locations in the United States (primarily in non-traditional retail locations).  Though the Company has traditionally focused on growth in the Southwest and the Northeast, franchised units offer the Company an additional opportunity to expand into new markets in the United States and internationally, including throughout central United States, China, Korea, Mexico, Russia, and the United Kingdom.

17.     In recent years, the Company has expanded into international markets through franchised locations that are similar to the Company's dine-in restaurants in the United States.  The Company has also opened a number of airport locations that serve a selection of traditional CPK

offerings with faster service to accommodate travelers.  Currently, the Company operates 36 franchised and airport locations across 7 countries around the world.

### b.  Take-Out.

18.    Innovative take-out options are a central aspect of CPK's strategy.  The Company's ability to deliver its signature dishes on the go with the same authentic taste is one of the key ways CPK differentiates itself from its competition.  All of the Company's takeout options are made fresh-to-order in-store or online and picked up by the customer in the store.

19.    "Take & Bake" is another take-out offering that combines the convenience of takeout with the quality and freshness of hot, "out-of-the-oven" pizza.  Each Take & Bake pizza is prepared fresh by CPK chefs in a CPK kitchen, picked up by or delivered to the customer, and designed for the customer to cook in the oven and enjoy at home with a bake time of less than seven minutes.  Take & Bake pizzas offer quality and taste in the crowded takeout market without sacrificing convenience to the customer.

### c.  Delivery / Off-Premise

20.    Delivery service is one of CPK's strengths.  CPK has its own platform that allows its customers to order their favorite dishes off the Company's website, through its mobile app, or in-person.  CPK also has partnerships with Grubhub, Postmates, DoorDash, Uber Eats, and other regional providers such as Bite Squad, which have provided CPK with a clear advantage compared to its competitors as stay-at-home orders have become more common in the wake of the COVID-19 pandemic.   CPK also offers catering services for large families and corporate events.

### d.  Licensing.

21.    Pursuant to an agreement with Nestlé, CPK distributes a selection of its signature pizzas, including its famous BBQ Chicken Pizza and pizzas with CPK's cauliflower crust,

9

allowing for penetration into the supermarket and wholesale club channel, as these pizzas are sold in over 20,000 supermarkets and wholesale clubs.

### C.    CPK's Workforce.

22.    As of early 2020, CPK employed approximately 15,000 employees, consisting of both hourly and salaried employees.  Due to unforeseen disruption to the Company's business caused by COVID-19, the Debtors instituted a furlough program, pursuant to which furloughed employees remain on unpaid leave unless otherwise scheduled to work, but remain eligible to participate in any health benefits programs in which they are currently enrolled.  As government mandates are lifted and restaurants begin to reopen, many of these employees have rejoined active status at CPK.

## II.    CPK's Prepetition Corporate and Capital Structure.

### A.    CPK's Corporate Structure.

23.    As set forth on the corporate structure chart attached hereto as **Exhibit B**, CPK currently owns, directly or indirectly, each of the CPK Debtor entities.  A simplified version of the Debtors' corporate structure is illustrated below:



## B.   CPK's Capital Structure.

24.     As of the Petition Date, CPK has approximately $403.1 million in aggregate principal amount of funded debt obligations.

| Funded and Unfunded Debt | Maturity | Amount Outstanding (in USD millions) |
|---|---|---|
| Priority First Lien Facility | August 2022 | $60.8 |
| First Lien Term Loan Facility | August 2022 | $254.8 |
| Revolving Credit Facility | August 2021 | $12.5 |
| Second Lien Facility | August 2023 | $75.0 |
| *Total Debt Obligations* | | *403.1* |

### a.   Priority First Lien Facility.

25.     On April 27, 2020, the Company entered into a priority term loan credit agreement (as amended, restated, supplemented or otherwise modified from time to time, the "Priority Term Loan Credit Agreement," and such facility, the "PTL Facility") with Jefferies Finance LLC ("Jefferies"), as administrative agent and collateral agent, and the certain lenders under the existing First Lien Credit Agreement (as defined below) to provide $30 million of new financing, with $15 million of initial financing and a $15 million delayed draw term loan (collectively, the "New

11

Money Term Loans"). The $15 million initial term loan was funded into escrow immediately upon closing, while the $15 million delayed draw term loan was funded into escrow at a later date. Ultimately, the entirety of the delayed draw term loan was funded into the escrow account and the Company withdrew the entire amount.

26.     The PTL Facility is *pari passu* in lien priority with, and senior in payment priority to, CPK's obligations under its existing First Lien Credit Agreement, pursuant to a waterfall in a new *pari passu* intercreditor agreement entered into by the agent under Priority Term Loan Credit Agreement and the agent under the First Lien Credit Agreement. The PTL Facility was syndicated to existing first lien lenders post-closing of the PTL Facility pursuant to the Dutch auction mechanics of the First Lien Credit Agreement. For each dollar of new money an existing lender provided, a dollar of its existing term loans or outstanding revolving loans (but not revolving commitments), as applicable, were rolled up into the PTL Facility. The roll-up is *pari passu* in lien priority with the New Money Term Loans and the existing obligations under the First Lien Credit Agreement, but junior in right of payment to the New Money Term Loans and senior in right of payment to the obligations under the First Lien Credit Agreement.

27.     As of the date hereof, there is $60.8 million of principal outstanding under the PTL Facility.

       b. **First Lien Facility.**

28.     On August 23, 2016, CPK entered into a $290 million first lien term loan facility (the "First Lien Term Loan Facility") and a $30 million first lien revolving credit facility with a $20 million letter of credit sublimit (the "Revolving Credit Facility" and together with the First Lien Term Loan Facility, the "First Lien Facility"), pursuant to the first lien credit agreement by and among CPK, as borrower, certain affiliates of CPK, as guarantors, Jefferies, as issuing bank, certain financial institutions as joint lead arrangers and lenders, and Jefferies as administrative and

12

collateral agent (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "First Lien Credit Agreement").[5]  The First Lien Facility is guaranteed by CPK's parent company and certain of CPK's subsidiaries and secured by a first priority lien on substantially all of the assets of CPK and the guarantors (subject to certain permitted liens).

29.    On April 24, 2020, the First Lien Credit Agreement was amended to, among other things, tighten basket capacity under the negative covenants, conform the Collateral package to align with the PTL Facility and reflect certain other terms agreed to with respect to the PTL Facility and to amend the Dutch auction procedures to expressly facilitate the roll-up of certain term loans and revolving loans outstanding under the First Lien Credit Agreement into the PTL Facility.  The Required Lenders under the First Lien Credit Agreement also agreed to forbear with respect to multiple imminent and existing Events of Default.  As of the date hereof, there is $254.8 million of principal outstanding under the First Lien Term Loan Facility and $12.5 million of principal and $12.5 million of letters of credit outstanding under the Revolving Credit Facility.

c.    **Second Lien Facility.**

30.    On August 23, 2016, CPK entered into a $75 million term loan facility (the "Second Lien Facility") pursuant to the second lien term loan agreement by and among CPK, as borrower, certain affiliates of CPK, as guarantors, Jefferies as lead arranger, administrative agent, and collateral agent,[6] and certain financial institutions as lenders (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Second Lien Credit

---

[5]    On May 10, 2017, the First Lien Credit Agreement was amended to correct a technical error with respect to one of the defined terms used therein.

[6]    On April 24, 2020, Wilmington Trust, National Association ("Wilmington") succeeded Jefferies as administrative and collateral agent under the Second Lien Credit Agreement pursuant to a successor agent agreement by and among CPK, the guarantors of the Second Lien Facility, Jefferies, and Wilmington.

Agreement").[7]  The Second Lien Facility is guaranteed by CPK's parent company and certain of

CPK's subsidiaries and secured by a second priority lien on substantially all of the assets of CPK

and the guarantors (subject to certain permitted liens).  As of the date hereof, there is approximately

$75.0 million of principal outstanding under the Second Lien Facility.  The Debtors and SYSCO

Corporation are also party to a promissory note and security agreement dated March 30, 2020

providing for $6,985,092.00 of junior secured claims, which is subordinate to the PTL Facility,

the First Lien Facility, and the Second Lien Facility.

> d.  **Equity Interests in CPK.**

31.     As of the Petition Date, the Debtors' ultimate parent has approximately

167,000,000 shares of common stock outstanding, of which approximately 89% is indirectly held

by Golden Gate Capital and the remainder is held by current and former members of management.

## III.    Circumstances Leading to These Chapter 11 Cases.

### A.     Industry Competition and Consumer Trends.

32.     Since at least 2018, several macro-trends within the polished casual restaurant

space have made competition for customers even more acute.  These include:

- *The emergence and growth of fast-casual dining in the early 2000s.*  CPK generally does not find itself in competition with fast food restaurants, since CPK's higher quality menu and traditional dining experience do not directly overlap with the strengths of a typical fast food restaurant.  The growth of the larger brands in the fast-casual dining space changed the field, however, as restaurants such as Chipotle, Blaze Pizza, and Panera were able to effectively introduce speed and convenience without sacrificing quality, and often at a lower price point than a sit-down restaurant.  As a result, CPK had to adjust its approach to new customer expectations surrounding a swift and efficient dining experience.  This competition from fast-casual chains is particularly focused with respect to lunch customers.

- *The "Amazon/Netflix" effect and changing consumer behavior.*  Because of the convenience provided by streaming companies and shopping websites, many consumers have begun to rely on these amenities for entertainment and personal shopping needs.  As

---

[7]    On May 10, 2017, the Second Lien Credit Agreement was amended to correct a technical error with respect to one of the defined terms used therein.

a general matter, this shift in behavior decreases foot traffic in and around malls and similar locations where CPK previously has access to customer.  Accordingly, the Company now has to draw people out of the comfort of their homes and has lost a number of customers who would otherwise have dined at a CPK on impulse while out for other purposes.

- *The recent increase of third-party delivery services.*  Customers are making food purchases through mobile apps or third-party delivery-focused websites, which offer a quickly accessible, expansive set of choices.  This dynamic has lowered barriers to entry and heightened visibility for restaurants that are not usually thought of as competitors for CPK.  This increased competition for customers on these applications is even more fierce because CPK is now one of many options in what is usually a list format, making it challenging for the Company to utilize its branding, quality, or consistency to stand out among competitors who may be offering lower prices or quicker delivery.

33.     On an operational level, the Company had engaged in several initiatives over the past several years to increase efficiency in its locations, streamline its menu options, and reduce excess costs.  The Company focused on a more value and speed-focused lunch menu to compete with fast-causal restaurants.  CPK also worked to meet market trends and remain unique and competitive by leaning into its strengths, which include quality, innovation, and Cali-health offerings.

34.     Despite these attempts to adjust to new consumer behavior, and although CPK maintained its existing market share, there were signs that the Company's growth strategy and traditional expansion efforts would face more obstacles in the future.  Although it maintained consistent profit margins and strong brand recognition, CPK faced a liquidity crunch throughout 2018 and 2019.

35.     In an effort to reevaluate its operating strategy and brand identity, the Company hired a management team with a proven track record of success in the industry, who collectively have one hundred-plus years of industry experience.  This management team's years of leading and growing established brands positioned it to understand how modern trends would affect the future of dine-in restaurants.  After a comprehensive review of the Company's operations, the management team designed and implemented a multi-year strategy aimed at improving the

Company's financial position and delivering the Company's signature menu in ways that resonated with modern consumers coupled with a strategy for future unit growth while still aligning with the Company's core values.

36.     In the fall of 2019, the Company retained Guggenheim Securities and Kirkland to explore a potential M&A and/or restructuring transaction and appointed Alan J. Carr to its Board to serve as an independent director in connection with the transaction process.[8]  Shortly thereafter, the Company commenced a marketing process to evaluate interest in a potential sale.   The marketing process generated serious interest, though the COVID-19 pandemic temporarily paused the Company's efforts.  As described below, the Company plans to engage in a marketing process during the Chapter 11 Cases to evaluate whether a viable sale option exists and maximizes value.

> **B.**     **The COVID-19 Pandemic and Operational Response.**

37.     In late 2019 through early 2020, the Company's management team was pursuing a strategy to make CPK more efficient, customer-driven, and flexible to remain competitive in a crowded restaurant industry.  Before the COVID-19 pandemic CPK began a robust sale process, including outreach to a broad universe of relevant strategic and financial parties.  As of the petition date, the Company has been in contact with a total of 61 parties, 30 of whom executed nondisclosure agreements and were provided with a confidential information materials.   The management team hosted several discussions with interested parties and received four written indications of interest and/or proposals.  In addition, parties that submitted written indications of interest were provided access to a virtual dataroom that contained confidential evaluation materials.  The COVID-19 pandemic severely interrupted the marketing process.

---

[8]     Mr. Carr engaged Cole Schotz P.C. as legal counsel to lead an investigation regarding interested party issues.

38.     Due to this sudden onset of the COVID-19 pandemic, however, CPK (like many other restaurants across the country) experienced a significant decline in customer spending and new operational challenges, the scale of which was impossible to have predicted.  As various federal, state and local governments instituted shelter-in-place mandates and limited restaurants to delivery and takeout services, CPK's business faced significant hurdles.  As a result, the Company put a pause on the sale process given the restaurant environment and capital markets uncertainty.  Given that on-premises dining traditionally accounts for 78% of the Company's sales, the shutdowns delivered a sudden and significant blow to CPK's liquidity position.  By the last week of March, weekly net sales were only $2.5 million, compared to $11.3 million for the same period in 2019, a 77% decline. Net sales have partially recovered since the last week of March but were still more than 40% below 2019 levels as of the last week of June. In terms of cash flow, the Company generated positive net cash flow before financing activities in the first two months of 2020. However, from the last week of March through June of 2020, net cash flow before financing activities was negative $18.9 million, despite not having paid any interest on prepetition debt or rent on the majority of the restaurant portfolio.  The Company's projections demonstrated that to weather this environment the Company needed imminent access to liquidity as well as marked adjustments to its operations.

39.     Beginning in late February 2020, CPK instituted a number of changes focused on customer health and safety, including aggressive steps to ensure a clean and safe CPK experience for customers to the extent restaurant dining rooms remained open.  As state regulations forced the Company to temporarily close restaurants for on-premises dining, CPK began to rely more on its takeout and delivery-based services and worked to keep its kitchens open for service.  CPK continued to engage with customers by leveraging its web-based delivery services and existing

relationships with third-party delivery providers such as Uber Eats, Grubhub, Postmates, and Doordash. The Company also shifted more focus to its takeout initiatives, including the Take & Bake program.

40. The Company also initiated its CPK Market program during this time, which provided a new means of delivering CPK offerings to customers that is somewhere between takeout and grocery shopping. Consistent with the current consumer preference for minimizing



the number of visits to stores and retail venues, CPK Market offers meal kits that include the ingredients necessary to make multiple servings of some of CPK's signature entrees, sides, and desserts. Each kit includes a recipe card that sets out exactly how to make the meal included in the kit. For the first few weeks, in addition to meal kits, CPK Market also offered fruits and vegetables, dairy items, pastas, sauces, meat and seafood, desserts, and pastry items that customers could use to make their own dishes at home. Certain CPK Market locations also offer a limited selection of beer and wine. CPK Market together with the Company's pre-COVID-19 initiatives allowed the Company to minimize disruption to its ingredient supply chain, retain a significant portion of its workforce, and continue to provide CPK's signature quick and easy dishes to customers.

41. However, with on-premise dining (78% of its historical net sales) effectively wiped away due to dining room closures because of the COVID-19 pandemic, however, CPK's liquidity needs persisted even in the face of the new money under the PTL Facility and the Company's swift operational initiatives.

C.     **Prepetition Engagement with Landlords and Lenders.**

1.     **Lease Footprint and Negotiations with Landlords.**

42.     In early March 2020, CPK's management team formulated its next steps in light of the uncertain market environment.  The Company closed 46 restaurant locations where it was not feasible to remain open as off-premises-only, and instituted other operational changes including introducing CPK Market, reshuffling of employees to maximize efficiency, and shifting its focus to maximize off-premises-only dining.  As part of this process, the Company engaged Hilco Real Estate, LLC to perform an analysis of CPK's leased locations.  Upon conclusion of the analysis, CPK and Hilco initiated discussions with the Company's landlords to negotiate terms of the various existing leases.  As of the Petition Date, the Company had successfully negotiated concessions totaling approximately $6.1 million over the next three years.  The Company is still on a path to right-sizing its lease footprint, however, and intends to continue negotiations with landlords during the pendency of these Chapter 11 Cases.  Due to the Company's liquidity position, the Company has generally not paid rent since the onset of the COVID-19 pandemic.

2.     **Bridge Financing.**

43.     CPK, with the assistance of its Advisors, engaged in outreach with the lenders across the Company's capital structure almost immediately after the onset of the COVID-19 pandemic.  Exactly one week after the W.H.O. declared COVID-19 a pandemic, the Company, with the assistance of its Advisors, hosted an initial kickoff teleconference with certain first and second lien lenders to open channels of communication and diligence.   During these communications, the Company, with the assistance of its Advisors, explained CPK's need for immediate incremental liquidity.

19

44.     Subsequently, certain first and second lien lenders signed non-disclosure agreements and conducted its diligence process.  Negotiations progressed, ultimately culminating in the Company's entry into the Priority Term Loan Credit Agreement, by which certain members of the first lien lender ad hoc group provided $30 million of new money financing.[9]  No second lien lender elected to participate in the PTL Facility.  The PTL Facility provided a much-needed liquidity infusion to allow the Company to continue to function, but the liquidity infusion was only a temporary solution:  the Company has to date exhausted the entirety of the facility and has just $13.5 million of cash on hand, and has approximately four months of unpaid rent obligations at the majority of its locations.  The DIP Financing Facility that has been committed by certain members of the first lien lender ad hoc group and the restructuring support agreement that has been signed by certain members of the first lien lender ad hoc group holding approximately 100% of CPK's Priority First Lien Term Loan and approximately 78% of CPK's First Lien Term Loan and provides both the funding necessary to finance the Company through the Chapter 11 Cases and the deleveraging necessary to allow the Company to emerge in a position to surmount the obstacles it has faced.

**IV.     Terms of the Plan, Restructuring Support Agreement, and Proposed DIP Financing.**

45.     The restructuring support agreement contemplates a comprehensive reorganization that will be implemented through the Plan and that will result in a substantial deleveraging of the Debtors' balance sheet and an infusion of new capital to fund the Debtors' business and CPK's emergence from chapter 11.  Under the restructuring support agreement, certain lenders under the Debtors' first lien debt facilities have agreed to backstop a $46.9 million new money DIP

---

[9]     Although the Company sought loan support from certain governmental programs, CPK ultimately did not qualify for access to such programs.

investment and equitize all but $50.0 million of the outstanding first lien debt.  Upon emergence from chapter 11, the Company's debt obligations will be reduced from approximately $403 million to approximately $174 million, with maturities effectively extended through 2024.  The Company will also have discharged substantial second lien and unsecured debt obligations that have accumulated in part as a result of the COVID-19 pandemic which the Company would not have otherwise been able to address on an out-of-court basis.

46.     To effectuate this comprehensive restructuring in accordance with the milestones under the restructuring support agreement and ensure the Debtors' emergence from chapter 11, the Debtors have contemporaneously herewith filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Disclosure Statement and Plan Confirmation* (the "Scheduling Motion") that seeks an order setting dates and deadlines in connection with confirmation of the Plan, approval of the related Disclosure Statement, and certain related deadlines that are consistent with the statutory notice periods.  Specifically, the Scheduling Motion proposes the following schedule:

| Event | Proposed Date |
|---|---|
| Disclosure Statement Objection Deadline | August 28, 2020, at 4:00 p.m., prevailing Central Time |
| Disclosure Statement Hearing | September 2, 2020, or such other date as the Court may direct |
| Voting Deadline | October 2, 2020, at 12:00 p.m., prevailing Central Time |
| Plan Objection Deadline | October 2, 2020, at 12:00 p.m., prevailing Central Time |
| Confirmation Hearing | October 7, 2020, or such other date as the Court may direct |

47.     The new first lien term loan exit facility will be funded initially as a debtor-in-possession (DIP) financing, with commitments from certain members of the first lien lender ad hoc group to backstop the entire $46.9 million new money DIP financing and an opportunity for all first lien lenders to participate.  Upon the Debtors' emergence from chapter 11, the entirety of the DIP Facility (inclusive of the $60.3 million in rolled up First Lien loans) will convert to the new first lien term loan exit facility.  The DIP Facility (and upon emergence, the new first lien term loan exit facility) will be used to, among other things, fund CPK's operations during the pendency of the Chapter 11 Cases, allow CPK to streamline its real estate portfolio, and ensures that the Debtors will have sufficient liquidity to successfully operate their business upon emergence.

48.     Additionally, the restructuring support agreement contemplates a continuation of the prepetition marketing process to test the valuation proposition.  The Debtors have contemporaneously filed a motion seeking approval of bidding procedures that would allow a potential sale transaction to proceed on a parallel path to the Plan.  The parallel sale process will allow the Debtors to ensure that the transaction contemplated by the restructuring support agreement maximizes value.

49.     Implementation of the transactions contemplated by the restructuring support agreement and the Plan will position CPK for long-term success, save thousands of jobs, and ensure that the Company's key landlords and vendors continue to have a viable go-forward business partner.  After an extensive review process, the restructuring support agreement and Plan present the only viable path forward that results in CPK's business continuing as a going concern. For these reasons and the other reasons described in this declaration I believe that the restructuring support agreement and Plan represent the value-maximizing path forward.

**V.      Evidentiary Support for First Day Motions.**[10]

50.      Contemporaneously herewith, CPK has filed a number of first day motions seeking orders granting various forms of relief intended to stabilize CPK's business operations, facilitate the efficient administration of these Chapter 11 Cases, and expedite a swift and smooth restructuring of the Debtors' balance sheet.  The First Day Motions include the following:

- **Joint Administration Motion.**  *Debtors' Emergency Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases*;

- **Creditor Matrix Motion.**  *Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to (I) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (II) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (III) Redact Certain Personal Identification Information, (IV) Limit Notice Required Under Bankruptcy Rule 2002, and (V) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information*;

- **DIP Motion.**  *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing*;

- **Scheduling Motion.**  *Debtors' Emergency Motion for Entry of Interim and Final Orders Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Disclosure Statement and Plan Confirmation*;

- **Schedules/SOFAs Extension Motion.**  *Debtors' Emergency Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs*;

- **Prime Clerk Application.**  *Debtors' Emergency Application for Entry of an Order Authorizing the Employment and Retention of Prime Clerk LLC as Claims, Noticing, and Solicitation Agent*;

---

[10]  Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

- **Cash Management Motion.** *Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Continue to Operate Their Cash Management System and Bank Accounts, (II) Continue to Perform Intercompany Transactions, and (III) Maintain Existing Business Forms*;

- **Wages Motion.** *Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (II) Continue Employee Benefits Programs*;

- **Customer Programs Motion.** *Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto*;

- **Insurance Motion.** *Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to (I) Pay Their Obligations Under Prepetition Insurance Policies, (II) Continue to Pay Certain Brokerage Fees, (III) Renew, Supplement, Modify, or Purchase Insurance Coverage, and (IV) Enter into New Financing Agreements in the Ordinary Course of Business*

- **Trade Claimants Motion.** *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Lien Claimants, (B) 503(b)(9) Claimants, and (C) PACA Claimants, and (II) Confirming Administrative Expense Priority of Outstanding Orders*;

- **Taxes Motion.** *Debtors' Emergency Motion for Entry of an Order Authorizing the Payment of Certain Taxes and Fees*;

- **Utilities Motion.** *Debtors' Emergency Motion for Entry of an Order (I) Determining Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, and (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests;* and

- **Equity Trading Motion.** *Debtors' Emergency Motion for Entry of an Order Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock.*

51.     The First Day Motions seek authority to, among other things, obtain postpetition financing, honor employee-related wages and benefits obligations, pay claims of certain vendors and suppliers to ensure that the Debtors' business operations are not disrupted by these Chapter 11 Cases, and continue the Debtors' cash management system and other operations in the ordinary

course of business with as minimal interruption as possible.  The Debtors have tailored their requests for immediate relief to those circumstances where the failure to receive such relief would cause immediate and irreparable harm to the Debtors and their estates.  An immediate and orderly transition into Chapter 11 is critical to the viability of the Debtors' operations and any delay in granting the relief described below could hinder the Debtors' operations and cause irreparable harm.  The failure to receive the requested relief during the first twenty-one days of these Chapter 11 Cases would severely disrupt the Debtors' operations at this important juncture.

52.    I am familiar with the content and substance contained in each First Day Motion and believe that the relief sought in each motion (a) is necessary to enable the Debtors to operate in Chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical element of the Debtors' successful reorganization, and (c) best serves the Debtors' estates and lenders' interests.  I have reviewed each of the First Day Motions and the facts set forth therein are true and correct and incorporated herein in their entirety by reference.  If asked to testify as to the facts supporting each of the First Day Motions, I would testify to the facts as set forth in such motions.  A description of the relief requested in and the facts supporting the First Day Motions is set forth in **Exhibit A** attached hereto and incorporated herein by reference.

[*Remainder of page intentionally left blank.*]

25

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  July 29, 2020                           /s/ *James Hyatt*
                                                Name:  James Hyatt
                                                Title:   Chief Executive Officer
                                                California Pizza Kitchen, Inc.

## Exhibit A

**Evidentiary Support for First Day Motions**

## THE DEBTORS' FIRST DAY MOTIONS

As explained in the Declaration, the Debtors have requested a variety of relief in various "first day" motions and applications (collectively, the "First Day Motions").[1]  As a result of my first-hand experience, and through my review of various materials and information, discussions with members of the Debtors' management, and discussions with the Debtors' outside advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtors in the First Day Motions described below, and (b) the immediate and irreparable harm to which the Debtors and their businesses will be exposed unless the relief requested in the First Day Motions is granted without delay.  I submit this Declaration in support of the Petitions and the First Day Motions filed with the Court in these chapter 11 cases and as described below.

I believe that the relief sought in the First Day Motions is critical to a smooth transition into Chapter 11 to minimize the adverse effects of the chapter 11 cases on the Debtors' business and on their employees and creditors.  Collectively, the First Day Motions maximize value for the Debtors' estates and stakeholders by reducing unnecessary disruption and minimizing any negative impact of the chapter 11 cases on the Debtors' businesses and operations.

Several of the First Day Motions request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent that relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, and as described more fully in each First Day Motion, the Debtors, in consultation with their professionals, carefully tailored

---

[1]   Capitalized terms used in this Exhibit but not otherwise defined shall have the meanings ascribed to such terms in the applicable First Day Motions.

the relief requested in the First Day Motions to ensure the Debtors' immediate operational needs are met, and that the Debtors suffer no immediate and irreparable harm.

I am familiar with the contents and substance of each First Day Motion (including the exhibits thereto), and the statements and facts set forth in each of the First Day Motions are true and correct to the best of my knowledge.  I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of value; (b) is necessary to provide the Debtors with a reasonable opportunity for a successful reorganization; and (c) best serves the interests of the Debtors' stakeholders.  For the reasons identified below and in each First Day Motion, I believe that the relief requested in each of the First Day Motions is narrowly tailored to avoid immediate and irreparable harm and is appropriate under the circumstances and should be granted by the Court.

## Administrative and Procedural Motions

**A.**     **Debtors' <u>Emergency</u> Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases (the "<u>Joint Administration Motion</u>").**

1.      The Debtors have filed several purely administrative or procedural First Day Motions, including a motion to jointly administer the Debtors' chapter 11 cases. As in many large chapter 11 cases that are jointly administered, many of the motions, hearings, and orders in these chapter 11 cases will affect all Debtor entities.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration also will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.  Moreover, joint administration will not adversely affect the Debtors' respective constituencies because the Joint Administration Motion seeks only administrative, not substantive, consolidation of the Debtors' estates.

2.      I believe that the relief requested in the Joint Administration Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, it is my opinion that the Joint Administration Motion should be approved.

**B.      Debtors' <u>Emergency</u> Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs (the "<u>Schedules and Statements Extension Motion</u>").**

3.      The Debtors seek entry of an order, substantially in the form attached hereto (the "<u>Order</u>") extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs by 21 days, for a total of 35 days from the Petition Date, through and including September 2, 2020, without prejudice to the Debtors' ability to request additional extensions.

4.      Ample cause exists to grant the relief requested.  To prepare their Schedules and Statements, the Debtors will have to compile information from books, records, and documents relating to thousands of claims, assets, leases, and contracts from each Debtor entity. Accordingly, collection of the necessary information will require a significant expenditure of time and effort on the part of the Debtors and their employees.  Additionally, because numerous invoices related to prepetition goods and services have not yet been received and entered into the Debtors' accounting system, it may be some time before the Debtors have access to all of the information required to prepare the Schedules and Statements, particularly in light of the COVID-19 pandemic.

5.      In the days leading up to the Petition Date, the Debtors' primary focus has been exploring restructuring alternatives.  The Debtors intend to focus the attention of key personnel

on critical operational and chapter 11 compliance issues during the early days of these chapter 11 cases.  Such efforts will facilitate the Debtors' smooth transition into chapter 11 for the benefit of all stakeholders.

6.      I believe that the relief requested in the Schedules and Statements Extension Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, it is my opinion that the Schedules and Statements Extension Motion should be approved.

      **C.**        **Debtors' <u>Emergency</u> Motion For Entry of an Order Authorizing the Debtors to (I) Compile a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (II) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (III) Redact Certain Personal Identification Information, (IV) Limit Notice Required Under Bankruptcy Rule 2002, and (V) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information (the "<u>Creditor Matrix Motion</u>").**

7.      Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order, substantially in the form attached hereto, authorizing the Debtors to (a) compile a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor; (b) file a consolidated list of the Debtors' thirty largest unsecured creditors in lieu of filing lists for each Debtor; (c) redact certain personal identification information; and (d) limit notice required under rule 2002 of the Bankruptcy Rules.

8.      *First*, the preparation of separate lists of creditors for each debtor would be expensive, time consuming, and administratively burdensome.  Therefore, the Debtors have requested to file a consolidated creditor matrix.  Moreover, filing a Top 30 List will help alleviate administrative burdens, costs, and the possibility of duplicative service.  *Second*, the list of creditors may include personal identification information of the Debtors' current and former

5

employees and contract workers. Such information can be used to perpetrate identity theft. *Third*, mailing initial notices of bankruptcy and the notice of commencement through the Debtors' proposed claims and noticing agent, Prime Clerk LLC, to parties in interest will maximize efficiency in administering these chapter 11 cases and will ease administrative burdens that would otherwise fall upon the Court and the U.S. Trustee.

9.      I believe that the relief requested in the Creditor Matrix Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, it is my opinion that the Creditor Matrix Motion should be approved.

**D.      Debtors' <u>Emergency</u> Application for Entry of an Order Authorizing the Employment and Retention of Prime Clerk LLC as Claims, Noticing, and Solicitation Agent (the "<u>Prime Clerk Retention Application</u>").**

10.      Pursuant to the Prime Clerk Retention Application, the Debtors seek entry of an order request entry of an order appointing Prime Clerk as the Claims and Noticing Agent for the Debtors and their chapter 11 cases, to, among other tasks, (i) serve as the noticing agent to mail notices to the estates' creditors, equity security holders, and parties in interest; (ii) provide computerized claims, objection, solicitation, and balloting database services; and (iii) provide expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to the Debtors' bankruptcy cases, pursuant to the provisions of the Engagement Agreement.

11.      Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of Prime Clerk to act as the Claims, Noticing, and Solicitation Agent is appropriate under the circumstances and in the best interest of the estates. Moreover, it is my understanding, based on all engagement proposals obtained and reviewed, that Prime Clerk rates are competitive and comparable to the rates charged by their competitors for similar services.

12.     Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be thousands of persons and entities to be noticed and that many of these parties will file claims.  In view of the number of anticipated claimants and the complexity of the Debtors' businesses, the Debtors submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's Office of the administrative burden of, noticing, administering claims, and soliciting and tabulating votes and is in the best interests of both the Debtors' estates and their creditors.

13.     I believe that the relief requested in the Prime Clerk Retention Application is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, it is my opinion that the Prime Clerk Retention Application should be approved.

**Operational Motions**

**E.      Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (II) Continue to Perform Intercompany Transactions, and (III) Maintain Existing Business Forms (the "Cash Management Motion").**

14.     Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to (a) continue to operate their Cash Management System and maintain their existing bank accounts, including honoring certain prepetition obligations related thereto, (b) continue to perform Intercompany Transactions consistent with the Debtors' historical practices, and (c) maintain existing business forms in the ordinary course of business.

15.     In the ordinary course of business, the Debtors maintain an integrated, centralized cash management system (the "Cash Management System") typical of multi-location restaurant operations and comparable to the centralized cash management systems used by other similarly sized food service companies to manage the cash of operating units in a cost-effective, efficient

manner.  The Debtors use the Cash Management System in the ordinary course of their business to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' accounting department maintains oversight over the Cash Management System; maintains cash management controls for entering, processing, and releasing funds, including in connection with Intercompany Transactions; and regularly reconciles the Debtors' books and records to ensure that all transfers are accounted for properly.  Any disruption to the Cash Management System would have an immediate adverse effect on the Debtors' businesses and operations to the detriment of the Debtors' estates and all of the Debtors' stakeholders.

16.     Because of the disruption that would result if the Debtors were forced to close their existing bank accounts, I believe it is critical that the existing Cash Management System remain in place.  I believe that the relief requested in the Cash Management Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, it is my opinion that the Cash Management Motion should be approved.

F.     **Debtors' <u>Emergency</u> Motion for Entry of an Order Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (II) Continue Employee Benefits Programs, (the "<u>Wages Motion</u>").**

17.     Pursuant to the Wages Motion, the Debtors seek entry of an order authorizing the Debtors to (a) pay all prepetition wages, salaries, other compensation, and reimbursable expenses, and (b) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto.

18.     As of the Petition Date, the Debtors employ a workforce of approximately 9,000 individuals, including 2,981 full-time employees (the "<u>Full-Time Employees</u>"), 5,857 part-time

employees (the "Part-Time Employees"), and 2 independent contractors (the "Independent Contractors", and together with the Full-Time Employees and Part-Time Employees, the "Employees").  8,091 Employees are compensated on an hourly basis, and approximately 747 are salaried.  On occasion, the Debtors also supplement their workforce with temporary employees (the "Temporary Employees").

19.     The Employees include personnel who are intimately familiar with the Debtors' business, processes, and systems, and possess unique skills and experience with the core business segments of the Debtors.  Many of these Employees have developed relationships with customers and vendors that are essential to the Debtors' business.  Without the continued, uninterrupted services of the Employees, the Debtors' business operations will be halted and the administration of the estates materially impaired.

20.     The Debtors seek authority to:  (a) pay and honor certain prepetition claims relating to, among other things: Wages and Withholding Obligations; Reimbursable Expenses; Health and Welfare Coverage and Benefits; a Workers' Compensation Program and a Workers' Compensation Insurance Policy; the 401(k) Plan, Deferred Compensation Plan, and other retiree benefits; Paid Leave Benefits; Severance Obligations, and certain other benefits that the Debtors have provided in the ordinary course (collectively, the "Employee Compensation and Benefits"); and (b) pay all costs related to or on account of the Employee Compensation and Benefits.

21.     Pursuant to the Wages Motion, the Debtors seek authority to continue honoring their Severance Obligations and any obligations under their bonus programs only with respect to Employees who are not "insiders" as that term is defined in 11 U.S.C. § 101(31).  To the extent the Debtors wish to award bonuses to insiders, such relief will be sought pursuant to a separate motion.  The Debtors believe such programs are necessary to properly motivate the Employees

to outperform, which will maximize value for all stakeholders.  I understand that "insiders" (as the term is defined in section 101(31) of the Bankruptcy Code) of the Debtors are excluded from the relief requested in the Wages Motion with respect to any bonus programs.

22.     The vast majority of the Employees rely on their compensation and benefits to pay their daily living expenses.  These workers will be unfairly harmed if the Debtors are not permitted to continue paying compensation and providing health and other benefits during these chapter 11 cases.  Additionally, after the COVID-19 pandemic caused the Debtors to temporarily close restaurants or operate off-premise-only dining, in recent months the Debtors were forced to furlough many their Employees.  As the Debtors reopen their restaurants in accordance with government guidelines, the formerly furloughed Employees who return to work in dining rooms—and now have to adhere to additional safety protocols and other operational adjustments — should be afforded the assurance of full wages and benefit payments as they had previously. Retaining this staff also allows the Debtors to avoid significant additional costs associated with recruiting, hiring, and training new personnel.  Thus, the relief requested herein benefits the estate as it allows the Debtors to retain their skilled workforce, provide certainty to these Employees that they will receive full compensation and benefits despite these chapter 11 cases, and maintain the Debtors' reputation for exceptional customer service and employee satisfaction.

23.     I believe that the relief requested in the Wages Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, it is my opinion that the Wages Motion should be approved.

G.     **Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and (II) Honor Certain Prepetition Obligations Related Thereto (the "<u>Customer Programs Motion</u>")**

24.     Pursuant to the Customer Programs Motion, the Debtors seek entry of an order authorizing the Debtors to (a) maintain and administer their Customer Programs and (b) honor certain prepetition obligations related thereto.

25.     As owners, operators, or franchisors of hundreds of restaurants across the United States and around the globe, CPK has developed a variety of incentives, discounts, promotions, and related programs to attract customers and maintain positive customer relationships (collectively, the "<u>Customer Programs</u>").  These Customer Programs include gift cards, the CPK Reward Program, promotions, discounts, or other similar programs, many of which may periodically change on a seasonal or annual basis.  The Debtors' Customer Programs are a critical aspect of the Debtors' marketing strategy, with twenty-two percent of the Debtors revenues in 2019 attributable to the Customer Programs.  The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their brand.  Maintaining the goodwill of their customers is critical to the Debtors' ongoing operations in these chapter 11 cases and is necessary to maximize value for the benefit of all of the Debtors' stakeholders.  Continued use of the Customer Programs will also enable the Debtors to protect their customer base and revenue growth opportunities.  As of the Petition Date, the Debtors estimate that there are approximately $15,550,000 of prepetition obligations outstanding related to Customer Programs.  Consequently, the Debtors seek the authority to maintain and administer the Customer Programs in the ordinary course of business.

26.     I believe that the relief requested in the Customer Programs Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the

Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, it is my opinion that the Customer Programs Motion should be approved.

> **H.    Debtors' <u>Emergency</u> Motion for Entry of an Order Authorizing the Debtors to (I) Pay Their Obligations Under Prepetition Insurance Policies, (II) Continue to Pay Certain Brokerage Fees, (III) Renew, Supplement, Modify, or Purchase Insurance Coverage, and (IV) Enter Into New Financing Agreements in the Ordinary Court of Business (the "<u>Insurance Motion</u>").**

27.    Pursuant to the Insurance Motion, the Debtors seek entry of an order authorizing, but not requiring, the Debtors to (a) pay their obligations under prepetition insurance policies; (b) continue to pay certain brokerage fees; (c) renew, supplement, modify, or purchase insurance coverage in the ordinary course; and (d) enter into new premium financing agreements in the ordinary course of business.

28.    In the ordinary course of business, the Debtors maintain approximately eighteen insurance policies (collectively, the "<u>Insurance Policies</u>") that are administered by various third-party insurance carriers (collectively, the "<u>Insurance Carriers</u>").  The Insurance Policies provide coverage for, among other things, the Debtors' property, general liability, umbrella coverage, automobile liability, automobile excess liability, business liability, trade name restoration, foreign commercial, crime, terrorism, cyber liability, employed lawyers professional liability, excess liability, employers' liability, and directors' and officers' liability.  All of the Insurance Policies are essential to the ongoing operation of the Debtors' businesses.  The aggregate annual premium for the Insurance Policies is approximately $2.7 million plus applicable taxes and surcharges.

29.    The Debtors' Insurance Policies are essential to the preservation of the value of the Debtors' business, properties, and assets.  I understand that, in many cases, the insurance coverage provided by the Insurance Policies is required by diverse regulations, laws, and

contracts. Failure to make the payments required to maintain the Debtors' Insurance Policies could have a significant negative impact on the Debtors' operations. Further, given the size, complexity, and evolving nature of the Debtors' business, it is essential that the Debtors maintain the flexibility to renew, amend, supplement, rollover, extend, finance, or purchase insurance policies and pay attendant premiums, deductibles, self-insured retentions, brokers' fees, and related expenses, as applicable, in the ordinary course of business.

30.     I believe that the relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, it is my opinion that the Insurance Motion should be approved.

**I.      Debtors' <u>Emergency</u> Motion for Entry of an Order Authorizing the Payment of Taxes and Fees (the "<u>Taxes Motion</u>").**

31.     Pursuant to the Taxes Motion, the Debtors seek entry of an order authorizing the Debtors to remit and pay Taxes and Fees without regard to whether such obligations accrued or arose before or after the Petition Date, including those obligations subsequently determined upon audit or otherwise to be owed for periods prior to the Petition Date.

32.     In the ordinary course of business, the Debtors collect, withhold, and incur sales taxes, use taxes, state business franchise taxes, income taxes, unemployment taxes, and property taxes, as well as other governmental taxes, fees, and assessments (collectively, the "<u>Taxes and Fees</u>"). The Debtors remit the Taxes and Fees to various federal, state, and local governments, including taxing and licensing authorities (collectively, the "<u>Authorities</u>"). Taxes and Fees are remitted and paid by the Debtors through checks and electronic funds transfers that are processed through their banks and other financial institutions.

33.     The Debtors pay the Taxes and Fees to the Authorities on a periodic basis, remitting them monthly, quarterly, semi-annually, or annually depending on the nature and incurrence of a particular Tax or Fee.  From time to time, the Debtors also receive tax credits for overpayments or refunds in respect of Taxes or Fees.  The Debtors use these credits in the ordinary course of business to offset against future Taxes or Fees, or have such amounts refunded to the Debtors.

34.     The Debtors seek authority to make such payments with respect to Taxes and Fees where:  (a) Taxes and Fees accrued or incurred postpetition and Taxes and Fees for so-called "straddle" periods;[2] (b) Taxes and Fees accrued or were incurred prepetition but were not paid prepetition or were paid in an amount less than actually owed; (c) payments were made prepetition by the Debtors and were lost or otherwise not received in full by any of the Authorities, which may give rise to interest or other penalties; and (d) Taxes and Fees incurred for prepetition periods become due and payable after the commencement of these chapter 11 cases.

35.     The Debtors believe that any failure to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways, including:  (a) the Authorities may initiate audits of the Debtors, which would unnecessarily divert the Debtors' attention from the restructuring process; (b) the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that would harm the estates; and (c) in certain instances, the Debtors' directors and officers could be subject to claims of personal

---

[2]     Claims for so-called "straddle" Taxes and Fees may be entitled to administrative claim treatment pursuant to Section 503(b)(1)(B). Because the Debtors could be subject to late payment penalties and interest in the event they do not pay such "straddle" Taxes and Fees and a court ultimately concludes that such taxes are entitled to administrative treatment, the Debtors are seeking the authority to pay such "straddle" Taxes and Fees as they become due under applicable law. The Debtors reserve their rights with respect to the proper characterization of such "straddle" Taxes and Fees and to seek reimbursement of any portion of a payment that was made that ultimately is not entitled to administrative or priority treatment.

liability, which would likely distract those key individuals from their essential duties related to the Debtors' restructuring. Unpaid Taxes and Fees may result in penalties, the accrual of interest, or both. Lastly, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and such funds may not constitute property of the Debtors' estates.

36. I believe that the relief requested in the Taxes Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, it is my opinion that the Taxes Motion should be approved.

**J.      Debtors' <u>Emergency</u> Motion for Entry of an Order Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock (the "<u>Equity Trading Motion</u>").**

37. Pursuant to the Equity Trading Motion, the Debtors seek entry of an Order (a) approving certain notification and hearing procedures related to certain transfers of, or declarations of worthlessness with respect to CPK Parent Inc.'s stock or any Beneficial Ownership therein (any such record or Beneficial Ownership, the "<u>Common Stock</u>"), as detailed in the Procedures; (b) directing that any purchase, sale, other transfer of, or declaration of worthlessness with respect to Beneficial Ownership of Common Stock in violation of the Procedures shall be null and void *ab initio*; and (c) granting related relief.

38. The Debtors currently estimate that, as of the end of their fiscal year ended December 29, 2019, they had approximately $46.8 million of general business credit carryforwards, and approximately $4.4 million of federal NOLs (collectively, and together with certain other tax attributes, the "<u>Tax Attributes</u>"). The Debtors further estimate that they may generate additional Tax Attributes in the 2020 tax year. The Tax Attributes are potentially of

significant value to the Debtors and their estates because the Debtors may be able to carry forward certain Tax Attributes to offset future taxable income or utilize the Tax Attributes to offset any taxable income generated by transactions consummated during these chapter 11 cases (or, in the case of tax credits, to offset any associated tax liabilities). Accordingly, the value of the Tax Attributes will inure to the benefit of all of the Debtors' stakeholder.

39. To maximize the use of the Tax Attributes and enhance recoveries for the Debtors' stakeholders, the Debtors seek limited relief that will enable them to closely monitor certain transfers of Beneficial Ownership of Common Stock and certain worthless stock deductions with respect to Beneficial Ownership of Common Stock so as to be in a position to act expeditiously to prevent such transfers or worthlessness deductions, if necessary, with the purpose of preserving the Tax Attributes. By establishing and implementing such Procedures, the Debtors will be in a position to object to "ownership changes" that threaten their ability to preserve the value of their Tax Attributes for the benefit of the estates.

40. The Procedures are necessary and appropriate to enforce the automatic stay and, critically, to preserve the value of the Tax Attributes for the benefit of the Debtors' estates. Under sections 382 and 383 of the IRC, certain transfers of, or declarations of worthlessness with respect to, Beneficial Ownership of Common Stock prior to the consummation of a chapter 11 plan could cause the termination or limit the use of the Tax Attributes. The Tax Attributes described above may provide the potential for material future tax savings (including in post-emergence years) or other tax structuring possibilities in these chapter 11 cases. The termination or limitation of the Tax Attributes could be materially detrimental to all parties in interest. Granting the relief requested will preserve the Debtors' flexibility in operating the Debtors' businesses during the pendency of these chapter 11 cases and implementing an exit plan that

makes full and efficient use of the Tax Attributes and maximizes the value of the Debtors' estates.

41.     Additionally, the Procedures do not bar all transfers of, or declarations of worthlessness with respect to, Beneficial Interests of Common Stock.  The Debtors seek to establish procedures only to monitor those types of transactions that would pose a serious risk under the ownership change test pursuant to sections 382 and 383 of the IRC, and to preserve the Debtors' ability to seek substantive relief if it appears that a proposed transfer or declaration of worthlessness could jeopardize the Debtors' utilization of the Tax Attributes.  Because of the Tax Attributes' importance to the Debtors' restructuring, and thus all parties in interest, the benefits of implementing the Procedures outweigh subjecting a limited number of transfers to the Procedures.

42.     I believe that the relief requested in the Equity Trading Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, it is my opinion that the Equity Trading Motion should be approved.

**K.     Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Lien Claimants, (B) 503(B)(9)Claimants, and (C) PACA Clamants, and (II) Confirming Administrative Expense Priority of Outstanding Orders (the "<u>Trade Claimants Motion</u>").**

43.     Pursuant to the Trade Claimants Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to pay in the ordinary course of business certain prepetition claims held by (i) Lien Claimants in an aggregate amount up to $750,000, (ii) 503(b)(9) Claimants in an aggregate amount up to $3.6 million, and (iii) PACA Claimants in an aggregate amount up to $2.0 million; and (b) confirming the administrative expense priority status of Outstanding Orders.

44.     As of the Petition Date, the Debtors estimate they owe approximately $10.6 million on account of all accounts payable to the Debtors' trade creditors.  By the Lien Claimants Motion, the Debtors are only seeking authority to pay an amount necessary to preserve the value of their estates, which shall not exceed $5.85 million on an interim basis and $6.35 million on a final basis.

45.     ***Lien Claimants.***   The Debtors routinely engage a number of third parties, including shippers, equipment manufacturers, contractors, repair technicians, and other service providers (collectively, the "Lien Claimants"), that may be able to assert and perfect liens, including shipper's liens, mechanic's liens, construction liens, and other similar liens, against the Debtors' property if the Debtors fail to pay for the goods or services rendered.

46.     The Lien Claimants perform a number of services for the Debtors, including the shipment of goods from the Debtors' vendors and the construction and servicing of equipment and facilities, supplies, and products that are essential to the Debtors' enterprise.  The Debtors regularly make improvements and repairs to their properties and certain equipment used in the operation of their businesses.  As such, the Debtors request the services and labor of the Lien Claimants, including certain subcontractors, to make regular improvements and repairs to the Debtors' equipment or ship goods on behalf of the Debtors' vendors.  With the Debtors' required ongoing service, repair, and maintenance obligations of their venues and equipment and shipping needs, the Debtors depend on continuing business relationships with and services provided by their Lien Claimants.  Failure to pay amounts owed to these parties when due could result in, among other things, Lien Claimants asserting liens against certain of the Debtors' assets under applicable state law, which could prevent the Debtors from maximizing recoveries for all stakeholders in these chapter 11 cases.

18

47.     The Debtors believe that as of the Petition Date, they owe approximately $750,000 on account of prepetition Lien Claims, all of which will come due within the first 21 days of these chapter 11 cases.

48.     ***The 503(b)(9) Claimants.***  The Debtors have received certain goods from various vendors (collectively, the "503(b)(9) Claimants") within the twenty-day period immediately preceding the Petition Date, thereby giving rise to claims that are accorded administrative priority under section 503(b)(9) of the Bankruptcy Code.   Some of the 503(b)(9) Claimants supply goods to the Debtors that are especially crucial to the Debtors' ongoing daily operations, including fresh produce, meats, and other foodstuffs necessary for the daily operation of the Debtors' restaurants.  The critical nature of the need for the regular shipment of fresh ingredients cannot be overstated—without the regular flow of these goods, the Debtors' business will effectively starve.  In addition, many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts.  Instead, the Debtors obtain goods from such claimants on an order-by-order basis.

49.     Accordingly, a 503(b)(9) Claimant may refuse to supply new orders in the event payment is not received, which may interrupt the Debtors' supply chain, in some cases quite significantly, and disrupt the Debtors' business during their stay in chapter 11.  Further, certain Section 503(b)(9) Claimants may impose stricter payment terms or reduce the Debtors' existing trade credit—or demand payment in cash-on-delivery—which will negatively affect the Debtors' already limited liquidity.   In light of these consequences, the Debtors have concluded that payment of the 503(b)(9) Claimants is essential to avoid disruptions to the Debtors' operations. The estimated amounts owing to the 503(b)(9) Claimants set forth below pale in comparison to

the potential damage to the Debtors' businesses if the Debtors' operations were to experience significant disruption.

50.     The Debtors believe that as of the Petition Date, they owe approximately $3.6 million on account of prepetition 503(b)(9) Claims, approximately $3.1 million of which will come due within the first 21 days of these chapter 11 cases.

51.     ***PACA Claimants***.  Certain of the goods delivered to the Debtors may qualify as "perishable agricultural commodit[ies]" under the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a et seq. ("PACA").  PACA's definition of "perishable agricultural commodity" generally includes "fresh fruits and fresh vegetables of every kind and character."[3]  Under PACA, eligible produce suppliers and their agents (the "PACA Claimants,") are the beneficiaries of a statutory trust in all of the buyer's perishable agricultural commodity inventory or other derivatives of perishable agricultural commodities, the products derived therefrom, and the proceeds related to any sale of the commodities or products (collectively, the "PACA Trust Assets").[4]  PACA Trust Assets are preserved as a non-segregated floating trust and may be commingled with non-trust assets.  The Statutory Trust beneficiaries may be able to assert claims (the "PACA Claims") that are entitled to receive payment ahead of other creditors of the Debtors.

52.     The Debtors estimate that as of the Petition Date, the PACA Claimants may be able to assert PACA Claims in an amount up to $2.0 million, all of which will come due within the first 21 days of these chapter 11 cases.

---

[3]     7 U.S.C § 499a(b)(4).

[4]     See 7 U.S.C. § 499e(c)(2).

53.     ***Customary Trade Terms***.  Subject to the Court's approval, the Debtors intend to pay the Trade Claims only to the extent necessary to preserve the value of their estates.  To that end, in return for paying a portion of the Trade Claims, the Debtors propose that they be authorized to require the Trade Claimants to provide favorable trade terms for the postpetition procurement of their goods and services.  The Debtors seek authorization to condition payment of Trade Claims upon each Trade Claimant's agreement to (a) continue—or recommence—providing goods and services to the Debtors in accordance with trade terms (including credit limits, pricing, timing of payments, availability, and other terms) at least as favorable to the Debtors as those in place during the twelve months prior to the Petition Date, or as otherwise agreed by the Debtors in their reasonable business judgment, and (b) agree that they shall not be permitted to cancel on less than ninety days' notice any contract or agreement pursuant to which they provide services to the Debtors.

54.     ***Outstanding Orders***.  Before the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (collectively, the "Outstanding Orders").  To avoid becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition.  To prevent any disruption to the Debtors' business operations, and given that goods delivered after the Petition Date are afforded administrative expense priority under section 503(b) of the Bankruptcy Code, the Debtors seek an order (a) granting administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the acceptance of goods subject to Outstanding Orders and (b) authorizing the Debtors to satisfy such obligations in the ordinary

course of business.   Absent such relief, however, the Debtors may be required to expend substantial time and effort reissuing the Outstanding Orders to provide certain suppliers with assurance of such administrative priority status.   The disruption to the continuous and timely flow of critical goods to the Debtors would force the Debtors to potentially halt operations and production, damage the Debtors' business reputation, erode the Debtors' customer base, and ultimately lead to a loss of revenue, all to the detriment of the Debtors and their creditors.

55.     I believe that the relief requested in the Trade Claimants Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.   Accordingly, it is my opinion that the Trade Claimants Motion should be approved.

**L.     Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Determining Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, and (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests (the "<u>Utilities Motion</u>").**

56.     Pursuant to the Utilities Motion, the Debtors seek entry of an order (a) determining that the proposed adequate assurance of payment for future utility services is within the meaning of section 366 of the Bankruptcy Code, (b) prohibiting utility providers from altering, refusing, or discontinuing services, and (c) approving the Debtors' proposed procedures for resolving disputes surrounding the proposed adequate assurance

57.     In connection with the operation of their business in the United States, the Debtors obtain electricity, natural gas, telecommunications, water, waste management (including sewer and trash), internet, and other similar services (collectively, the "<u>Utility Services</u>") from a number of utility providers or brokers (the "<u>Utility Providers</u>") to facilitate their business operations.   For some of the Debtors' locations, certain Utility Services are billed directly to the Debtors' landlords or third parties, such as Engie, and passed through to the

22

Debtors as part of the Debtors' lease or service agreements, as applicable.  In the aggregate, the Debtors pay approximately $816,063.68 million each month for Utility Services, calculated as a historical average payment for the three-month period ending June 30, 2020, where available, and the most recently available three-month period where such data is unavailable. Additionally, the Debtors have provided certain of the Utility Providers with approximately $212,405.11 in prepetition cash deposits as set forth in the Utility Services List.  To the best of my knowledge, there are no defaults or arrearages with respect to the undisputed invoices for prepetition Utility Services.

58.     The Debtors intend to satisfy postpetition obligations owed to the Utility Providers in the ordinary course of business and in a timely manner.  The Debtors believe that cash held by the Debtors, generated in the ordinary course of business, as well as cash made available to the Debtors under the DIP Facilities will provide sufficient liquidity to pay the Utility Providers for Utility Services in accordance with their prepetition practice during the pendency of their chapter 11 cases.  To provide additional assurance of payment, the Debtors propose to deposit $359,907.62 into a segregated account, which represents an amount equal to approximately one-half of the Debtors' average monthly cost of Utility Services, which will be held in a segregated account at Bank of America.

59.     Additionally, the Debtors seek approval of their proposed Adequate Assurance Procedures.  These procedures set forth a streamlined process for Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while allowing the Debtors to continue their operations uninterrupted.

60.     Uninterrupted Utility Services are essential to the Debtors' ongoing business operations and, hence, the overall success of these chapter 11 cases.  The Utility Services are

essential for the Debtors to maintain and operate their restaurants and corporate offices throughout the United States to provide functions essential for daily operations.  These restaurants and offices require electricity, water, natural gas, telecommunications, and other Utility Services in order to operate.  Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted, and such disruption would jeopardize the Debtors' ability to successfully operate and manage their reorganization efforts.

61.     I believe that the relief requested in the Utilities Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, it is my opinion that the Utilities Motion should be approved.

**<u>Exhibit B</u>**

**Corporate Organizational Structure**



## Exhibit C

**Restructuring Support Agreement**

*Execution Version*

---

*CPK Holdings Inc., et al.,*

### RESTRUCTURING SUPPORT AGREEMENT

**July 29, 2020**

THIS RESTRUCTURING SUPPORT AGREEMENT AND THE DOCUMENTS ATTACHED HERETO COLLECTIVELY DESCRIBE A PROPOSED RESTRUCTURING OF THE COMPANY PARTIES THAT WILL BE EFFECTUATED THROUGH FILING CHAPTER 11 CASES IN THE BANKRUPTCY COURT.

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF THE COMPANY PARTIES. ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.

THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES THERETO. ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.

      This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 16.02, this "**Agreement**") is made and entered into as of July 29, 2020 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (iv) of this preamble, collectively, the "**Parties**"):[1]

    i.    CPK Holdings, Inc., a company incorporated under the Laws of Delaware ("**CPK**"), and each of its Affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Stakeholders (the Entities in this clause (i), each a "**Company Party**," and collectively, the "**Company Parties**");

    ii.    the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Priority First Lien Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (ii), collectively, the "**Consenting Priority First Lien Lenders**");

    iii.    the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, First Lien Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (iii), collectively, the "**Consenting First Lien Lenders**", and together with the Consenting Priority First Lien Lenders, the "**Consenting Lenders**"); and

    iv.    the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Equity Interests that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (collectively, the "**Consenting Sponsors**," and, collectively with the Consenting Priority First Lien Lenders and the Consenting First Lien Lenders, the "**Consenting Stakeholders**").

## *RECITALS*

      **WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit B** hereto (the "**Restructuring Term Sheet**" and, such transactions as described in this Agreement and the Restructuring Term Sheet, the "**Restructuring Transactions**");

      **WHEREAS**, the Company Parties intend to implement the Restructuring Transactions in accordance with the terms set forth in this Agreement by commencing voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter**

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

**11 Cases**"), in accordance with the terms and conditions set forth herein and in the Restructuring Term Sheet;

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet;

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**     *Definitions and Interpretation.*

**1.01.**   <u>Definitions</u>.  The following terms shall have the following definitions:

"**Affiliate**" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

"**Agent**" means any administrative agent, collateral agent, or similar Entity under the Priority First Lien Credit Agreement or the First Lien Credit Agreement, including any successors thereto.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 16.02 (including the Restructuring Term Sheet, which is expressly incorporated herein and made a part of this Agreement).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any plan, inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, asset sale, share issuance, recapitalization, plan of reorganization, share exchange, business combination, joint venture, or similar transaction involving any one or more Company Parties or any Affiliates of the Company Parties or the debt, equity, or other interests in any one or more Company Parties or any Affiliates of the Company Parties, in each case that is an alternative to one or more of the Restructuring Transactions.

"**Assumed Executory Contract and Unexpired Lease List**" means the list, as determined by the Debtors or Reorganized CPK, as applicable, of executory contracts and unexpired leases (with proposed cure amounts) that will be assumed by Reorganized CPK, which list shall be included in the Plan Supplement *provided* that the obligation that the Deferred Compensation Plan

be included on the Assumed Executory Contract and Unexpired Lease List is conditioned in all respects on the terms of the Restructuring Support Agreement and entry of the Financing Order contemplated by this Agreement and the Restructuring Support Agreement.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court in which the Chapter 11 Cases are commenced or another United States Bankruptcy Court with jurisdiction over the Chapter 11 Cases.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company**" means CPK and all of its Affiliates.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Company Party, including the Priority First Lien Claims, the First Lien Claims, the Second Lien Claims, and the Equity Interests.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the confirmation order with respect to the Plan.

"**Consenting First Lien Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Lenders Fees and Expenses**" has the meaning set forth in Section 16.20.

"**Consenting Lender Released Parties**" has the meaning set forth in Section 14.01(a).

"**Consenting Lender Releasing Parties**" has the meaning set forth in Section 14.01(a).

"**Consenting Priority First Lien Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Sponsors**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meaning correlative thereto.

"**CPK**" has the meaning set forth in the preamble to this Agreement.

"**Debtors**" means the Company Parties that commence the Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Disclosure Statement Order**" means the order of the Bankruptcy Court approving the Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code and modification of the automatic stay to permit the Consenting Stakeholders to provide any notices, including notices of termination, with respect to this Agreement in accordance with the terms hereof or thereof, which Disclosure Statement Order will be in accordance with this Agreement and the Definitive Documents.

"**Effective Date**" means the date on which all conditions to consummation of the Plan have been satisfied in full or waived, in accordance with the terms of the Plan, and the Plan becomes effective.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Exit L/C Lenders**" has the meaning set forth in the Restructuring Term Sheet.

"**Financing Documents**" means any debtor-in-possession financing credit agreement and any other documentation necessary to effectuate the incurrence of a debtor-in-possession financing facility, which shall in each case be consistent with the Restructuring Term Sheet.

"**Financing Order**" means any order entered in the Chapter 11 Cases authorizing debtor in possession financing or the use of cash collateral (whether interim or final), which shall be consistent with the Restructuring Term Sheet.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file in consultation with the Required Consenting Lenders.

"**First Lien Agent**" means Jefferies Finance LLC, acting through such of its affiliates or branches as it may designate, in its capacity as administrative agent and collateral agent under the First Lien Credit Agreement, or any successor administrative agent or collateral agent as permitted by the terms set forth in the First Lien Credit Agreement.

"**First Lien Claims**" means any Claim on account of the Obligations under the First Lien Credit Agreement, including but not limited to any fees provided thereunder.

"**First Lien Credit Agreement**" means that certain First Lien Credit and Guarantee Agreement, as amended, supplemented, or otherwise modified from time to time, dated as of August 23, 2016, by and among CPK Holdings Inc., as holdings, the subsidiary guarantors from time to time party thereto, the First Lien Lenders, California Pizza Kitchen, Inc., as borrower, and the First Lien Agent.

"**First Lien Credit Agreement Documents**" means, collectively, the First Lien Credit Agreement and all other agreements, documents, and instruments related thereto, including any guarantee agreements, forbearance agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents.

"**First Lien Credit Agreement Facilities**" means, collectively, the First Lien Revolving Credit Facility and the First Lien Term Loan Facility.

"**First Lien Credit Agreement Lenders**" means, collectively, the banks, financial institutions, and other lenders party to the First Lien Credit Agreement from time to time, each solely in their capacity as such.

"**First Lien Credit Agreement Loans**" means the loans outstanding under the First Lien Credit Agreement.

"**First Lien Loans**" means loans outstanding under the First Lien Credit Agreement.

"**First Lien Revolving Credit Facility**" means that certain senior secured revolving credit facility provided for under the First Lien Credit Agreement in the original aggregate principal amount of $30,000,000 between certain of the Company Parties as obligors or guarantors and the lenders thereto.

"**First Lien Term Loan Facility**" means that certain senior secured term loan facility provided for under the First Lien Credit Agreement in the original aggregate principal amount of $290,000,000 between certain of the Company Parties as obligors or guarantors and the lenders thereto.

"**FTI**" means FTI Consulting, Inc., restructuring and financial advisor to certain of the Consenting Lenders.

"**Gibson Dunn**" means Gibson, Dunn & Crutcher LLP, counsel to certain of the Consenting Lenders.

"**Governance Documents**" means the organizational and governance documents for Reorganized CPK and its subsidiaries and affiliates, including without limitation, certificates of incorporation, certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements (or equivalent governing documents), as applicable.

"**Interest**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit C**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Milestones**" means the milestones set forth in the Restructuring Term Sheet.

"**New First Lien Exit L/C Facility**" has the meaning set forth in the Restructuring Term Sheet.

"**New First Lien Term Loan Exit Facility**" has the meaning set forth in the Restructuring Term Sheet.

"**New Second Lien Term Loan Exit Facility**" has the meaning set forth in the Restructuring Term Sheet.

"**Obligations**" means those obligations outstanding under either (a) the Priority First Lien Credit Agreement, (b) the First Lien Credit Agreement, or (c) the Second Lien Credit Agreement.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transfer**" means a Transfer of any Company Claims/Interests that meets the requirements of Section 8.01.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 8.01.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means the joint plan of reorganization filed by the Debtors under chapter 11 of the Bankruptcy Code that embodies the Restructuring Transactions in accordance with the terms of this Agreement.

"**Plan Effective Date**" means the occurrence of the Effective Date of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court.

"**Priority First Lien Agent**" means Jefferies Finance LLC, acting through such of its affiliates or branches as it may designate, in its capacity as administrative agent and collateral agent under the Priority First Lien Credit Agreement, or any successor administrative agent or collateral agent as permitted by the terms set forth in the Priority First Lien Credit Agreement.

"**Priority First Lien Claims**" means any Claim on account of the Obligations under the Priority First Lien Credit Agreement, including but not limited to any fees provided thereunder.

"**Priority First Lien Credit Agreement**" means that certain Priority First Lien Credit and Guarantee Agreement, as amended, supplemented, or otherwise modified from time to time, dated as of April 27, 2020, by and among CPK Holdings Inc., as holdings, the subsidiary guarantors from time to time party thereto, the First Lien Lenders from time to time parties hereto, California Pizza Kitchen, Inc., as borrower, and the Priority First Lien Agent.

"**Priority First Lien Credit Agreement Documents**" means, collectively, the Priority First Lien Credit Agreement and all other agreements, documents, and instruments related thereto, including any guarantee agreements, forbearance agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents.

"**Priority First Lien Credit Agreement Lenders**" means, collectively, the banks, financial institutions, and other lenders party to the Priority First Lien Credit Agreement from time to time.

"**Priority First Lien Delayed Draw Term Loans**" means those certain super priority term loans provided for under the Priority First Lien Credit Agreement and available upon the execution of this Agreement in the original aggregate principal amount of $15,000,000 between certain of the Company Parties as obligors or guarantors and the lenders thereto.

"**Priority First Lien Initial Term Loans**" means those certain super priority term loans provided for under the Priority First Lien Credit Agreement in the original aggregate principal amount of $15,000,000 between certain of the Company Parties as obligors or guarantors and the lenders thereto.

"**Priority First Lien Loans**" means loans outstanding under the Priority First Lien Credit Agreement.

"**Priority First Lien Rolled Up Loans**" means certain First Lien Loans in the aggregate amount of $30,000,000, which shall be repurchased and cancelled and deemed exchanged for Priority First Lien Loans under the Priority First Lien Credit Agreement.

"**Priority First Lien Term Loan Facility**" means, collectively, the Priority First Lien Initial Term Loans, the Priority First Lien Delayed Draw Term Loans, and the Priority First Lien Rolled Up Loans.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Related Party**" means, with respect to any person or Entity, each of, and in each case in its capacity as such, the current and former directors, managers, officers, equityholders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed or advised accounts, funds or other entities, investment advisors, sub-advisors, and/or managers, predecessors, participants, successors, assigns, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors of such person or Entity.

"**Release Revocation Event**" has the meaning set forth in Section 15.02.

"**Release Revocation Notice**" has the meaning set forth in Section 15.01(a).

"**Releases**" means the releases contained in Section 14 of this Agreement.

"**Released Claim**" means, with respect to any Releasing Party, any Claim, cause of action, or any other debt, obligation, right, suit, damage, judgment, action, remedy, or liability that is released by such Releasing Party pursuant to this Agreement.

"**Releasing Parties**" has the meaning set forth in Section 14.01.

"**Reorganized CPK**" means CPK, as reorganized pursuant to and under the Restructuring Transactions or any successor thereto.

"**Required Consenting First Lien Lenders**" means, as of the relevant date, Consenting First Lien Lenders holding at least 50.01% of the aggregate outstanding principal amount of First Lien Loans that are held by Consenting First Lien Lenders.

"**Required Consenting Lenders**" means, as of the relevant date, each of (i) the Required Consenting Priority First Lien Lenders and (ii) the Required Consenting First Lien Lenders.

"**Required Consenting Priority First Lien Lenders**" means, as of the relevant date, Consenting Priority First Lien Lenders holding at least 50.01% of the aggregate outstanding principal amount of Priority First Lien Loans that are held by Consenting Priority First Lien Lenders.

"**Required Consenting Sponsors**" means, as of the relevant date, Consenting Sponsors holding at least 50.01% of the aggregate Equity Interests.

"**Required Consenting Stakeholders**" means the Required Consenting Lenders and the Required Consenting Sponsors.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Revocation Cure Period**" has the meaning set forth in Section 15.01(a).

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Second Lien Claims**" means any Claim on account of the Obligations under the Second Lien Credit Agreement.

"**Second Lien Credit Agreement**" means that certain Second Lien Credit and Guarantee Agreement, as amended, supplemented, or otherwise modified from time to time, dated as of August 23, 2016, by and among CPK Holdings Inc., as holdings, the subsidiary guarantors from time to time party thereto, the Second Lien Lenders, California Pizza Kitchen, Inc., as borrower, and the Second Lien Agent.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means all solicitation materials in respect of the Plan together with the Disclosure Statement, which Solicitation Materials shall be in accordance with this Agreement and the Definitive Documents.

"**Sponsor**" means Golden Gate Private Equity, Inc. and their respective Controlled Affiliates.

"**Sponsor Consent Right**" means each Consenting Sponsor's right to consent or approve any of the Definitive Documents (or any amendments, modifications, or supplements to the Definitive Documents) and shall apply solely to the extent any Definitive Document modifies or affects the release, exculpation, injunction, or indemnification provisions related to such Consenting Sponsor as identified in the Restructuring Term Sheet and this Agreement and implemented pursuant to the Plan; *provided* that any ruling by a Court of competent jurisdiction permitting a holder of Company Claims or Interests other than a Consenting Stakeholder to opt out of releases in the Plan shall not give rise to any Sponsor Consent Right.

"**Sponsor Released Parties**" has the meaning set forth in Section 14.01(a).

"**Sponsor Releasing Parties**" has the meaning set forth in Section 14.01(a).

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 12.01, 12.02, 12.03, 12.04, or 12.05.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit D**.

**1.02.**   Interpretation.  For purposes of this Agreement:

(a)      in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)      capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)      unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, amended and restated, supplemented, or otherwise modified or replaced from time to time in accordance with this Agreement; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(d)      unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(e)      the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(f)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(g)      references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(h)      the use of "include" or "including" is without limitation, whether stated or not;

(i)      the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 16.10 other than counsel to the Company Parties; and

(j)      unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

**Section 2.      *Effectiveness of this Agreement.*** This Agreement shall become effective and binding upon each of the Parties according to its terms as of 12:00 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)      each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(b)      holders (i) of at least 66.67% of the aggregate outstanding principal amount Priority First Lien Loans and (ii) constituting more than half of the aggregate number of Priority First Lien Lenders shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties as of the date hereof; *provided*, the signature pages executed by Consenting Priority First Lien Lenders shall be treated in accordance with Section 16.21 and shall be delivered to (i) other Consenting Stakeholders in a redacted form that removes the details of such Consenting Stakeholders' holdings of Priority First Lien Claims and (ii) the Company, the advisors to the Company, and Gibson Dunn in an unredacted form; *provided* further that such recipients shall not disclose the unredacted signature pages and shall keep such unredacted signature pages in strict confidence, except as required by Law;

(c)      holders (i) of at least 66.67% of the aggregate outstanding principal amount First Lien Loans and (ii) constituting more than half of the aggregate number of First Lien Lenders shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties as of the date hereof; *provided*, the signature pages executed by Consenting First Lien Lenders shall be treated in accordance with Section 16.21 and shall be delivered to (i) other Consenting Stakeholders in a redacted form that removes the details of such Consenting Stakeholders' holdings of First Lien Claims and (ii) the Company, the advisors to the Company, and Gibson Dunn in an unredacted form; *provided* further that such recipients shall not disclose the unredacted signature pages and shall keep such unredacted signature pages in strict confidence, except as required by Law;

(d)      each of the Consenting Sponsors shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(e)      counsel to the Company Parties shall have given notice to counsel to the Consenting Stakeholders in the manner set forth in Section 16.10 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2(a) have occurred; and

(f)      the Company Parties have paid the Consenting Lenders Fees and Expenses through the Agreement Effective Date in full in cash.

**Section 3.      *Definitive Documents.***

**3.01.** The Definitive Documents governing the Restructuring Transactions shall include the following:  (a) this Agreement; (b) all documents implementing and achieving the Restructuring Transactions, including any documents in connection with any "first day" or "second

day" pleadings and all orders sought pursuant thereto; (c) the Plan; (d) the Confirmation Order; (e) the Disclosure Statement; (f) the Solicitation Materials; (g) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials; (h) the Financing Order and the Financing Documents; (i) any exit financing documents, including, without limitation, the New First Lien Term Loan Exit Facility, the New Second Lien Term Loan Exit Facility, and the New First Lien Exit L/C Facility; (j) all documents in connection with the Alternative Transaction (as defined in the Restructuring Term Sheet); (k) the Governance Documents; (l) the Plan Supplement; (m) such other definitive documentation relating to a recapitalization or restructuring of the Company Parties as is necessary or desirable to consummate the Restructuring Transactions; and (n) any other material exhibits, schedules, amendments, modifications, supplements, appendices or other documents and/or agreements relating to any of the foregoing.

3.02.   The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion subject to the consent rights in Section 3.03 below.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 13.

3.03.   Consent Rights Regarding Definitive Documents.   Each of the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall otherwise be consistent with this Agreement in all respects and otherwise in form and substance (i) acceptable to the Company Parties, (ii) acceptable to the Required Consenting Lenders and the Required DIP Lenders (as defined in the Restructuring Term Sheet), (iii) with respect to the New First Lien Exit L/C Facility or the New First Lien L/C Facility, acceptable to the Exit L/C Lenders or the L/C Lenders (as defined in the Restructuring Term Sheet), as applicable, and (iv) solely to the extent required to give effect to the Sponsor Consent Right, acceptable to the Required Consenting Sponsors.

**Section 4.**   ***Commitments of the Consenting Stakeholders.***

4.01.   General Commitments, Forbearances, and Waivers.

(a)   During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, as applicable, pursuant to this Agreement to use commercially reasonable efforts to:

(i)   support the Restructuring Transactions in accordance with the terms and conditions of this Agreement, and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(ii)   use commercially reasonable efforts to oppose any party or person from taking any actions contemplated in Section 4.02(b);

(iii)    forbear from exercising remedies on account of its Collateral (as defined in the Priority First Lien Credit Agreement Documents and First Lien Credit Agreement Documents) other than as contemplated by this Agreement or as otherwise permitted by the Financing Order and the Definitive Documents; *provided* that the forbearance set forth in this Section 4.01(a)(iii) shall not constitute a waiver with respect to any default or event of default under the Priority First Lien Credit agreement or the First Lien Credit Agreement and shall not bar the Consenting Lenders from filing a proof of claim or taking action to establish the amount of such claim; upon termination of this Agreement, the agreement of the Consenting Lenders to forbear from exercising rights and remedies in accordance with this Section 4.01(a)(iii) shall immediately terminate without the requirement of any demand, presentment or protest of any kind, all of which the Company Parties hereby waive;

(iv)    in the case of the Consenting Lenders, give any notice, order, instruction, or direction to the applicable Agents necessary to give effect to the Restructuring Transactions, so long as the Consenting Lenders are not required to incur any out-of-pocket costs or provide any indemnity in connection therewith;

(v)    refrain from directly or indirectly seeking, supporting, negotiating, engaging in any discussions relating to, or soliciting any Alternative Restructuring Proposal;

(vi)    not prevent any Company Party from complying with its obligations under this Agreement and each of the Definitive Documents;

(vii)    in the case of the Consenting Sponsors, not (x) pledge, encumber, assign, sell, or otherwise transfer, offer, or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, directly or indirectly, any portion of its right, title, or interests in any of its shares, stock, or other interests in any Company Party or any subsidiary thereof or Permitted Liens provided under the Priority First Lien Credit Agreement or First Lien Credit Agreement, in each case, other than direct or indirect transfers of interests in the Consenting Sponsors, (y) acquire any outstanding indebtedness of any Company Party or any subsidiary thereof, or (z) make any worthless stock deduction for any tax year ending on or prior to the Plan Effective Date, in the case of each of (x), (y), and (z), to the extent such pledge, encumbrance, assignment, sale, acquisition, declaration of worthlessness or other transaction or event may impair or adversely affect any of the tax attributes of the Company Parties or any of their subsidiaries (including under section 108 or 382 of the Internal Revenue Code of 1986 (as amended)); and

(viii)    negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party.

(b)    During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, that it shall not directly or indirectly:

(i)    object to, delay, impede, or take any action that is reasonably likely to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)    propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii)    file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is materially inconsistent with this Agreement or the Plan;

(iv)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v)    exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of Claims against or Interests in the Company Parties;

(vi)    with respect to the Consenting Sponsors, object to, delay, or impede the payment of the Consenting Lenders Fees and Expenses; or

(vii)    object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code; *provided, however*, that nothing in this Agreement shall limit the right of any party hereto to exercise any right or remedy provided under this Agreement, the Confirmation Order or any other Definitive Document.

**4.02.**    <u>Commitments with Respect to Chapter 11 Cases</u>.

(a)    During the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting Stakeholder, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)    vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)    to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases of the Released Parties set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iii)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above.

(b)    During the Agreement Effective Period, each Consenting Stakeholder, in respect of each of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action that is reasonably likely to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement and the Consenting Stakeholders' rights hereunder; provided; however, that nothing in this Agreement shall limit the right of any party hereto to exercise any right or remedy provided under this Agreement, the Confirmation Order or any other Definitive Document.

(c)      Notwithstanding any other provision of this Agreement, nothing in this Agreement shall require the Consenting Lenders to incur any expenses, liabilities, or other obligations, or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to any Consenting Lender or its Affiliates in each case that is not reimbursable under this Agreement.

**Section 5.      *Additional Provisions Regarding the Consenting Stakeholders' Commitments.*** Notwithstanding anything contained in this Agreement, and notwithstanding any delivery of a consent or vote to accept the Plan by any Consenting Stakeholder, or acceptance of the Plan by any class of creditors, nothing in this Agreement shall:

(a)      affect the ability of any Consenting Lender to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee);

(b)      impair or waive the rights of any Consenting Lender to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions;

(c)      prevent any Consenting Stakeholder from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement;

(d)      obligate a Consenting Lender to deliver a vote to support the Plan or prohibit a Consenting Lender from withdrawing such vote, in each case from and after the Termination Date (other than a Termination Date as a result of the occurrence of the Effective Date); provided that, upon the withdrawal of any such vote after the Termination Date (other than a Termination Date as a result of the occurrence of the Effective Date), such vote shall be deemed void ab initio, and such Consenting Lender shall have the opportunity to change its vote;

(e)      (i) prevent any Consenting Lender from taking any action that is required by applicable Law, (ii) require any Consenting Lender to take any action that is prohibited by applicable Law or to waive or forego the benefit of any applicable legal privilege, or (iii) require any Consenting Lender to incur any expenses, liabilities, or other obligations, or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations unless reimbursable under this Agreement;

(f)      prevent any Consenting Lender by reason of this Agreement or the Restructuring Transactions from making, seeking, or receiving any regulatory filings, notifications, consents, determinations, authorizations, permits, approvals, licenses, or the like;

(g)      impair or waive the rights of any Consenting Lender to assert or raise any objection not prohibited under this Agreement;

(h)      prohibit any Consenting Lender from taking any action that is not inconsistent with this Agreement; or

(i)      be construed to prohibit any Consenting Lender from appearing as a party in interest in any matter to be adjudicated in a Chapter 11 Case, so long as such appearance and positions advocated in connection therewith are not inconsistent with this Agreement and are not for the

purpose of delaying, interfering, impeding, or taking any other action to delay, interfere, or impede, directly or indirectly, the Restructuring Transactions.

**Section 6.**     *Commitments of the Company Parties.*

**6.01.**   <u>Affirmative Commitments</u>.  Except as set forth in Section 7, during the Agreement Effective Period, the Company Parties agree to:

(a)     support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement, including by timely complying with the Milestones;

(b)     not take any action, and not encourage any other person or entity to, take any action, directly or indirectly, that would reasonably be expected to breach or be inconsistent with this Agreement, or take any other action, directly or indirectly, that would reasonably be expected to interfere with the acceptance or implementation of the Restructuring Transactions, this Agreement, or the Plan;

(c)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, support and take all steps reasonably necessary and desirable to address and resolve any such impediment;

(d)     use commercially reasonable efforts to obtain any and all required governmental, regulatory (including self-regulatory) and/or third-party approvals for the Restructuring Transactions;

(e)     negotiate in good faith and execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(f)     actively oppose and object to the efforts of any person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions (including, if applicable, the filing of timely filed objections or written responses) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring Transactions;

(g)     consult and negotiate in good faith with the Consenting Lenders and their advisors regarding the execution and implementation of the Restructuring Transactions;

(h)     upon reasonable request of the Consenting Lenders, inform the advisors to the Consenting Lenders as to (i) the status and progress of the Restructuring Transactions, including progress in relation to the negotiations of the Definitive Documents, and (ii) the status of obtaining any necessary or desirable authorizations (including any consents) from each Consenting Lender, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body, or any stock exchange;

(i)     inform Gibson Dunn as soon as reasonably practicable after becoming aware of: (i) any event or circumstance that has occurred, or that is reasonably likely to occur (and if it did so

occur), that would permit any Party to terminate, or that would result in the termination of, this Agreement; (ii) any matter or circumstance that they know to be a material impediment to the implementation or consummation of the Restructuring Transactions; (iii) any notice of any commencement of any material involuntary insolvency proceedings, legal suit for payment of debt, or securement of security from or by any person in respect of any Company Party or any subsidiary or affiliate of a Company Party; (iv) a breach of this Agreement (including a breach by any Company Party); and (v) any representation or statement made or deemed to be made by any of them under this Agreement that is or proves to have been materially incorrect or misleading in any respect when made or deemed to be made;

(j)      use commercially reasonable efforts to maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized;

(k)      not (i) operate their business outside the ordinary course, taking into account the Restructuring Transactions, without the consent of the Required Consenting Lenders or (ii) transfer any material asset or right of the Company Parties or any material asset or right used in the business of the Company Parties to any person or entity outside the ordinary course of business without the consent of the Required Consenting Lenders;

(l)      use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(m)      provide Gibson Dunn a review period of (i) at least three (3) calendar days (or such shorter period as is necessary or appropriate under the circumstances) prior to the date when the Company intends to file any Definitive Document and, (ii) at least one (1) calendar day prior to the date when the Company intends to file any another material pleading with the Bankruptcy Court;

(n)      provide the Consenting Lenders with a schedule of all the Company's existing employee bonus obligations, employee retention plans, employee incentive plans, or other similar obligations on the Agreement Effective Date; and

(o)      pay the Consenting Lenders' Fees and Expenses in accordance with this Agreement.

**6.02.**   Negative Commitments.   Except as set forth in Section 7, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      take any action that is inconsistent with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in, this Agreement and the Definitive Documents;

(c)      modify either the Plan or the Definitive Documents, in whole or in part, in a manner that is inconsistent with this Agreement and the Definitive Documents;

(d)      file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement, the Definitive Documents or the Plan; or

(e)      (i) make or declare any dividends, distributions, or other payments on account of its equity or membership interests, applicable, (ii) directly or indirectly make or procure any payments to the Sponsors or any of their respective Affiliates, or (iii) make any transfers (whether by dividend, distribution, or otherwise) to any direct or indirect parent entity or shareholder of the Company or any of their respective Affiliates.

**Section 7.**      *Additional Provisions Regarding Company Parties' Commitments.*

**7.01.**      Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law; *provided*, however, that to the extent any such action or inaction is materially inconsistent with this Agreement or would be deemed to constitute a breach hereunder, including a determination to pursue an Alternative Restructuring Proposal, the Company Parties shall provide Gibson Dunn with at least two (2) Business Days' advance written notice prior to when it or they intend to take such action or inaction.  Notwithstanding anything to the contrary herein, each Consenting Lender reserves its rights to challenge any action taken in the exercise of such fiduciary duties.

**7.02.**      Notwithstanding anything to the contrary in this Agreement (but subject to Section 7.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals in good faith and consistent with applicable fiduciary duties; and (e) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Company Party (including any Consenting Stakeholder), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals.  At all times prior to the date on which the Company Parties enter into a definitive agreement in respect of an Alternative Restructuring Proposal, the Company Parties shall (i) provide Gibson Dunn and FTI with (a) reasonably prompt updates on the status of any discussions regarding an Alternative Restructuring Proposal (including without limitation any financing proposals) and (b) a copy of any written offer or proposal for such Alternative Restructuring Proposal (including without limitation any financing proposals) within two (2) Business Days of the Company Parties' or their advisors' receipt of such offer or proposal (it being understood that such period may be shortened to the extent there are exigent circumstances) and (ii) consult with the Consenting Lenders regarding the Alternative Restructuring Proposals.

**7.03.**    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8.**    *Transfer of Interests and Securities.*

**8.01.**    During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest; provided that, notwithstanding the previous sentence, a Consenting Lender may Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) to the extent:

(a)    in the case of any Company Interests, the authorized transferee is one of (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (ii) a non-U.S. person located outside the United States in an offshore transaction (as such terms are used in Regulation S under the Securities Act), (iii) an institutional accredited investor (as defined in the Rules), or (iv) a Consenting Stakeholder; and

(b)    either (i) the transferee executes and delivers to counsel to the Company Parties and Gibson Dunn, at or before the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Lender and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company Parties and Gibson Dunn at or before the time of the proposed Transfer.

**8.02.**    Upon compliance with the requirements of Section 8.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 8.01 shall be void *ab initio*.

**8.03.**    This Agreement shall in no way be construed to preclude the Consenting Lenders from acquiring additional Company Claims/Interests; *provided*, *however*, that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Lender be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders) and (b) such Consenting Lender must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties and Gibson Dunn within five (5) Business Days of such acquisition.

**8.04.**    This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply

and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

8.05.   Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (a) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee under Section 8.01; and (c) the Transfer otherwise is a Permitted Transfer under Section 8.01.   To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

8.06.   Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 9.**   ***Representations and Warranties of Consenting Stakeholders.***   Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement and as of the Effective Date:

(a)   it is the beneficial or record owner of the face amount of the Company Claims/Interests, as applicable, or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests other than those reflected in, such Consenting Stakeholder's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8);

(b)   it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)   such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)   it has the full power to vote, approve changes to all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law; and

(e)     solely with respect to the Consenting Sponsors, the Consenting Sponsors, after having conducted reasonable due diligence, have disclosed to Gibson Dunn all known material related-party transactions between the Company Parties and any Sponsor Released Party and, other than the transactions disclosed by the Consenting Sponsors or the Company Parties to Gibson Dunn (the "***Disclosed Transactions***"), the Consenting Sponsors are not aware of any transactions, actions or omissions that are reasonably likely to give rise to a material and colorable claim against the Sponsor Released Parties.

(f)     solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person and is located outside the United States (as such terms are used in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Sponsor in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 10.     *Representations and Warranties of Company Parties.*** Each Company Party severally, and not jointly, represents and warrants that, as of the date such Company Party executes and delivers this Agreement and as of the Effective Date:

(a)     to the best of its knowledge having made all reasonable inquiries, no order has been made, petition presented, or resolution passed for the winding up of or appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager, or other similar officer in respect of it or any other Company Party or affiliate or subsidiary of any Company Party, and no analogous procedure has been commenced in any jurisdiction; *provided, however*, that this Section 10 does not apply to any proceeding commenced in connection with filing the Chapter 11 Cases;

(b)     within the 120 days preceding the execution of this Agreement, no Company Party has made any dividend, distribution, or other payment (other than ordinary course expense reimbursement) to any Sponsor or any of their respective Affiliates on account of its equity, other than as has been disclosed in writing to the advisors for the Consenting Lenders prior to the execution of this Agreement;

(c)     except as expressly provided for in this Agreement, it has not entered into any arrangement (including with any individual creditor thereunder, irrespective of whether it is or is to become a Consenting Stakeholder) with respect to a Restructuring Transaction on terms that are inconsistent with the Restructuring Term Sheet; and

(d)     the Company Parties, after having conducted reasonable due diligence, have disclosed to Gibson Dunn all known material related-party transactions between the Company Parties and any Sponsor Released Party, and, other than the Disclosed Transactions, the Company Parties are not aware of any other transactions, actions, or omissions that are reasonably likely to give rise to a material and colorable claim against any Sponsor Released Party.

**Section 11.**   *Mutual Representations, Warranties, and Covenants*.   Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, on the Effective Date:

(a)     it is validly existing and in good standing (or the equivalent thereof) under the Laws of the state or jurisdiction of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)     except as expressly provided in this Agreement, the Restructuring Term Sheet, the Plan, the Confirmation Order, and the Bankruptcy Code, no consent or approval is required by any governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange, third party, or any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement, other than any such consent or approval which has been obtained, provided, or otherwise satisfied prior to the Agreement Effective Date and which consent or approval has not been subsequently revoked;

(c)     the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)     except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)     except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 12.**   *Termination Events*.

**12.01.**   <u>Consenting Lender Termination Events</u>.   This Agreement may be terminated (a) with respect to all Consenting Priority First Lien Lenders, by the Required Consenting Priority First Lien Lenders; and (b) with respect to all Consenting First Lien Lenders, by the Required Consenting First Lien Lenders (solely as it relates to such Consenting Lenders, as applicable, and not as it relates to this Agreement itself) by the delivery to the Company Parties of a written notice in accordance with Section 16.10 hereof upon the occurrence of the following events, other than as contemplated by the Restructuring Transactions:

(a)     the (i) breach (other than an immaterial breach) in any respect by a Company Party of any of the undertakings, representations, warranties, or covenants of the Company Parties set forth in this Agreement or (ii) failure of the Company Parties to act in a manner materially consistent with this Agreement, in each case which breach or failure remains uncured (to the extent curable) for five (5) Business Days after the terminating Consenting Lenders transmit a written notice in accordance with Section 16.10 hereof identifying such breach;

(b)      the making public, modification, amendment, or filing of any Definitive Documents without the consent of the Required Consenting Lenders in accordance with this Agreement;

(c)      any Company Party's (i) withdrawal of the Plan, (ii) public announcement of its intention not to support the Restructuring Transactions, or (iii) filing, public announcement, or execution of a definitive written agreement with respect to an Alternative Restructuring Proposal;

(d)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions, including the Plan and (ii) either (A) such ruling, judgment, or order has been issued at the request of the Company Parties in contravention of any obligations set forth in this Agreement or (B) remains in effect for fifteen (15) Business Days after such terminating Consenting Lenders transmit a written notice in accordance with Section 16.10 hereof detailing any such issuance; *provided*, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(e)      the failure to meet a Milestone after two (2) Business Day's written notice of such failure, which has not been extended or waived in a manner consistent with this Agreement;

(f)      prior to the Petition Date, the occurrence of any Default or Event of Default (as defined in the Priority First Lien Credit Agreement and the First Lien Credit Agreement, respectively) under the Priority First Lien Credit Agreement and the First Lien Credit Agreement (to the extent not otherwise waived or subject to a forbearance agreement) other than any Default or Event of Default that results from entry into this Agreement;

(g)      the occurrence of any event of default under the Financing Order or Financing Documents, as applicable;

(h)      the occurrence of the Maturity Date (as defined in the Financing Documents) without the Plan having been substantially consummated;

(i)      entry of a Financing Order or order authorizing the use of cash collateral or postpetition financing that is not acceptable to the DIP Lenders and the Required Consenting Lenders;

(j)      if (A) any Financing Order is reversed, stayed, dismissed, vacated, reconsidered, modified, or amended in a manner that is inconsistent with this Agreement and without the consent of the Required Consenting Lenders and the Required DIP Lenders or (B) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed and the Company Parties have failed to object timely to such motion;

(k)      the Bankruptcy Court enters an order denying confirmation of the Plan;

(l)      if (A) the Confirmation Order is reversed, stayed, dismissed, vacated, reconsidered, modified, or amended in a manner that is inconsistent with this Agreement and without the consent of the Required Consenting Lenders and the Required DIP Lenders or (B) a motion for

reconsideration, reargument, or rehearing with respect to any such order has been filed and the Company Parties have failed to object timely to such motion;

(m)     the filing of a motion, application, or adversary proceeding, by any Company Party (or if any Company supports any such motion, application or adversary proceeding filed or commenced by any third party) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Consenting Lenders' Priority First Lien Claims or First Lien Claims or asserting any other cause of action against the Consenting Lenders or with respect or relating to such Priority First Lien Claim, First Lien Claim, the Priority First Lien Credit Agreement, the First Lien Credit Document or any Loan Document (as such term is defined in the Priority First Lien Credit Agreement, the First Lien Credit Document of any Loan Document) or the prepetition liens securing the Prepetition First Lien Claims and the First Lien Claims;

(n)     entry of an order that grants relief terminating, annulling, or materially modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset that, to the extent such relief were granted, would have a material adverse effect on the consummation of the Restructuring Transactions;

(o)     the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Lenders and Required DIP Lenders), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, (iii) dismissing one or more of the Chapter 11 Cases, (iv) terminating exclusivity under section 1121 of the Bankruptcy Code, or (v) rejecting this Agreement;

(p)     if, without the prior consent of the Required Consenting Lenders and the Required DIP Lenders, any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, except as contemplated by this Agreement, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the preceding subsection (i), (iii) files an answer admitting the material allegations of a petition filed against it in any such proceeding; (iv) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official with respect to any Company Party or for a substantial part of such Company Party's assets, (v) makes a general assignment or arrangement for the benefit of creditors, or (vi) takes any corporate action for the purpose of authorizing any of the foregoing;

(q)     an order is entered by the Bankruptcy Court granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of the Company Parties that would materially and adversely affect any Company Party's ability to operate its business in the ordinary course;

(r)     the delivery of a notice by the Company Parties pursuant to Section 7.01 hereof;

(s)      failure by the Company Parties to pay the fees and expenses set forth in Section 16.20 of this Agreement as and when required, subject to applicable Law; provided, however, that the Effective Date shall not occur until and unless the fees and expenses set forth in Section 16.20 have been paid in full;

(t)      any Company Party files any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with this Agreement and such motion has not been withdrawn within five (5) Business Days of receipt by the Company Parties of written notice from the Required Consenting Lenders that such motion or pleading is inconsistent with this Agreement;

(u)      a Company Party (including its advisors) or Sponsor Released Party has intentionally withheld any material information or failed to provide any material information regarding any related-party transactions, payment or other transfer of value between a Company Party and a Sponsor Released Party that is reasonably likely to give rise to a material and colorable claim against a Sponsor; or

(v)      if after conducting due diligence, the Consenting Lenders discover information that is reasonably likely to give rise to a material and colorable claim against any of the Sponsor Released Parties that is not otherwise subject to the Sponsor Released Party Release contemplated by Section 14 hereof.

**12.02.**  Company Party Termination Events.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 16.10 hereof upon the occurrence of any of the following events:

(a)      the breach in any material respect by the Required Consenting Lenders of any provision set forth in this Agreement that remains uncured for a period of five (5) Business Days after the receipt by the Required Consenting Lenders of notice of such breach, including:

(i)      Any direct or indirect objection, delay, impediment, or other action taken by the Required Consenting Lenders or Agent against any Financing Document filed by any Company Party in the Bankruptcy Court; *provided* that such Financing Document is materially consistent with this Agreement and the Plan;

(ii)      Any direct or indirect objection, delay, impediment, or other action taken by the Required Consenting Lenders or Agent opposing entry of any Definitive Document and/or consummation of any Restructuring Transaction; *provided* that such Restructuring Transaction is materially consistent with this Agreement and the Plan; or

(iii)      The failure of the Required Consenting Lenders to negotiate in good faith, support, and implement a Restructuring Transaction.

(b)      three (3) Business Days after receipt by Gibson Dunn of a notice by the Company Parties pursuant to Section 7.01; or

(c)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for

fifteen (15) Business Days after such terminating Company Party transmits a written notice in accordance with Section 16.10 hereof detailing any such issuance; *provided*, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement.

**12.03.** Consenting Sponsor Termination Events. This Agreement may be terminated as to only the Consenting Sponsors by the Consenting Sponsor by the delivery to the Company Parties of a written notice in accordance with Section 16.10 hereof upon the occurrence of the following events, other than as contemplated by the Restructuring Transactions:

(a) any Definitive Document adversely modifies or affects the release, exculpation, or injunction provisions related to the Consenting Sponsors as provided in the Restructuring Term Sheet or this Agreement; *provided* that, any ruling by a court of competent jurisdiction permitting a holder of Company Claims/Interests other than a Consenting Stakeholder to opt out of the releases in the Plan shall not give rise to any termination right; or

(b) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions, including the Plan and (ii) either (A) such ruling, judgment, or order has been issued at the request of the Company Parties in contravention of any obligations set forth in this Agreement or (B) remains in effect for fifteen (15) Business Days after such terminating Consenting Sponsor transmit a written notice in accordance with Section 16.10 hereof detailing any such issuance; *provided*, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement.

**12.04.** Mutual Termination. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following: (a) the Required Consenting Stakeholders; and (b) each Company Party.

**12.05.** Automatic Termination. This Agreement shall terminate automatically without any further required action or notice immediately after the occurrence of the Effective Date.

**12.06.** Effect of Termination.

(a) Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action. Upon the occurrence of a Termination Date prior to the Effective Date any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; *provided*, *however*, any Consenting Stakeholder withdrawing or changing its vote pursuant to this

Section 12.06 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court. Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder. No purported termination of this Agreement shall be effective under this Section 12.06 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 12.02(a) or Section 12.02(c). Nothing in this Section 12.06 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 12.02(a). For the avoidance of doubt, the automatic stay arising pursuant to section 362 of the Bankruptcy Code shall be deemed waived or modified for purposes of delivering any notices or exercising any rights hereunder.

(b)     For the avoidance of doubt and notwithstanding anything to the contrary in this Agreement, (i) in the event the Consenting Sponsors terminate this Agreement (other than as set forth in (ii) below) the Company Parties and the Consenting Lenders shall remain parties to this Agreement and this Agreement shall remain in full force and effect as between the Company Parties and the Consenting Lenders and (ii) in the event that the Consenting Sponsors terminate this Agreement in accordance with and pursuant to Section 12.03(a) as a result of a breach of this Agreement by the Consenting Lenders, the Required Consenting Lenders and the Company Parties shall have the option (which shall be exercised by delivery of a writing to the Company Parties or Consenting Lenders, as applicable, including via e-mail) to (i) determine that the Consenting Lenders or Company Parties will continue remaining Parties to this Agreement in pursuit and support of the Plan and the Restructuring Transactions, or (ii) terminate this Agreement in accordance with Sections 12.01 or 12.02, as applicable. For the avoidance of doubt, upon termination of this Agreement by the Consenting Sponsors, any releases of the Consenting Sponsors granted or provided for under this Agreement shall terminate without requiring any further action by the Company Parties or Consenting Lenders and regardless of whether the Required Consenting Lenders exercise the continuation option in this Section 12.06(b).

## Section 13.     *Amendments and Waivers*.

(a)     This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 13.

(b)     This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing (email being sufficient) signed by each of: (i) each Company Party; (ii) the Required Consenting Lenders; (iii) with respect to the New First Lien Exit L/C Facility or the New First Lien L/C Facility, the Exit L/C Lenders or the L/C

Lenders, as applicable; and (iv) solely with respect to any modification, amendment, waiver, or supplement that materially and adversely affects the Sponsor Consent Right or the provisions related thereto, the Required Consenting Sponsors; *provided* that any modification, amendment, waiver or supplement that affects the material terms of the Restructuring Term Sheet shall require the consent of (i) Consenting Priority First Lien Lenders holding at least 65% of the aggregate outstanding principal amount of the Priority First Lien Claims that are held by Consenting Priority First Lien Lenders and (ii) Consenting First Lien Lenders holding at least 65% of the aggregate outstanding principal amount of the First Lien Claims that are held by Consenting First Lien Lenders.

(c)     Any proposed modification, amendment, waiver or supplement that does not comply with this Section 13 shall be ineffective and void *ab initio*.

(d)     Notwithstanding anything herein to the contrary, (i) any modification, amendment or supplement to the definitions of "Required Consenting Lenders," "Required Consenting Priority First Lien Lenders," or "Required Consenting First Lien Lenders" shall require the written consent of each Consenting Lender, as applicable, included in such definition, and (ii) any modification, amendment, waiver, or supplement that treats or affects any Consenting Lender in a manner that is materially and adversely disproportionate, on an economic basis, to the manner in which any of the other Consenting Lenders are treated (after taking into account each of the Consenting Lenders' respective Company Claims/Interests and the recoveries contemplated hereunder), or that requires any Consenting Lender to incur any expenses liabilities, or other obligations, or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations, shall require the written consent of each such affected Consenting Lender.

(e)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 14.**     *Releases*

**14.01.**  Releases.

(a)     On the Agreement Effective Date and subject in all respects to Section 15 hereof, each Consenting Lender, on behalf of itself and its predecessors, successors and assigns, subsidiaries and affiliates that it has express written authority to bind, managed accounts or funds, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, in each case in their capacity as such (collectively, the "**Consenting Lender Releasing Parties**"), expressly and generally releases, acquits, and discharges (the "**Sponsor Released Party Release**")

(i) the Consenting Sponsors, (ii) the Consenting Sponsors' respective predecessors, successors and assigns, subsidiaries, affiliates (in each case of the foregoing, except the Company Parties), managed accounts or funds or investment vehicles, and each of such entities' respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals of the Consenting Sponsors, and (iii) the current and former directors of the Company Parties, in each case with respect to the foregoing (i), (ii), and (iii), in their capacity as such (collectively, the "**Sponsor Released Parties**"), from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Company Parties, any claims asserted or assertable on behalf of any holder of any claim against or interest in the Company Parties and any claims asserted or assertable on behalf of any other entity, whether known or unknown, foreseen or unforeseen, matured or unmatured, in law, equity, contract, tort, or otherwise, by statute or otherwise, that any of the Consenting Lender Releasing Parties (whether individually or collectively) ever had, now has, or may have, based on or relating to, or in any manner arising from, in whole or in part, (A) the Company Parties, the Company Parties' restructuring efforts, intercompany transactions, (B) the Restructuring Transactions and any matters resolved, satisfied, and/or settled through the Restructuring Transactions and this Agreement, including the negotiation, formulation, or preparation of the Restructuring Transactions and this Agreement, and (C) any other act or omission, transaction, agreement, event, or other occurrence, in each case relating to any of the foregoing (A) or (B) taking place on or before the execution of this Agreement.

On the Agreement Effective Date and subject in all respects to Section 15 hereof, each of the Sponsor Released Parties, on behalf of itself and its predecessors, successors and assigns, subsidiaries and affiliates that it has express written authority to bind (in each case of the foregoing, except the Company), managed accounts or funds or investment vehicles, and each of such entities' respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, in each case in their capacity as such (collectively, the "**Sponsor Releasing Parties**" and together with the Consenting Lender Releasing Parties, the "**Releasing Parties**"), expressly and generally releases, acquits, and discharges (i) the other applicable Sponsor Released Parties, (ii) each Consenting Lender and each Agent, and (iii) each Consenting Lender's and each Agent's respective predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, and each of such entities' respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals of each Agent and each Consenting Lender, in each case with respect to the foregoing (i) through (iii), in their capacity as such ((ii) and (iii) of the foregoing, collectively, the "**Consenting Lender Released Parties**"), from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Company, any claims asserted or assertable on behalf of any holder of any claim against or interest in the Company and any claims asserted or assertable on behalf of any other entity, whether known or unknown, foreseen or unforeseen, matured or unmatured, in law, equity, contract, tort, or otherwise, by statute or otherwise, that any of the Sponsor Releasing Parties (whether individually or collectively) ever had, now have, or may

have, based on or relating to, or in any manner arising from, in whole or in part, (A) the Company Parties, the Company Parties' restructuring efforts, intercompany transactions, (B) the Restructuring Transactions and any matters resolved, satisfied, and/or settled through the Restructuring Transactions and this Agreement, including the negotiation, formulation, or preparation of the Restructuring Transactions and this Agreement, and (C) any other act or omission, transaction, agreement, event, or other occurrence, in each case relating to any of the foregoing (A) or (B) taking place on or before the execution of this Agreement.

(b)     Subject to Section 14.01(e) and Section 15 hereof, each of the Releasing Parties knowingly grants the Release notwithstanding that each Releasing Party may hereafter discover facts in addition to, or different from, those which either such Releasing Party now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and each Releasing Party expressly waives any and all rights that such Releasing Party may have under any statute or common law principle that would limit the effect of the Release to those claims actually known or suspected to exist as or before the Agreement Effective Date.

(c)     Subject to Section 14.01(e) and Section 15 hereof, in connection with their agreement to the foregoing Release, each of the Releasing Parties knowingly and voluntarily waive and relinquish any and all provisions, rights, and benefits conferred by any law of the United States or any state or territory of the United States, or principle of common law, which governs or limits a person's release of unknown claims, comparable or equivalent to California Civil Code § 1542, which provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

(d)     Each of the Releasing Parties hereby represents and warrants that it has access to adequate information regarding the terms of this Agreement, the scope and effect of the Release, and all other matters encompassed by this Agreement, to make an informed and knowledgeable decision with regard to entering into this Agreement.  Each of the Releasing Parties further represents and warrants that it has not relied upon any other Party (or such other Party's financial or legal advisors) in deciding to enter into this Agreement and has instead made its own independent analysis and decision to enter into this Agreement.

(e)     Notwithstanding anything to the contrary in this Section 14 or the Restructuring Term Sheet, (i) the releases set forth herein shall not release (A) any obligations of any party or entity under this Agreement, the Plan, or any Definitive Document, or (B) any claim or liability arising out of or related to any act or omission of a Released Party that constitutes actual fraud, or willful misconduct, and (ii) other than with respect to the Disclosed Transactions, the Sponsor Released Parties Release shall not be effective and the Sponsor Released Parties shall not be released (and any all claims liabilities, and causes of action subject to such Release shall be retained and reserved in all respects) for any claims or liability with respect to which a Company Party (including its advisors) or Sponsor Released Party intentionally withheld any information or failed to provide any information regarding any related-party transactions, payment or other

transfer of value between a Company Party and a Sponsor Released Party that is reasonably likely to give rise to a material and colorable claim.

**Section 15.**      *Revocation of Release*.

      **15.01.**   Revocation of Release.

      (a)      Subject to Section 15.03 hereof, a Release provided in Section 14 hereof shall be deemed revoked if any Party receives a notice from any other Party (each, a "**Release Revocation Notice**") of the occurrence of a Release Revocation Event (as defined herein) and the recipient(s) of the Release Revocation Notice fails to cure such Release Revocation Event within five (5) business days of receipt of such Release Revocation Notice (the "**Revocation Cure Period**") or such Release Revocation Notice is not otherwise rescinded; *provided* that in the event the recipient(s) of a Release Revocation Notice disputes either the occurrence of a Release Revocation Event or the failure of the recipient(s) to cure the Release Revocation Event within the Revocation Cure Period, such recipient(s) shall have seven (7) business days from the expiration of the Revocation Cure Period to seek a determination by the Bankruptcy Court or such other court of competent jurisdiction having jurisdiction over such claim in accordance with this Agreement as to whether a Release Revocation Event occurred and was not cured within the Revocation Cure Period.

      **15.02.**   Release   Revocation   Event.      For   purposes   of   this   Agreement, a "**Release Revocation Event**" means any of the following:

      (a)      a breach by any Party (other than the Party seeking to revoke the Release) of any material representation, warranty, covenant, or other provision of this Agreement that gives rise to a termination right under this Agreement;

      (b)      this Agreement is terminated with respect to any of the Company Parties, including as a result of a Company Party's determination pursuant to Section 7.01 hereof;

      (c)      any Sponsor Released Party brings an action or claim that has been released pursuant to Section 14 against any Consenting Lender Released Party; or

      (d)      Notwithstanding the foregoing subsections (a) and (b) of this Section 15.02, if the economic outcome for the Required Consenting Lenders, the timing of the effective date of the Plan, and all other material terms as contemplated herein are substantially preserved, and the Company Parties and Consenting Lenders did not suffer any material loss or expend material out of pocket costs in connection with the event or circumstances giving rise to the Release Revocation Event, the foregoing subsections (a) and (b) shall not constitute a Release Revocation Event.

      **15.03.**   Effect of Revocation of Release.

      (a)      Revocation of a Release as a result of a Release Revocation Event as contemplated in subsections (b), (c), and (d) of this Section 15.03 shall result in a full and complete restoration of any and all claims, liabilities, and causes of action subject to such Release, and such Release

shall be void *ab initio*, in each case, to the extent contemplated in subsections (a), (b), (c), and (d) of this Section 15.03.

(b)     In the case of a Release Revocation Event under subsection (a) of Section 15.02 hereof, if the breaching Party is a Sponsor Released Party, the Release in Section 14.01(a) hereof shall be revoked with respect to all of the Sponsor Released Parties (and such Sponsor Released Parties shall no longer have the benefit of such Release), and if the breaching Party is a Consenting Lender, the Releases in Section 14.01(a) hereof shall be revoked solely with respect to such breaching Consenting Lender and its respective Consenting Lender Released Parties (and such Consenting Lender Released Parties shall no longer have the benefit of such Release).  Other than as set forth in this subsection (b) of Section 15.03 hereof, the revocation of any Release under subsection (a) of Section 15.01 hereof shall not operate as a revocation or, nor otherwise impair or affect, any other Release.

(c)     In the case of a Release Revocation Event under subsection (b) or (d) of Section 15.02 hereof, the Releases in Sections 14.01(a) hereof shall be revoked in their entireties.

(d)     In the case of a Release Revocation Event under subsection (c) of Section 15.02 hereof, the Releases granted by the Sponsor Releasing Parties in Section 14.01(a) hereof shall be revoked in their entirety.

**Section 16.    *Miscellaneous.***

**16.01.**  <u>Acknowledgement</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

**16.02.**  <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

**16.03.**  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable; provided however that this Section 16.03 shall not limit the right of any party hereto to exercise any right or remedy provided for in this Agreement (including the approval rights set forth in Section 2.03).

**16.04.**  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter

hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

**16.05.** GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Notwithstanding the foregoing consent to jurisdiction in either a state or federal court of competent jurisdiction in the State and County of New York, upon the commencement of the Chapter 11 Cases, each of the Parties hereby agrees that, if the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

**16.06.** TRIAL BY JURY WAIVER.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**16.07.** Execution of Agreement.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

**16.08.** Rules of Construction.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

**16.09.** Successors and Assigns; Third Parties.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  Other than with respect to the persons, advisors or other Entities released or otherwise referenced in Section 14 and Section 16.11 (and solely to the extent set forth in said Section 14 and Section 16.11), there are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

**16.10.** <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

    (a)    if to a Company Party, to:

        California Pizza Kitchen, Inc.
        12181 Bluff Creek Drive, 5th Floor
        Playa Vista, CA 90094
        Attention:  James Hyatt
        E-mail address:  jhyatt@cpk.com

        with copies to:

        Kirkland & Ellis LLP
        601 Lexington Avenue
        New York, New York 10022
        Attention:  Joshua Sussberg, P.C., Matthew Fagen, and Francis Petrie
        E-mail address:  joshua.sussberg@kirkland.com, matthew.fagen@kirkland.com, and francis.petrie@kirkland.com

    (b)    if to a Consenting Lender, to each Consenting Lender at the addresses or e-mail addresses set forth below the Consenting Lender's signature page to this Agreement (or to the signature page to a Joinder or Transfer Agreement in the case of any Consenting Lender that becomes a party hereto after the Agreement Effective Date):

        with a copy to (which shall not constitute notice):

        Gibson, Dunn & Crutcher LLP
        200 Park Avenue
        New York, New York 10166
        Attention:  David M. Feldman, J. Eric Wise, and Alan Moskowitz
        E-mail address:  dfeldman@gibsondunn.com, ewise@gibsondunn.com, and amoskowitz@gibsondunn.com

    (c)    if to a Consenting Sponsor, at the addresses or e-mail addresses set forth below the Consenting Sponsor's signature page to this Agreement:

with a copy to (which shall not constitute notice):

> Golden Gate Capital
> One Embarcadero Center, 39th Floor
> San Francisco, California 94111
> Attention:  Neale Attenborough and Stephen Oetgen
> E-mail address:  neale@goldengatecap.com; soetgen@goldengatecap.com

Any notice given by delivery, mail, or courier shall be effective when received.

    **16.11.**  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties, and without reliance on any statement of any other Party or Entity (or such other Party's or Entity's financial or legal advisors), other than such express representations, releases and other statements of the Parties set forth in Sections 9, 10 and 14.

    **16.12.**  <u>Enforceability of Agreement</u>.  The Parties hereby acknowledge and agree: (a) that the provision of any notice or exercise of termination rights under this Agreement is not prohibited by the automatic stay provisions of the Bankruptcy Code; (b) that they waive any right to assert that the exercise of any notice or termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising notice and termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required; (c) that they shall not take a position to the contrary of this Section 16.12 in the Bankruptcy Court or any other court of competent jurisdiction; and (d) they will not initiate, or assert in, any litigation or other legal proceeding that this Section 16.12 is illegal, invalid, or unenforceable, in whole or in part.

    **16.13.**  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason other than pursuant to Section 12.05 hereof, the Parties fully reserve any and all of their rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

    **16.14.**  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

    **16.15.**  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

**16.16.** <u>Reserved</u>.

**16.17.** <u>Remedies Cumulative</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

**16.18.** <u>Capacities of Consenting Stakeholders</u>. Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

**16.19.** <u>Email Consents</u>. Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 13, or otherwise, including a written approval by the Company Parties or any of the Required Consenting Stakeholders or Required DIP Lenders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

**16.20.** <u>Fees and Expenses.</u> Regardless of whether the Restructuring Transactions are consummated, the Company Parties shall promptly pay in cash all reasonable and documented fees and expenses of (a) (i) Gibson Dunn, as counsel to certain of the Consenting Lenders, and (ii) FTI, as financial advisor to certain of the Consenting Lenders, and (c) any consultants or other professionals retained by the Consenting Lenders represented by Gibson Dunn in connection with the Company Parties or the Restructuring Transactions with the consent of the Company Parties (not to be unreasonably withheld), in each case, in accordance with the engagement letters of such consultant or professional signed by the Company Parties, including, without limitation, any completion fees contemplated therein, and in each case, without further order of, or application to, the Bankruptcy Court but such consultant or professionals (collectively, the "**Consenting Lenders Fees and Expenses**"); *provided*, *however*, that simultaneously with the execution of this Agreement, the Company Parties shall pay all such unpaid Consenting Lenders Fees and Expenses incurred at any time prior to the Agreement Effective Date.

**16.21.** <u>Confidentiality and Publicity</u>. Other than as may be required by applicable Law and regulation or by any governmental or regulatory authority, no Party shall disclose to any person (including, for the avoidance of doubt, any other Consenting Stakeholder), other than legal, accounting, financial, and other advisors to the Company Parties and Consenting Lenders (who are under obligations of confidentiality to the Company Parties with respect to such disclosure, and, with respect to the advisors to the Company Parties, whose compliance with such obligations the Company Parties shall be responsible for), the name of, or the principal amount or percentage of the Priority First Lien Claims or First Lien Claims held by, any Consenting Lender or any of its respective subsidiaries (including, for the avoidance of doubt, any Priority First Lien Claims or First Lien Claims acquired pursuant to any Transfer), without the consent of such Consenting Lender. Any public filing of this Agreement, with the Bankruptcy Court or otherwise, and any

version of this Agreement shared with Consenting Stakeholders generally, shall omit the holdings of each individual Consenting Lender's signature page hereto or shall include such signature page only in redacted form with respect to the holdings of each Consenting Lender.  The Company Parties further agree that such information shall be redacted from "closing sets" or other representations of the fully executed Agreement, any Joinder or Transfer Agreement.  The Company Parties shall use commercially reasonable efforts to submit to Gibson Dunn all press releases, public filings, public announcements, or other communications with any news media, in each case, to be made by the Company Parties relating to this Agreement or the transactions contemplated hereby and any amendments thereof at least three (3) Business Days (it being understood that such period may be shortened to the extent there are exigent circumstances that require such public communication to be made to comply with applicable Law) in advance of release, will take such counsel's view with respect to such communications into account and shall not disseminate to any news media any press releases, public filings, public announcements, or other communications relating to this Agreement or the transactions contemplated hereby and any amendments thereof without first receiving the prior written consent of the Required Consenting Lenders. Nothing contained herein shall be deemed to waive, amend or modify the terms of any Confidentiality Agreement.

      **16.22.**  <u>Survival</u>. Notwithstanding any termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 16 and any Confidentiality Agreement shall survive such termination and shall continue in full force and effect.

      **16.23.**  <u>Damages</u>. Notwithstanding anything to the contrary in this Agreement, none of the Parties shall claim or seek to recover from any other Party on the basis of anything in this Agreement any punitive, special, indirect or consequential damages or damages for lost profits.

      **16.24.**  <u>Relationship Among Parties</u>. Notwithstanding anything to the contrary herein, the duties and obligations of the Consenting Stakeholders under this Agreement shall be several, not joint. None of the Consenting Stakeholders shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to each other, any Consenting Stakeholder, any Company Party, or any of the Company Party's respective creditors or other stakeholders, and there are no commitments among or between the Consenting Stakeholders, in each case except as expressly set forth in this Agreement.

      **16.25.**  <u>Other Interpretive Matters.</u>

      (a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:  (i) when calculating the period of time before which, within which, or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and, if the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day; (ii) all exhibits attached hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein; (iii) words imparting the singular number only shall include the plural and vice versa; (iv) the division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement; and (v) "Business Day" means

any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

(b)     The Company and Consenting Stakeholders have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

[*Signature Pages Follow*]

**Company Parties' Signature Page to**
**the Restructuring Support Agreement**

**CALIFORNIA PIZZA KITCHEN, INC.**
**CALIFORNIA PIZZA KITCHEN OF ANNAPOLIS, INC.**
**CPK HOLDINGS, INC.**
**CPK HOSPITALITY, LLC**
**CPK HUNT VALLEY, INC.**
**CPK MANAGEMENT COMPANY**
**CPK PARENT INC.**
**CPK SPIRITS, LLC**
**CPK TEXAS, LLC.**


By: _____

Name:

Title:

Authorized Signatory

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**[CONSENTING STAKEHOLDER]**

_____

Name:
Title:


Address:


E-mail address(es):

| _Aggregate Amounts Beneficially Owned or Managed on Account of:_ | |
|---|---|
| Priority First Lien Loan | |
| First Lien Loan | |
| Second Lien Loan | |
| Equity Interests | |

## EXHIBIT A

### Company Parties

CALIFORNIA PIZZA KITCHEN, INC.

CALIFORNIA PIZZA KITCHEN OF ANNAPOLIS, INC.

CPK HOLDINGS, INC.

CPK HOSPITALITY, LLC

CPK HUNT VALLEY, INC.

CPK MANAGEMENT COMPANY

CPK PARENT INC.

CPK SPIRITS, LLC

CPK TEXAS, LLC.

## **EXHIBIT B**

### **Restructuring Term Sheet**

# EXHIBIT C

## Form of Joinder

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among California Pizza Kitchen, Inc. ("**CPK**") and its Affiliates and subsidiaries bound thereto and the Consenting Stakeholders and agrees to be bound by the terms and conditions thereof to the extent the other Parties are thereby bound, and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date hereof and any further date specified in the Agreement.

Date Executed:

_____

Name:
Title:

Address:

E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| Priority First Lien Claims | |
| First Lien Claims | |
| Second Lien Claims | |

---

[1]   Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

## <u>EXHIBIT D</u>

**Provision for Transfer Agreement**

The undersigned ("**<u>Transferee</u>**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**<u>Agreement</u>**"),[1] by and among California Pizza Kitchen, Inc. ("**<u>CPK</u>**") and its Affiliates and subsidiaries bound thereto and the Consenting Stakeholders, including the transferor to the Transferee of any Priority First Lien Claims, First Lien Claim or Second Lien Claim (each such transferor, a "**<u>Transferor</u>**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____
Name:
Title:

Address:

E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| Priority First Lien Claims | |
| First Lien Claims | |
| Second Lien Claims | |

---

[1] Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

# CPK HOLDINGS, INC.
# RESTRUCTURING TERM SHEET

This term sheet (this "**Term Sheet**") summarizes certain terms and conditions (and does not purport to summarize all of the terms and conditions) of the proposed restructuring described below (the "**Restructuring**").[1]  This Term Sheet is presented for discussion purposes only, does not constitute a commitment to provide, accept, or consent to any financing or otherwise create any implied or express legally binding or enforceable obligation on any party (or any affiliates of a party), at law or in equity, to negotiate or enter into definitive documentation related to the Restructuring or to negotiate in good faith or otherwise.

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER TO SELL OR BUY, OR THE SOLICITATION OF AN OFFER TO SELL OR BUY ANY SECURITIES OR A SOLICITATION OR ACCEPTANCE OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE (AS DEFINED BELOW), IT BEING UNDERSTOOD THAT ANY SUCH OFFER OR SOLICITATION WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE LAW.**

Without limiting the generality of the foregoing, this Term Sheet and the undertakings contemplated herein are subject in all respects to the negotiation, execution and delivery of definitive documentation in form and substance consistent with this Term Sheet and otherwise acceptable to the Company Parties, acceptable to the Consenting Lenders, and, solely with respect to the Sponsor Consent Right, the Consenting Sponsors, as well as the satisfactory completion of due diligence (including, without limitation, with respect to the tax implications of the Restructuring).

This Term Sheet together with the associated restructuring support agreement by and among the Company Parties, the Consenting Lenders signatory thereto, and the Consenting Sponsors signatory thereto (each as defined below), is provided as part of a settlement proposal in furtherance of settlement discussions and is entitled to protection from any use or disclosure to any party or person pursuant to Federal Rule of Evidence 408 and any applicable statutes, doctrines or rules protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions.

| Restructuring Terms | |
|---|---|
| **Overview of the Restructuring** | This Term Sheet contemplates the restructuring of CPK Holdings, Inc., a Delaware corporation ("**CPK**"), and certain of its affiliates identified on **Annex 1** attached to this Term Sheet (each a "**Company Party**," and collectively, the "**Company Parties**").  The restructuring will be consummated pursuant to voluntary cases (the "**Chapter 11 Cases**") commenced by the |

---

[1]   Capitalized terms used but not immediately defined herein shall have the meanings ascribed to such terms in the Restructuring Support Agreement.

Company Parties under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") (each Company Party that commences Chapter 11 Cases, a "**Debtor,**" and collectively, the "**Debtors**"), which may be pursuant to a "prearranged" chapter 11 plan of reorganization (together with all exhibits, annexes, and schedules thereto, as each may be amended, restated, amended and restated, supplemented, or otherwise modified in accordance with its terms, the "**Plan**") to be confirmed by the Bankruptcy Court.

To effectuate the Restructuring, certain parties, including: (i) the Company Parties; (ii) certain lenders (the "**Priority First Lien Lenders**") party to that certain Priority First Lien Credit Agreement, dated as of April 27, 2020, by and among CPK, as holdings, California Pizza Kitchen, Inc., as borrower, the subsidiary guarantors from time to time party thereto, the Priority First Lien Lenders from time to time party thereto, and Jefferies Finance LLC, as administrative agent and collateral agent (the "**Priority First Lien Agent**") (such agreement, as amended, supplemented, or otherwise modified from time to time, the "**Priority First Lien Credit Agreement**," the new money loans outstanding thereunder, the "**Priority First Lien New Money Loans,**" the Rolled Up First Lien Loans (as defined in the Priority First Lien Credit Agreement) outstanding thereunder, the "**Priority First Lien Roll-Up Loans**," and the Priority First Lien New Money Loans and the Priority First Lien Roll-Up Loans together, the "**Priority First Lien Loans**") (those Priority First Lien Lenders that are signatories to the Restructuring Support Agreement are referred to as the "**Consenting Priority First Lien Lenders**"); (iii) certain term lenders (the "**First Lien Credit Agreement Lenders**," together with the Priority First Lien Lenders, the "**First Lien Lenders**") party to that certain First Lien Credit and Guarantee Agreement, dated as of August 23, 2016, by and among CPK, as holdings, California Pizza Kitchen, Inc., as borrower, the subsidiary guarantors from time to time party thereto, the First Lien Credit Agreement Lenders from time to time party thereto, and Jefferies Finance LLC, as administrative agent and collateral agent (the "**First Lien Credit Agreement Agent**," together with the Priority First Lien Agent, the "**First Lien Agents**") (such agreement, as amended, supplemented, or otherwise modified from time to time, the "**First Lien Credit Agreement**," together with the Priority First Lien Credit Agreement, the "**First Lien Credit Agreements**," and the loans outstanding under the First Lien Credit Agreement, the "**First Lien Credit Agreement Loans**," together with the Priority First Lien Loans, the "**First Lien Loans**") (those First Lien Lenders that are signatories to the Restructuring Support Agreement are referred to as the "**Consenting First Lien Lenders**,"

|  | and together with the Consenting Priority First Lien Lenders, the "**Consenting Lenders**")[2] and (iv) certain holders of Existing Equity Interests listed on **Annex 2** attached to this Term Sheet collectively holding approximately 89% of such Existing Equity Interests (all holders of Existing Equity Interests, the "**Sponsors,**" and such holders that execute the Restructuring Support Agreement, the "**Consenting Sponsors**," and the Consenting Lenders together with the Consenting Sponsors, the "**Consenting Stakeholders**"), will enter into a restructuring support agreement consistent in all respects with the material terms set forth herein (and to which this Term Sheet shall be appended as an exhibit thereto) and otherwise as approved by the Company Parties, the Consenting Lenders, and the Consenting Sponsors (and any other party thereto) in their respective sole discretion (the "**Restructuring Support Agreement**"). |
| --- | --- |
| **Treatment of Claims and Interests Pursuant to the Plan** ||
| **Administrative, Priority, and Tax Claims** | On or as soon as reasonably practicable after the later to occur of (i) the effective date of the Plan (the "**Plan Effective Date**") and (ii) the date such claim becomes Allowed[3] (or as otherwise set forth in the Plan), each holder of an administrative, priority, or priority tax claim will, with the reasonable consent of the Required DIP Lenders (as defined below) and the Required Consenting Lenders either be satisfied in full, in cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| **DIP Facility Claims** | On the Plan Effective Date, the Obligations under the DIP Facility (as defined below) (the "**DIP Facility Claims**") shall be deemed Allowed in full, and each holder of an Allowed DIP Facility Claim |

---

[2]   As of the relevant date, (A) the Consenting Priority First Lien Lenders holding at least 50.01.% of the aggregate outstanding principal amount of Priority First Lien Loans that are held by Consenting Priority First Lien Lenders shall be referred to as the "**Required Consenting Priority First Lien Lenders**", and (B) the Consenting First Lien Lenders holding at least 50.01% of the aggregate outstanding principal amount of the First Lien Credit Agreement Loans that are held by Consenting First Lien Lenders shall be referred to as the "**Required Consenting First Lien Lenders**," and together with the Required Consenting Priority First Lien Lenders, the "**Required Consenting Lenders**".

[3]   "**Allowed**" means, with respect to any claim or interest:  (a) a claim or interest as to which no objection has been filed and that is evidenced by a proof of claim or interest, as applicable, timely filed by the applicable bar date, if any, or that is not required to be evidenced by a filed proof of claim or interest, as applicable, under the Plan, the Bankruptcy Code, or a final order; (b) a claim or interest that is scheduled by the Company as neither disputed, contingent, nor unliquidated, and as for which no proof of claim or interest, as applicable, has been timely filed; or (c) a claim or interest that is Allowed (i) pursuant to any final order of the Bankruptcy Court or the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court, or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith.  Except as otherwise specified in the Plan or any final order of the Bankruptcy Court, the amount of an Allowed claim shall not include interest or other charges on such claim from and after the Petition Date.  No claim of any entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such entity pays in full the amount that it owes such debtor or reorganized debtor, as applicable.

shall receive its allocated share of a new senior secured first lien term loan credit facility in an aggregate principal amount of up to $127,283,000 in form and substance acceptable to the Required DIP Lenders (the "**New First Lien Term Loan Exit Facility**") consisting of (A) $18,750,000[4] of new money term loans (the "**New Money First Lien Exit Loans**"), which will be funded on the Plan Effective Date, and (B) DIP Facility Claims, which will be converted into the New First Lien Term Loan Exit Facility on the Plan Effective Date.

The New First Lien Term Loan Exit Facility shall be consistent with the following terms:

- Maturity:  Four (4) years after the Plan Effective Date

- Interest rate:

  - L+10.00% payable in cash (subject to 1.50% LIBOR floor) for (a) New Money First Lien Exit Loans, (b) DIP New Money Loans (defined below) that are converted into the New First Lien Term Loan Exit Facility, and (c) Priority First Lien New Money Loans rolled into the DIP Facility and converted into the New First Lien Term Loan Exit Facility.

  - (a) PIK Toggle: (i) 1.00% payable in cash, and L+11.00% PIK (subject to 1.50% LIBOR floor) or (ii) L+10.00% (subject to 1.50% LIBOR floor) payable in cash, through December 31, 2021; and (b) L+10.00% payable in cash from after December 31, 2021 (subject to 1.50% LIBOR floor), for Priority First Lien Roll-Up Loans rolled into the

---

[4]   Represents the face amount of New Money First Lien Exit Loans including Commitment Premium/Closing Premium.  The net amount of New Money First Lien Exit Loans will be $15,000,000.

DIP Facility and converted into the New First Lien Term Loan Exit Facility.

- Commitment Premium/Closing Premium:
  - o 15% commitment premium.
  - o 6.25% closing premium.
  - o 2.5% of common stock of the reorganized Company Parties ("**New Common Stock**") (subject to dilution by the Management Incentive Plan).
- Priority and Security:
  - o Perfected first priority liens on all Collateral (as defined in the Priority First Lien Credit Agreement).
  - o Perfected first priority liens on all assets of the Loan Parties, subject to usual and customary exceptions for facilities of this type to be agreed.
  - o Perfected first priority liens on 100% of equity in/assets of foreign subsidiaries, subject to usual and customary exceptions for facilities of this type to be agreed.
  - o Other standard and customary assets to be included in collateral package.
  - o Priority in payment over the New Second Lien Term Loan Exit Facility (defined below).
- Conditions Precedent to Funding: (a) Company Parties meeting rent savings projections acceptable to the Required DIP Lenders and the Required Consenting Lenders, (b) after taking into account the funding of the New First Lien Term Loan Exit Facility, minimum liquidity of $16.5 million, and (c) other customary conditions precedent consistent with the Priority First Lien Credit Agreement.
- Covenants: To include (a) minimum liquidity; and (b) other covenants consistent with the Priority First Lien Credit Agreement.
- Rating: Company Parties shall use commercially reasonable efforts to obtain a private credit rating from each of Standard & Poor's Ratings Services ("**S&P**") and Moody's Investors Services, Inc. ("**Moody's**") for the New First Lien Term Loan Exit Facility and a corporate family rating for the borrower from each of S&P and Moody's.

| | |
|---|---|
| | • All Loan Parties as obligors, subject to customary carve-outs to be agreed. |
| **Priority First Lien Credit Agreement Claims** | Upon entry of the Final DIP Order (defined below), the Obligations under the Priority First Lien Credit Agreement (the "**Priority First Lien Credit Agreement Claims**") will be rolled into the DIP Facility and shall receive the same treatment as Allowed DIP Facility Claims on the Plan Effective Date. |
| **First Lien Credit Agreement Claims** | On the Plan Effective Date, the Obligations under the First Lien Credit Agreement (other than on account of outstanding letters of credit) (the "**First Lien Credit Agreement Claims**") shall be deemed Allowed in full and each holder of a First Lien Credit Agreement Claim will (A) receive its pro rata share of 100% of the common stock in the reorganized Company Parties (the "**New Common Stock**") (subject to dilution by the Management Incentive Plan and the New Money DIP Fee (as defined below)), and (B) be exchanged, on a dollar-for-dollar basis, for an interest in a new senior secured credit facility in an aggregate amount of $50,000,000 in form and substance acceptable to the Required Consenting Lenders and Required DIP Lenders (the "**New Second Lien Term Loan Exit Facility**"). |
| | The New Second Lien Term Loan Facility which will be consistent with the following terms: |
| | • Maturity:  Four and a half (4.5) years after Plan Effective Date. |
| | • Interest rate:  1.00% paid in cash / L+12.50% PIK (subject to 1.50% LIBOR floor). |
| | • Priority and Security:  Subordinate in rights in collateral and in right of payment to the New First Lien Term Loan Exit Facility and First Lien Exit L/C Facility with the same collateral package. |
| | • All Loan Parties (as defined in the Priority First Lien Credit Agreement) as obligors, subject to customary carve-outs to be agreed. |
| | Notwithstanding anything herein to the contrary, the First Lien Lenders shall have a deficiency claim on account of any First Lien Claim that is not a Secured claim, which shall be classified as a General Unsecured Claim. |

| | |
|---|---|
| **First Lien Credit Agreement L/C Claims** | On the Plan Effective Date, the Obligations under the First Lien Credit Agreement on account of outstanding letters of credit (the "**First Lien Credit Agreement L/C Claims**," and together with the First Lien Credit Agreement Claims, and the Priority First Lien Credit Agreement Claims, the "**First Lien Claims**") shall be converted into a $12,500,000 letter of credit facility *pari passu* to the New First Lien Term Loan Exit Facility (the "**New First Lien Exit L/C Facility**," and the lenders thereunder, the "**Exit L/C Lenders**") in form and substance acceptable to the Exit L/C Lenders, Required DIP Lenders, and the Required Consenting Lenders.<br><br>The New First Lien Exit L/C Facility shall be consistent with the following terms:<br><br>• Maturity date:  Four (4) years.<br><br>• Interest rate:  10%<br><br>• Fees:  Letter of credit fees consistent with the existing First Lien Credit Agreement.<br><br>• Priority and Security:  *Pari passu* with the New First Lien Term Loan Exit Facility with respect to collateral and in right of payment; shall be secured by the same collateral package as the New First Lien Term Loan Exit Facility at all times.<br><br>• Covenants:  Prohibition on the subordination of the New First Lien Exit L/C Facility to any other indebtedness, obligations, and/or liens, including by way of waterfall provision or otherwise; subordination prohibition covenant to be subject to 100% consent requirement or provided as a sacred right.<br><br>• No additional letters of credit shall be issued under the New First Lien Exit L/C Facility; any cancellation or return of a letter of credit issued under the New First Lien Exit L/C Facility shall reduce the commitments thereunder on a dollar for dollar basis.<br><br>• Other customary terms and conditions to be agreed. |
| **Second Lien Claims** | No distributions under the Plan. |
| **General Unsecured Claims** | No distributions under the Plan.  For the avoidance of doubt, upon the Effective Date of the Plan, the Sponsors, in their capacities as such, shall be deemed to have waived all General Unsecured Claims held thereby (including any claims for accrued and unpaid management fees payable by the Company). The General Unsecured Claims class shall include the First Lien Lenders' deficiency claims. |

| | |
|---|---|
| **Existing Equity Interests**[5] | Each Allowed Existing Equity Interest shall be canceled, released, and extinguished, and will be of no further force or effect. |
| **Intercompany Claims** | Unless otherwise provided for under the Plan, on the Plan Effective Date, intercompany claims shall be reinstated, compromised, cancelled, set off, settled, canceled and released, contributed or distributed, or otherwise addressed at the election of the Company Parties, subject to the consent of the Required DIP Lenders and the Required Consenting Lenders, such that intercompany claims are treated in a tax-efficient manner. |
| **Intercompany Interests** | Intercompany Interests shall receive no recovery or distribution and be reinstated on the Plan Effective Date solely to the extent necessary to maintain the Debtors' corporate structure. |
| **DIP Facility Terms** | |
| **DIP Facility** | The Company Parties will secure commitments from certain Consenting Lenders to fund a new money senior secured credit facility in an aggregate amount of up to $107,347,966, consisting of (A) $46,875,000 of new money loans[6] (the "**DIP New Money Loans**"), (B) a roll-up of $60,472,966 of Priority First Lien Loans comprised of (1) $30,000,000 of Priority First Lien New Money Loans, and (2) $30,472,966 of Priority First Lien Roll-Up Loans, (clauses (B) (1) and (2)) together, the "**DIP Roll-Up Loans**," together with the DIP New Money Loans, the "**DIP Facility**," and the lenders thereunder, the "**DIP Lenders**," and the DIP Lenders holding at least 60.01% of the aggregate outstanding principal amount of the DIP Facility, the "**Required DIP Lenders**"), which shall be in form and substance acceptable to the Required DIP Lenders. <br><br> The DIP Facility shall be consistent with the following terms: <br><br> • Maturity:  Five (5) months. <br><br> • Structure:  Delayed draw term loan. <br><br> • Funding:  Funding into a third party escrow account (the "**DIP Escrow Account**") within three (3) business day of entry of the Interim DIP Order (defined below); *provided* that until the entry of the Final DIP Order, amounts withdrawn from the DIP Escrow Account will not exceed $17.5 million in the aggregate.  All draws from the DIP Escrow Account will be subject to the DIP Budget and withdrawal conditions contained in the Priority First Lien Credit Agreement, *provided*, that, such withdrawal |

---

[5]   "**Existing Equity Interests**" means all existing securities issued by the Company Parties.

[6]   Represents the face amount of DIP New Money Loans including Commitment Premium/Closing Premium.  The net amount of DIP New Money Loans will be $37,500,000.

conditions shall require (i) one (1) Business Day's notice prior to a withdrawal (*provided* such notice is delivered no later than 1:00 pm (prevailing eastern time) on the Business Day prior to such withdrawal) and (ii) Actual Liquidity (as defined in the Priority First Lien Credit Agreement) not in excess of $13,000,000.

- Interest rate:

  o L+10.00% (subject to 1.50% LIBOR floor) paid in cash for DIP New Money Loans.

  o L+10.00% (subject to 1.50% LIBOR floor) paid in cash for Priority First Lien New Money Loans rolled into DIP Roll-Up Loans.

  o L+10.00% PIK (subject to 1.50% LIBOR floor) for Priority First Lien Roll-Up Loans rolled into DIP Roll-Up Loans.

- Commitment Premium/Closing Premium:

  o 15% commitment premium.

  o 6.25% closing premium.

  o 7.5% of New Common Stock (subject to dilution by the Management Incentive Plan) (the "**New Money DIP Fee**").

- Priority and Security:

  o Priming, perfected first priority DIP liens on all Collateral of the Debtors (as defined in the Priority First Lien Credit Agreement) securing the First Lien Claims.

  o Perfected first priority DIP liens on all property of the Debtors not subject to valid, perfected and non-avoidable liens as of the commencement of the Chapter 11 Cases and the proceeds thereof.

  o Perfected junior DIP liens on all property of the Debtors that is subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the Chapter 11 Cases or to valid and non-avoidable liens in existence at the time of such commencement (other than liens securing the First Lien Claims).

  o Super-priority, administrative claim status.

- Covenants:  To include (a) minimum liquidity; (b) milestones (including the applicable milestones set forth herein); and

| | |
|---|---|
| | (c) other covenants (including those set forth herein) consistent with the Priority First Lien Credit Agreement. |
| | • Rating: Company Parties Shall use commercially reasonable efforts to obtain a private credit rating from each of S&P and Moody's Investors Services, Inc. Moody's for the DIP Facility and a corporate family rating for the borrower from each of S&P and Moody's. |
| | • All Loan Parties (as defined in the Priority First Lien Credit Agreement) as obligors, subject to customary carve-outs to be agreed. |
| **DIP Orders** | The Company Parties shall seek, and the Consenting Lenders and the Consenting Sponsors shall support, entry of interim and final orders approving the DIP Facility (respectively, the "**Interim DIP Order**" and the "**Final DIP Order**," and, collectively, the "**DIP Orders**"), which shall be acceptable to the Required DIP Lenders and the Required Consenting Lenders. |
| | Prior to the filing of the Chapter 11 Cases, the Company Parties and Required Consenting Lenders shall negotiate terms for the consensual use of cash collateral, which terms, for the avoidance of doubt, shall be memorialized in each of the DIP Orders and shall include customary terms and conditions related to the adequate protection (including those set forth herein) to be provided to the Consenting Lenders. |
| **Adequate Protection** | The DIP Orders shall provide, among other things, the First Lien Lenders and the First Lien Agents (together, the "**First Lien Secured Parties**") with adequate protection in form and substance acceptable to the Required DIP Lenders and Required Consenting Lenders, including without limitation:  (a) unless and until the Priority First Lien Credit Agreement Claims are converted into the DIP Facility (1) current cash payment of interest on account of Priority First Lien New Money Loans, and (2) PIK interest on account of Priority First Lien Roll-Up Loans and the First Lien Credit Agreement Claims, in each case in accordance with the applicable First Lien Credit Agreement, as well as costs and expenses (including the costs and expenses of counsel) under the First Lien Credit Agreements; (b) the provision of replacement liens to the extent of any diminution in value of the collateral (the "**Prepetition Collateral**") securing the First Lien Claims ("**Diminution in Value**"); (c) first-priority liens on unencumbered assets for the First Lien Secured Parties to the extent of any Diminution in Value; (d) reimbursement of the reasonable and documented fees and expenses of the First Lien Lenders (including, without limitation, the fees and expenses of the Ad Hoc Group Professionals (as defined herein) and the First Lien Agents); and (e) super priority administrative expense claims pursuant to Section |

| | |
|---|---|
| | 507(b) of the Bankruptcy Code to the extent of any Diminution in Value. |
| **DIP Budget** | The DIP Facility and use of cash collateral in the Chapter 11 Cases shall be subject to a budget (the "**DIP Budget**"), which shall be in form and substance acceptable to the Required DIP Lenders, and shall contain, among other things, a weekly cash flow reporting requirement.  In addition, any revisions or modifications to the DIP Orders, the DIP Budget, the Restructuring Support Agreement, or this Term Sheet shall be subject to the consent of, and in form and substance acceptable to, the Required DIP Lenders. |
| **Reporting and Financial Covenants** | The DIP Facility and use of cash collateral shall be subject to customary reporting and financial covenants for debtor in possession financings, including the following covenants:<br><br>(a) **Budget Variance Covenant**:  Consistent with the Priority First Lien Credit Agreement.<br><br>(b) **Test Period**:   Consistent with the Priority First Lien Credit Agreement.<br><br>(c) **Cash Transfers to Non-Debtors**:  Transfers of cash from any Debtor to any non-Debtor shall be prohibited unless expressly authorized under the DIP Budget.<br><br>(d) **Critical Vendor / 503(b)(9) / PACA Payments**: The amount of any critical vendor payments for which the Company Parties may seek authority shall be subject to the consent of the Required DIP Lenders. |
| **Stipulations** | The DIP Orders shall contain stipulations as to, among other things, the amount and priority of the secured indebtedness under the First Lien Credit Agreements, which shall be subject to a customary challenge period. |
| **Carve-Out** | See **Annex 4** attached hereto. |
| **Other Restructuring Terms** | |
| **Milestones** | The following shall be Milestones under the Restructuring Support Agreement, which milestones may only be extended by express written consent of the Required Consenting Lenders and the Required DIP Lenders:<br><br>(a) On or prior to July 29, 2020 (the "**Petition Date**") the Company Parties shall commence the Chapter 11 Cases, pursuant to Definitive Documents in form and substance acceptable to the Required Consenting Lenders and Required DIP Lenders; |

11

(b) On the Petition Date, the Company Parties shall file (A) the Plan and the Disclosure Statement in form and substance acceptable to the Required Consenting Lenders and Required DIP Lenders, (B) a motion seeking entry of an order, among other things, scheduling hearings with respect to approval of the Disclosure Statement and confirmation of the Plan (the "**Prearranged Scheduling Order**") in form and substance acceptable to the Required Consenting Lenders and Required DIP Lenders, and (C) a motion seeking entry of an order in form and substance acceptable to the Required Consenting Lenders and Supermajority Required DIP Lenders[7], approving bidding procedures for an alternative sale of substantially all of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code (the "**Bidding Procedures Order**" and such transaction, the "**Alternative Transaction**");

(c) The Court shall enter the Interim DIP Order by no later than three (3) days following the Petition Date;

(d) By no later than thirty-five (35) days following the Petition Date, the Court shall enter (A) the Final DIP Order in form and substance acceptable to the Required Consenting Lenders and Required DIP Lenders, (B) the Bidding Procedures Order, in form and substance acceptable to the Required Consenting Lenders and Supermajority Required DIP Lenders, (C) the Prearranged Scheduling Order, in form and substance acceptable to the Required Consenting Lenders and Required DIP Lenders and (D) the order approving the Disclosure Statement, in form and substance acceptable to the Required Consenting Lenders and Required DIP Lenders;

(e) If the Debtors elect to pursue an Alternative Transaction, with the consent of the Required Consenting Lenders and Supermajority Required DIP Lenders, the deadline to submit qualified bids shall be no later than forty-five (45) days following the Petition Date;

(f) If the Debtors elect to pursue an Alternative Transaction, with the consent of the Required Consenting Lenders and Supermajority Required DIP Lenders, the auction shall be held no later than fifty-five (55) days following the Petition Date;

(g) The Court shall enter an order confirming the Plan (the "**Confirmation Order**") in form and substance acceptable to the Required Consenting Lenders and Required DIP Lenders no later than seventy (70) days following the Petition Date;

---

[7]    "**Supermajority Required DIP Lenders**" means DIP Lenders holding at least 66.67% of the aggregate outstanding principal amount of the DIP Facility that have signed the Restructuring Support Agreement.

| | |
|---|---|
| | (h) The Plan Effective Date shall occur no later than eighty-five (85) days after the Petition Date. |
| **Alternative Transaction** | Subject to the Restructuring Support Agreement, the decision to pursue and consummate an Alternative Transaction shall in all respects be subject to the consent of the Required Consenting Lenders and the Supermajority Required DIP Lenders. |
| **Executory Contracts and Unexpired Leases** | Assumption and/or rejection of any executory contract or unexpired lease (other than those governing the Deferred Compensation Plan subject to the terms herein and as set forth below) shall be at the discretion of the Company Parties and subject in all respects to the consent of the Required Consenting Lenders and Required DIP Lenders. |
| **Employment Obligations and Programs** | Assumption of the Company Parties' written employee contracts, agreements, policies, and programs shall be subject in all respects to the consent of the Required Consenting Lenders and Required DIP Lenders; *provided* that the Company shall include on the Assumed Executory Contracts and Unexpired Lease List, subject to the Restructuring Support Agreement, the accrued obligations as of the Petition Date of the California Pizza Kitchen Executive Retirement Savings Plan, as amended effective January 1, 2014 (the "**Deferred Compensation Plan**"), *provided* that any assumption of the accrued obligations under the Deferred Compensation Plan contemplated hereunder shall be solely up to the balance of the related grantor trust as of the Petition Date.   To the extent the liabilities under the Deferred Compensation Plan as of the Plan Effective Date exceed the trust balance as of the Petition Date, any account balance assumed in excess of $500,000 for any individual shall be reduced on a proportionate basis by the amount of (but by no more than) such excess. |
| **Management Incentive Plan** | The Company Parties, the Required Consenting Lenders and the Required DIP Lenders shall negotiate in good faith to determine a mutually agreed-upon incentive program for the officers and other management of reorganized Company Parties (the "**Management Incentive Plan**"), which may provide for equity-based incentive awards, issued at the applicable divisions or operating company levels, of up to 10%, which shall include consideration to be agreed. Within 90 days of its formation, the Company's initial board of directors shall make a determination on such plan and shall determine an appropriate vesting schedule, including whether such plan is time-based, performance-based, or a combination of the two. |
| **Definitive Documents** | Any documents contemplated by this Term Sheet, including any Definitive Documents, that remain the subject of negotiation as of the Agreement Effective Date shall be subject to the rights and |

| | obligations set forth in Section 3 of the Restructuring Support Agreement. Failure to reference such rights and obligations as it relates to any document referenced in this Term Sheet shall not impair such rights and obligations. |
|---|---|
| **Board of Directors and Corporate Governance** | The initial board of directors for the reorganized Company Parties shall consist of five directors and shall be selected by a board selection committee comprised by the three largest equity holders on a post-reorganization basis. The current CEO of CPK shall be one of board members. |
| | Holders of New Common Stock shall be (or be deemed) parties to a shareholder agreement (the "**New Shareholders' Agreement**") in form and substance acceptable to (i) the Required Consenting Lenders, and (ii) the Required DIP Lenders, subject to the consent rights set forth in the Restructuring Support Agreement. The New Shareholders' Agreement shall include customary protections for minority shareholders, which may only be amended or modified with the consent of each shareholder. |
| **Discharge, Release, Injunction, and Exculpation** | Certain matters with respect to release, discharge, injunction, and exculpation provisions in connection with the Restructuring are attached hereto as **Annex 3**, and are subject in all respects to the terms of the Restructuring Support Agreement and this Term Sheet. |
| **D&O Insurance** | The reorganized Company Parties shall assume its existing or purchase new D&O liability insurance policies for directors, officers, employees, attorneys, or other professionals and agents of the reorganized Company Parties on terms and conditions acceptable to the Required Consenting Lenders and the Required DIP Lenders. |
| **Retention of Jurisdiction** | The Plan will provide for the retention of jurisdiction by the Bankruptcy Court for usual and customary matters. |
| **Tax Issues** | The terms of the Restructuring, including whether the Restructuring is structured as a taxable transaction (in whole or in part), shall be structured to preserve or otherwise maximize favorable tax attributes (including tax basis) of the Company Parties to the extent practicable and commercially reasonable as determined by the Company Parties, the Required Consenting Lenders, the Required DIP Lenders, and the Consenting Sponsors; *provided* that the tax structuring of the Restructuring shall be subject to the consent of the Required Consenting Lenders and Required DIP Lenders, and to the extent material to their interests, the Consenting Sponsors. |
| **Exemption Under Section 1145 of the Bankruptcy Code** | The Plan and Confirmation Order shall provide that the issuance of any securities thereunder, including the New Common Stock, will be exempt from securities laws in accordance with section 1145 of the Bankruptcy Code. |

| | |
|---|---|
| **Conditions to the Effective Date** | The following conditions precedent to the effectiveness of the Effective Date shall be satisfied or waived by the Debtors, with the consent of (i) the Consenting Lenders holding at least 65% of the aggregate outstanding principal amount of each of the Priority First Lien Claims and First Lien Claims that are held by Consenting Lenders, and (ii) the Required DIP Lenders, and the Effective Date shall occur on the date upon which the last of such conditions are so satisfied and/or waived:<br><br>• All financing agreements contemplated hereunder, as applicable, shall have closed and be in full force and effect;<br><br>• The Restructuring Support Agreement shall continue to be in full force and effect;<br><br>• The Company Parties shall have paid or reimbursed all reasonable and documented fees and expenses of the Consenting Lenders (as applicable) in connection with the Restructuring, including the reasonable and documented fees and expenses of the Ad Hoc Group Professionals;<br><br>• Amounts sufficient to pay all of the Company Parties' reasonable and documented fees and expenses after the Effective Date, including those of (i) Kirkland & Ellis LLP, as counsel to the Company Parties, (ii) Guggenheim Securities, LLC, as financial advisor and investment banker to the Company Parties; and (iii) Alvarez & Marsal, Inc., as restructuring advisor to the Company Parties, shall have been placed in the Professional Fee Escrow Account pending approval of the Professional Fee Claims by the Bankruptcy Court;[8]<br><br>• Each document or agreement constituting the Definitive Documentation shall be in form and substance consistent with the Restructuring Support Agreement and this Term Sheet, and acceptable to the Required Consenting Lenders and the Required DIP Lenders;<br><br>• All governmental approvals and consents that are legally required for the consummation of the Restructuring shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, shall have expired;<br><br>• All agreements or other arrangements by and among the Company Parties and any of the Sponsors or their respective affiliates or related parties shall be terminated with no |

---

[8] For the avoidance of doubt, the Consenting Lenders and DIP Lenders reserve all rights to review and object to any such retentions or payments in accordance with applicable laws.

<table>
<tr>
<td></td>
<td>

consideration payable in connection therewith as of the Effective Date. For the avoidance of doubt, the Sponsors shall waive all their Claims against the Company Parties (other than any funded debt claims);

- Such other conditions precedent that are customary and otherwise requested to the Effective Date, as are customary and otherwise reasonably requested by the Required Consenting Lenders and the Required DIP Lenders; and

- The Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Required Consenting Lenders and the Required DIP Lenders, and the Confirmation Order shall not be stayed, modified, or vacated, and shall not be subject to any pending appeal, and the appeals period for the Confirmation Order shall have expired; *provided* that the requirement that the Confirmation Order not be subject to any pending appeal and the appeals period for the Confirmation Order shall have expired may be waived by the Required Consenting Lenders and the Required DIP Lenders.

</td>
</tr>
<tr>
<td>

**Fees and Expenses of the Consenting Lenders**

</td>
<td>

The Company Parties shall pay or reimburse all reasonable and documented fees and expenses of the Consenting Lenders in connection with the Restructuring (including all prior restructuring proposals) on an ongoing basis and as of the Effective Date, including the reasonable and documented fees and expenses of (a) (i) Gibson, Dunn, & Crutcher LLP, as counsel to the Consenting Lenders, and (ii) FTI Consulting, Inc., as financial advisor to the Consenting Lenders; and (b) one local counsel retained in connection with the Chapter 11 Cases in any relevant jurisdictions, as applicable (collectively, with any other advisors retained by the Consenting Lenders with the consent of the Company Parties (not to be unreasonably withheld), the "**Ad Hoc Group Professionals**"), regardless of whether the Effective Date ever occurs.

</td>
</tr>
<tr>
<td>

**Consent and Consultation Rights**

</td>
<td>

The consent and consultation rights over the Definitive Documents are as set forth in the Restructuring Support Agreement.  To the extent there is any inconsistency between the Restructuring Support Agreement and this Term Sheet, the Restructuring Support Agreement shall govern except with respect to the conditions to the Effective Date, which shall be governed by this Term Sheet.

</td>
</tr>
</table>

## Annex 1

**Company Parties**

California Pizza Kitchen, Inc.

California Pizza Kitchen of Annapolis, Inc.

CPK Holdings, Inc.

CPK Hospitality, LLC

CPK Hunt Valley, Inc.

CPK Management Company

CPK Parent Inc.

CPK Spirits, LLC

CPK Texas, LLC

## **Annex 2**

### **Consenting Sponsors**

Golden Gate Capital & Affiliates

## Annex 3

**Discharge, Release, Injunction, and Exculpation Provisions**

**CHAPTER 11 CASES RELEASES**

The release, discharge, injunction, and exculpation provisions applicable to the Restructuring shall be set forth only in the Plan, substantially as set forth below:

| Discharge of Claims and Termination of Interests | Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Debtor Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring. |
|---|---|
| Released Parties | Collectively, and in each case in its capacity as such: (a) the Debtors and the Reorganized Debtors; (b) the Consenting Lenders; (c) the DIP Lenders, (d) the First Lien Agents; (e) the Consenting Sponsors; (f) with respect to each of the foregoing entities, each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, |

| | |
|---|---|
| | direct and indirect equity holders, and funds; and (g) with respect to each of the foregoing Entities in clauses (a) through (f), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (with respect to clause (f), each solely in their capacity as such); *provided, however,* that any Holder of a Claim or Interest that objects to the releases in the Plan or affirmatively opts out of the releases provided by the Plan shall not be a "Released Party." |
| **Releasing Parties** | Collectively, and in each case in its capacity as such: (a) the Debtors and the Reorganized Debtors; (b) the Consenting Lenders; (c) the DIP Lenders, (d) the First Lien Agents, (e) the Consenting Sponsors; (f) with respect to each of the foregoing entities in clauses (a) through (e), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, and funds; (g) with respect to each of the foregoing Entities in clauses (a) through (f), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (with respect to clause (f), each solely in their capacity as such); and (h) all Holders of Claims and Interests not described in the foregoing clauses (a) through (g); *provided, however,* that any Holder of a Claim or Interest that (1) affirmatively opts out of the releases provided by the Plan or (2) objects to the releases in the Plan, shall not be a "Releasing Party" for purposes of the Plan. |
| **Releases by the Debtors** | Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:<br><br>(a)  the Debtors, the Debtors' restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support |

<table>
<tr>
<td></td>
<td>Agreement;</td>
</tr>
<tr>
<td></td>
<td>

(b) any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan; or

(c) the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

(d) any other act or omission, transaction, agreement, event, or other occurrence, in each case relating to any of the foregoing (a), (b), or (c), taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any (i) post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (ii) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud.
</td>
</tr>
<tr>
<td>

**Releases by Holders of Claims and Interests of the Debtors**
</td>
<td>

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

(a) the Debtors, the Debtors' restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement;

(b) any transaction that is part of the Restructuring, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or
</td>
</tr>
</table>

3

<table>
<tr>
<td></td>
<td>

the reliance by any Released Party on the Plan or the order confirming the Plan in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan;

(c) the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of confirmation of the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

(d) any other act or omission, transaction, agreement, event, or other occurrence, in each case relating to any of the foregoing (a), (b), or (c), taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any (i) post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (ii) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud.

</td>
</tr>
<tr>
<td>**Exculpated Parties**</td>
<td>Collectively, and in each case in its capacity as such: (a) the Debtors and the Reorganized Debtors, (b) the Consenting Lenders, (c) the Agent, (d) the DIP Lenders, (e) the DIP Agents, and (b) with respect to each of the foregoing entities, each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, and advisors.</td>
</tr>
<tr>
<td>**Exculpation**</td>
<td>Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the</td>
</tr>
</table>

| | administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission constitutes actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and, upon completion of the Plan, shall be deemed to have participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. |
|---|---|
| **Injunctions** | Except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that have held, hold, or may hold claims or interests that have been released pursuant to the Plan, shall be discharged pursuant to the Plan, or are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Released Parties:  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan. |

**Annex 4**

**Carve-Out Provisions**

| Carve Out | As used in this [Final/Interim] Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $[75,000] incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Creditors' Committee  pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the [DIP Agent] (at the direction of the Required DIP Lenders) of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $3,000,000 incurred after the first business day following delivery by the [DIP Agent] (acting at the direction of the [Required DIP Lenders]) of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").   Any transaction or success fee shall not be included in the Carve Out, unless otherwise earned by such Professional Person prior to the [Trigger Date] or earned pursuant to the applicable Professional Person's engagement letter as approved by the Court.  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the [DIP Agent] to the Debtors, their lead restructuring counsel, counsel to the [DIP Lenders], the [DIP/Priority/1L Advisors], the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked. |
| Carve Out Reserves | On the day on which a Carve Out Trigger Notice is given by the [DIP Agent] to the Debtors with a copy to counsel to the Creditors' Committee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for [DIP] Loans under the [DIP Facility] (each, as defined in the [DIP Credit Agreement]) (on a pro rata basis |

based on the then outstanding [DIP Obligations]), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute [DIP] Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors for [DIP] Loans under the [DIP Facility] (on a pro rata basis based on the then outstanding [DIP Obligations]), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute [DIP] Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.  On the first business day after the DIP Agent gives such notice to such [DIP] Lenders, notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for [DIP] Loans under the [DIP] Facility, any termination of the [DIP Obligations] following an Event of Default, or the occurrence of the Maturity Date, each [DIP] Lender with an outstanding Commitment (on a pro rata basis based on the then outstanding Commitments) shall make available to the DIP Agent such [DIP] Lender's pro rata share with respect to such borrowing in accordance with the [DIP] Facility.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the [DIP Agent] for the benefit of the [DIP Lenders], unless the [DIP Obligations] have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid

to the [Prepetition Secured Parties] in accordance with their respective rights and priorities as of the Petition Date. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the [DIP Agent] for the benefit of the [DIP Lenders], unless the [DIP Obligations] have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the [Prepetition Secured Creditors] in accordance with their respective rights and priorities as of the Petition Date. Notwithstanding anything to the contrary in the [DIP Documents], or this [Final/Interim] Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph [●], then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph [●], prior to making any payments to the [DIP Agent] or the [Prepetition Secured Parties], as applicable. Notwithstanding anything to the contrary in the [DIP Documents] or this [Final/Interim] Order, following delivery of a Carve Out Trigger Notice, the [DIP Agent] and the [Prepetition Agents] shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the [DIP Agent] for application in accordance with the [DIP Documents]. Further, notwithstanding anything to the contrary in this [Final/Interim] Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute [Loans] (as defined in the [DIP Credit Agreement]) or increase or reduce the [DIP Obligations], (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Approved Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors; *provided*, *however*, in no event shall the [DIP Secured Parties] be obligated to make DIP Obligations in excess of the aggregate amount of [DIP New Money Loans] set forth in the [DIP Documents] . For the avoidance of doubt and notwithstanding anything to the contrary in this [Final/Interim] Order, the [DIP Documents], or in any [Prepetition Credit Documents], the Carve Out shall be senior to all liens and claims securing the [DIP Facility], the Adequate

| | Protection Liens, and the 507(b) Claim, and any and all other forms of adequate protection, liens, or claims securing the [DIP Obligations] or the [Prepetition Secured Obligations]. |
|---|---|
| **Payment of Allowed Professional Fees Prior to the Termination Declaration Date** | Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out. |
| **No Direct Obligation To Pay Allowed Professional Fees** | None of the [DIP Agent], [DIP Lenders], or the [Prepetition Secured Creditors] shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this [Interim/Final] Order or otherwise shall be construed to obligate the [DIP Agent], the [DIP Lenders], or the [Prepetition Secured Parties], in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement. |
| **Payment of Carve Out On or After the Termination Declaration Date** | Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis. Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this [Final/Interim] Order, the DIP Documents, the Bankruptcy Code, and applicable law. |