## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CALIFORNIA PIZZA KITCHEN, INC., *et al.*,[1] | ) | Case No. 20-33752 (MI) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) | (Emergency Hearing Requested) |

## DEBTORS' EMERGENCY MOTION
## FOR ENTRY OF INTERIM AND FINAL
## ORDERS (I) AUTHORIZING THE DEBTORS TO
## OBTAIN POSTPETITION SECURED FINANCING,
## (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY
## ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING
## THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE
## PROTECTION, (V) MODIFYING THE AUTOMATIC STAY,
## (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

**EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON JULY 30, 2020, AT 4:00 P.M. (CENTRAL TIME) AT UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, 515 RUSK STREET, HOUSTON, TEXAS 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**RELIEF IS REQUESTED NOT LATER THAN JULY 30, 2020.**

**PLEASE NOTE THAT ON MARCH 24, 2020, THROUGH THE ENTRY OF GENERAL ORDER 2020-10, THE COURT INVOKED THE PROTOCOL FOR EMERGENCY PUBLIC HEALTH OR SAFETY CONDITIONS.**

**IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR VIA VIDEO AT THIS HEARING.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S REGULAR DIAL-IN NUMBER. THE DIAL-IN NUMBER IS +1(832) 917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. YOU WILL BE ASKED TO KEY IN THE CONFERENCE ROOM NUMBER. JUDGE ISGUR'S CONFERENCE ROOM NUMBER IS 954554.**

**PARTIES MAY PARTICIPATE IN ELECTRONIC HEARINGS BY USE OF AN INTERNET CONNECTION. THE INTERNET SITE IS WWW.JOIN.ME. PERSONS CONNECTING BY MOBILE DEVICE WILL NEED TO DOWNLOAD THE FREE JOIN.ME APPLICATION.**

**ONCE CONNECTED TO WWW.JOIN.ME, A PARTICIPANT MUST SELECT "JOIN A MEETING". THE CODE FOR JOINING THIS HEARING BEFORE JUDGE ISGUR IS**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: California Pizza Kitchen, Inc. (0623); California Pizza Kitchen of Annapolis, Inc. (4806); CPK Holdings Inc. (2486); CPK Hospitality, LLC (3536); CPK Hunt Valley, Inc. (6751); CPK Management Company (1196); CPK Spirits, LLC (3614); and CPK Texas, LLC (3574). The location of the Debtors' service address is 12181 Bluff Creek Drive, 5th Floor, Playa Vista, California 90094.

"JUDGEISGUR". THE NEXT SCREEN WILL HAVE A PLACE FOR THE PARTICIPANT'S NAME IN THE LOWER LEFT CORNER. PLEASE COMPLETE THE NAME AND CLICK "NOTIFY".

HEARING APPEARANCES SHOULD BE MADE ELECTRONICALLY AND IN ADVANCE OF THE HEARING. YOU MAY MAKE YOUR ELECTRONIC APPEARANCE BY:

1) GOING TO THE SOUTHERN DISTRICT OF TEXAS WEBSITE;

2) SELECTING "BANKRUPTCY COURT" FROM THE TOP MENU;

3) SELECTING JUDGES' PROCEDURES AND SCHEDULES;

4) SELECTING "VIEW HOME PAGE" FOR JUDGE ISGUR;

5) UNDER "ELECTRONIC APPEARANCE" SELECT "CLICK HERE TO SUBMIT ELECTRONIC APPEARANCE;"

6) SELECT CALIFORNIA PIZZA KITCHEN, INC., ET AL. FROM THE LIST OF ELECTRONIC APPEARANCE LINKS, AND

7) AFTER SELECTING CALIFORNIA PIZZA KITCHEN, INC., ET AL. FROM THE LIST, COMPLETE THE REQUIRED FIELDS AND HIT THE "SUBMIT" BUTTON AT THE BOTTOM OF THE PAGE.

SUBMITTING YOUR APPEARANCE ELECTRONICALLY IN ADVANCE OF THE HEARING WILL NEGATE THE NEED TO MAKE AN APPEARANCE ON THE RECORD AT THE HEARING.

The above-captioned debtors and debtors in possession (collectively, the "Debtors" or the "Company") respectfully state as follows in support of this motion:[2]

## Relief Requested

1.    The Debtors seek entry of interim and final orders, substantially in the forms attached hereto (the "Interim Order"[3] and the "Final Order,"[4] respectively, and together the "DIP Orders"). In support of this motion, the Debtors respectfully submit (a) the *Declaration of Stuart Erickson in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling*

---

[2]    Capitalized terms used but not otherwise defined in this motion shall have the meanings ascribed to them in the First Day Declaration, the Interim Order, or in the Plan, as applicable.

[3]    The description of the capital structure (including the priority, perfection, and collateral (if any)) of the Debtors contained herein is solely for illustrative purposes. To the extent that there is any discrepancy between the Interim Order and this motion, the terms of the Interim Order, as entered by the Court, shall control.

[4]    The Debtors will file the form of Final Order prior to the Final Hearing (as defined herein).

*a Final Hearing, and (VII) Granting Related Relief*, attached hereto as **Exhibit A** (the "Erickson Declaration"), (b) the *Declaration of Jonathan Tibus in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief*, attached hereto as **Exhibit B** (the "Tibus Declaration"); and (c) the First Day Declaration.

2.      In addition, the Debtors request that the Court schedule a final hearing 21 days after the commencement of these chapter 11 cases, or as soon thereafter as is convenient for the Court, to consider approval of this motion on a final basis.

## Jurisdiction and Venue

3.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157 (b).  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Bankruptcy Rules 2002 and 4001, rules 4002-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and the United States Bankruptcy Court for the Southern District of Texas Procedures for Complex Chapter 11 Cases (the "Complex Case Procedures").

6.     A detailed description of the Debtors, their business, and the facts and circumstances supporting the Debtors' chapter 11 cases are set forth in greater detail in the *Declaration of James Hyatt, Chief Executive Officer of California Pizza Kitchen, Inc., in Support of the Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed substantially contemporaneously with the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the Bankruptcy Code on July 29, 2020 (the "Petition Date") and incorporated by reference herein.

7.     On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have also filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

**Preliminary Statement**

8.     This motion requests that the Court approve the superpriority senior secured multi-draw term loan debtor-in-possession credit facility in the aggregate amount of up to $107,347,966 (the "DIP Facility"), with up to $17.5 million available on or after the date of the Court's entry of the Interim Order and the remainder upon entry of the Final Order, provided by Jefferies Finance LLC, as administrative agent and collateral agent (in such capacities, the "DIP Agent"), Coöperatieve Rabobank U.A., New York Branch, as sole lead arranger, The Bank of New York Mellon Trust Company, N.A., as escrow agent (in such capacity, the "DIP Escrow Agent"), and the lenders from time to time a party thereto (collectively, the "DIP Lenders" and together with the DIP Escrow Agent and the DIP Agent, the "DIP Secured Parties"). The DIP Facility will provide the Debtors with an immediate and necessary infusion of liquidity to, among other things,

honor employee wages and benefits, procure goods and services, and satisfy other administrative obligations of these chapter 11 cases, including rent obligations for locations the Debtors are occupying as of the Petition Date, giving the Debtors the breathing room they need to consummate the restructuring transactions contemplated under the Plan.

9.      Absent entry into the DIP Facility, the Debtors will have insufficient liquidity to continue operating their enterprise and paying their debts as they come due, with no other readily available sources of additional financing.  The liquidity provided by the DIP Facility will ensure the Debtors can continue to operate uninterrupted in the ordinary course of business and will provide the Debtors with sufficient time to consummate the restructuring of their business pursuant to the transactions contemplated by the Plan.

10.      The DIP Facility is the product of extensive, arm's-length negotiations with the DIP Lenders.  As discussed herein, the DIP Facility was preceded by a third-party marketing process designed to secure postpetition financing on the best available terms.  Prior to commencing any marketing process, the Debtors recognized that it would be particularly difficult to secure financing because all of the Debtors' material assets are encumbered by existing liens under their prepetition debt, and the Debtors' prepetition lenders indicated that they would not consent to a "priming" DIP financing provided by a third party.  Moreover, as a result of the COVID-19 pandemic and its effects on the Debtors' business, the Debtors' liquidity and access to capital deteriorated rapidly while markets for new sources of liquidity and capital tightened significantly.  Despite these concerns, the Debtors engaged with parties outside of their existing capital structure to potentially fund these chapter 11 cases.

11.      As part of this process, the Debtors, with the assistance of Guggenheim Securities, LLC ("Guggenheim Securities"), the Debtors' proposed investment banker, ran a marketing

process for postpetition financing.  Eight third-party financial institutions were contacted to solicit proposals for debtor-in-possession financing.  Of the eight parties contacted, seven declined the opportunity to submit a proposal to provide DIP financing.  While the Debtors did receive one proposal, the third-party lender required a first priority priming security interest in all of the Debtors' assets, thus requiring a nonconsensual priming of the Debtors' prepetition lenders.  That proposal was not viable because the potential additional costs and uncertainty associated with a nonconsensual priming of the Debtors' prepetition lenders' liens and the likelihood of a priming fight at the outset of the chapter 11 cases outweighed the benefit of that proposal as a source of capital and liquidity for the company.

12.     Simultaneously with this marketing process, the Debtors engaged in arm's-length financing negotiations with certain lenders within their prepetition capital structure.  Following initial discussions with the lenders to the Priority First Lien Facility, the parties spent several weeks exchanging numerous term sheets and mark-ups, each with significant changes to the material terms of the proposals.  As a result of these financing negotiations, which centered on fees and the amount of new money financing, the terms of the DIP Facility improved to the benefit of the Debtors.  Among other things, the lenders agreed to make a larger DIP facility available and to scale back the operating covenants.  The Debtors, in consultation with their advisors, determined that the Prepetition Priority/First Lien Ad Hoc Group's proposal of a $107,347,966 postpetition financing facility, $46,875,000 of which represents new capital, provides necessary liquidity and avoids the costly and protracted priming fight that would be inevitable under the competing proposal.  The proposed DIP Facility is thus in the best interests of the Debtors and their estates.

13.     For these reasons, and for the reasons set forth below and in the Erickson Declaration, the Tibus Declaration, and the First Day Declaration, entry into the DIP Credit

6

Agreement will maximize the value of the Debtors' estates and is a sound exercise of the Debtors'

business judgment.  Accordingly, the Debtors respectfully request that the Court enter the DIP

Orders.

**Concise Statement Pursuant to Bankruptcy Rule 4001 and the United States Bankruptcy Court for the Southern District of Texas Procedures for Complex Chapter 11 Cases**

14.     The Debtors seek entry of the DIP Orders:

a.     ***DIP Facility:***  authorizing the Debtors to enter into (a) a superpriority senior secured multi-draw term loan credit facility in an aggregate principal amount of up to $107,347,966 (the "DIP Loans"), consisting of: (i) $46,875,000 of new money loans (the "DIP New Money Loans"), and (ii) $60,472,966 of which will be comprised of rolled up Prepetition Priority Term Loans (the "DIP Roll Up Loans") on the terms and conditions set forth in the DIP Orders and the DIP Documents (as defined herein);

b.     ***DIP Documents:***  authorizing the Debtors to enter into the Senior Secured Super-Priority Debtor-In-Possession Credit and Guarantee Agreement,[5] among the DIP Borrower, the Guarantors, and the DIP Secured Parties, substantially in the form annexed as **Exhibit 2** to the Interim Order attached hereto (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Credit Agreement") and certain ancillary documentation (together with the DIP Credit Agreement, the "DIP Documents");

c.     ***Cash Collateral:***  authorizing the Debtors to continue to use Prepetition Collateral, including Cash Collateral, subject to the restrictions set forth in the DIP Documents and the Interim Order and the granting of adequate protection to the prepetition secured lenders (the "Prepetition Secured Parties") with respect thereto;

d.     ***Adequate Protection:***  authorizing the Debtors to grant adequate protection to the Prepetition Secured Parties;

e.     ***Superpriority Claims and DIP Liens:***  granting superpriority priming liens on all property of the Debtors' estates, including all assets, reserves, inventory, accounts receivables, and fixed assets, subject only to the Carve Out (as defined herein);

---

[5]     Prior to the first day hearing, the Debtors will file the form of DIP Credit Agreement as a supplement to this motion.

   f.  ***Automatic Stay:***  modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the DIP Orders; and

   g.  ***Final Hearing:***  scheduling a final hearing (the "Final Hearing") on the motion.

  15.  The following chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and the Complex Case Procedures.[6]

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | California Pizza Kitchen, Inc. ("CPK"), a Delaware Corporation.<br><br>*See* DIP Credit Agreement Preamble.<br><br>*See* Interim Order Preamble. |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | "Guarantors" shall mean, collectively, CPK Holdings Inc., the Subsidiary Guarantors, and in the case of Guaranteed Obligations incurred directly by CPK Holdings Inc. or any Subsidiary Guarantor, CPK.<br><br>*See* DIP Credit Agreement, Art. I. |
| **DIP Financing Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | "Lender" shall mean each financial institution listed on Schedule I, and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that shall have ceased to be a party hereto pursuant to an Assignment and Assumption.<br><br>*See* DIP Credit Agreement, Art. I. |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | "Maturity Date" shall mean the earliest to occur of:<br><br>(a) the date that is five (5) months after the Petition Date;<br><br>(b) the date on which the Obligations become due and payable pursuant to this Agreement, whether by acceleration or otherwise;<br><br>(c) the effective date of a Chapter 11 Plan for the Debtors;<br><br>(d) the date of consummation of a sale of all or substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code;<br><br>(e) the first Business Day on which the Interim Order expires by its terms, unless the Final Order has been entered and become effective prior thereto; |

---

6 The summaries contained in this motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable.

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | (f) conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or any Loan Party shall file a motion or other pleading seeking the conversion of the Chapter 11 Cases to Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the Required Lenders (which consent may be communicated via an email from any of the Specified Lender Advisors); |
| | (g) dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing by the Required Lenders (which consent may be communicated via an email from any of the Specified Lender Advisors); and |
| | (h) the Final Order (once entered) is vacated, terminated, rescinded, revoked, declared null and void or otherwise ceases to be in full force and effect (unless consented to by the Required Lenders) (which consent of the Required Lenders may be communicated via an email from any of the Specified Lender Advisors).<br><br>*See* DIP Credit Agreement, Art. I. |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B) | "Commitment" shall mean, for each Lender, the sum of its New Money Term Loan Commitment and Rolled Up Loan Commitment.<br><br>"DIP Term Loan Commitment" shall mean, for each Lender, (i) the New Money Term Loan Commitment and (ii) the Rolled Up Loan Commitment. The aggregate amount of the DIP Term Loan Commitments as of the Closing Date is $107,347,966.<br><br>"New Money Term Loan Commitment" shall mean, for each Lender, the amount set forth such Lender's name in Schedule 2.01 directly below the column entitled "New Money Term Loan Commitment" as terminated in accordance with the terms hereof. The aggregate amount of the New Money Term Loan Commitments as of the Closing Date is $46,875,000.<br><br>"Rolled Up First Lien Loan Commitment" shall mean, for each Lender, the amount set forth opposite such Lender's name in Schedule 2.01 directly below the column entitled "Rolled Up First Lien Loan Commitment." The aggregate amount of the Rolled Up First Lien Loan Commitment as of the Closing Date is $30,472,000.<br><br>"Rolled Up Loan Commitment" shall mean collectively, (i) the Rolled Up First Lian Loan Commitment and (ii) the Rolled Up PTL Loan Commitment.<br><br>"Rolled Up PTL Loan Commitment" shall mean, for each Lender, the amount set forth opposite each Lender's name in Schedule 2.01 directly below the column entitled "Rolled Up PTL Loan Commitment." The aggregate amount of the Rolled Up PTL Loan Commitment as of the Closing Date is $30,000,000.<br><br>"Total New Money Term Loan Commitment" shall mean, at any time, the sum of the New Money Term Loan Commitments of each of the Lenders at such time.<br><br>(a) Closing Date Term Loans. Subject to and upon the terms and conditions set forth herein and in the DIP Order on the Closing Date, each Lender severally agrees to make a term loan or term loans (each, a "New Money Term Loan" and, collectively, the "New Money Term Loans") to the Borrower, which New Money Term Loans (A) shall be incurred pursuant to a single drawing, (B) shall be denominated in Dollars, (C) except as hereinafter provided, shall be incurred and maintained as LIBOR Loans, provided that except as otherwise specifically provided in Section 2.11(b), all New Money Term Loans shall at all times be of the same Type, (D) shall be made by each such Lender in that aggregate principal amount equal to the amount of such Lender's New Money Term Loan |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | Commitment as set forth opposite such Lender's name on Schedule 2.01 and (E) shall be funded into the Loan Proceeds Account on the Closing Date (net of fees and expenses payable by the Borrower on the Closing Date in connection with the Transactions and the amounts withdrawn by the Borrower on the Closing Date in accordance with Section 6.03, which shall be funded as directed in the Notice of Borrowing); |
| | (b) Rolled Up Loans. |
| | (i) Pre-Petition PTL Loans.  Subject to and upon the terms and conditions set forth herein and in the DIP Order, on the Final Hearing Date each applicable Lender, severally agrees that the PTL New Money Loans (including any accrued fees and interest thereon) previously made available to the Borrower (either by such Lender or an Affiliate thereof) shall be repurchased and cancelled by the Borrower and deemed exchanged for DIP Term Loans hereunder that will be deemed advanced by such Lender to the Borrower hereunder as Rolled Up PTL Loans on a dollar-for-dollar basis with such purchased and cancelled loans in the amount of the Rolled Up PTL Loan Commitment of such Lender following the entry of the Final Order, which Rolled Up PTL Loans (A) shall be denominated in Dollars and (B) except as hereinafter provided, shall be incurred and maintained as LIBOR Loans with the same Interest Period as the loans from which such Rolled Up PTL Loans were converted, provided that except as otherwise specifically provided in Section 2.11(b), all Rolled Up PTL Loans shall at all times be of the same Type.  The Rolled Up PTL Loans shall be deemed to be DIP Term Loans outstanding for all purposes under this Agreement owed by the Borrower to such Lenders in the aggregate principal amount set forth on Schedule 2.01. |
| | (ii) Pre-Petition First Lien Loans.  Subject to and upon the terms and conditions set forth herein and in the DIP Order, on the Final Hearing Date each applicable Lender, severally agrees that the "Rolled Up Loans" (as defined in the Pre-Petition PTL Credit Agreement) (including any accrued fees and interest thereon) previously made available to the Borrower (either by such Lender or an Affiliate thereof) shall be repurchased and cancelled by the Borrower and deemed exchanged for DIP Term Loans hereunder that will be deemed advanced by such Lender to the Borrower hereunder as Rolled Up First Lien Loans on a dollar-for-dollar basis with such purchased and cancelled loans in the amount of the Rolled Up First Lien Loan Commitment of such Lender, which Rolled Up First Lien Loans (A) shall be denominated in Dollars and (B) except as hereinafter provided, shall be incurred and maintained as LIBOR Loans with the same Interest Period as the loans from which such Rolled Up Loans were converted, provided that except as otherwise specifically provided in Section 2.11(b), all Rolled Up First Lien Loans shall at all times be of the same Type.  Upon entry of the Final Order, the Rolled Up First Lien Loans shall be deemed to be DIP Term Loans outstanding for all purposes under this Agreement owed by the Borrower to such Lenders in the aggregate principal amount set forth on Schedule 2.01. |
| | See DIP Credit Agreement, Art. I; Art. II, § 2.01. |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) | The DIP Orders and DIP Credit Documents include standard and customary conditions to borrowing, the satisfaction of which is a condition precedent to the obligations of each DIP Lender to provide the DIP Facility. |

The DIP Credit Agreement includes the following conditions precedent:

(a) <u>Loan Documents.</u>   The Administrative Agent shall have received (i) this Agreement, executed and delivered by the Borrower, Holdings, and each Subsidiary Guarantor and each Person listed on <u>Schedule 2.02</u>, (ii) the Security Agreement, executed and delivered by each Loan Party party thereto, (iii) each other Security Document executed and delivered by each Loan Party party thereto to the extent required to be delivered on the Closing Date and (iv) for the account of each of the Lenders that has requested same at least one (1) Business Day prior to the Closing Date, the appropriate Note executed and delivered by the Borrower.

(b) <u>Orders</u>. (i) The Bankruptcy Court shall have entered the Interim Order, no later than three (3) Business Days after the Petition Date, and such order shall be in form and substance satisfactory to the Required Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent) in their sole discretion, be in full force and effect, and shall not have been reversed, modified, amended, stayed or vacated absent prior written consent of the Required Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent); (ii) the Administrative Agent and the Lenders shall have received drafts of the "first day" pleadings for the Chapter 11 Cases, in each case, in form and substance satisfactory to the Administrative Agent and the Required Lenders, not later than a reasonable time in advance of the Petition Date for the Administrative Agent's and Lenders' counsel to review and analyze the same; (iii) all motions, orders (including the "first day" orders) and other substantive documents to be filed with or submitted to the Bankruptcy Court on the Petition Date shall be in form and substance reasonably satisfactory to the Administrative Agent and the Lenders; and (iv) all "first day" orders shall have been approved and entered by the Bankruptcy Court except as otherwise agreed by the Required Lenders.

(c) <u>Notice of Borrowing</u>.   On or prior to the Closing Date, the Administrative Agent shall have received a Notice of Borrowing.

(d) <u>Approved Budget; 13-Week Cash Flow</u>.   The Administrative Agent shall have received (i) the Approved Budget and (ii) the initial 13-week cash flow, each in form and substance reasonably acceptable to the Lenders.

(e) <u>Compliance with RSA</u>.   The RSA shall be in full force and effect and no default by any of the Loan Parties shall have occurred and be continuing (with all applicable grace periods having expired) under the RSA.

(f) <u>Fees</u>.   On the Closing Date, the Lenders and the Administrative Agent shall have received (or will receive from the proceeds of the Loans) all fees and other amounts payable thereto on or prior to such date and all fees and reasonable and documented expenses required hereunder or under any other Loan Document to be paid, including the reasonable and documented fees, charges and disbursements of the Specified Lender Advisors, and counsel to the Administrative Agent, the Collateral Agent and the Escrow Agent, and the fees and expenses of any local counsel, foreign counsel, appraisers, consultants and other advisors required to be paid hereunder or any under other Loan Documents, for which invoices have been presented to the Borrower at least

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | one day prior to the Closing Date (which amounts may be offset against the proceeds of the New Money Term Loans). |
| | (g) <u>Organizational Certificates; Organizational Documents; Good Standing Certificates</u>.  The Administrative Agent shall have received a certificate of each Loan Party, dated the Closing Date signed by the Secretary or any Assistant Secretary of such Loan Party and attested to by an Authorized Officer of such Loan Party, with the following insertions and attachments: (i) certified organizational authorizations, incumbency certifications, the certificate of incorporation or other similar organizational document, including all amendments thereto, of each Loan Party certified by the relevant authority of the jurisdiction of organization of such Loan Party and bylaws or other similar organizational document, including all amendments thereto, of each Loan Party, each of which is certified as being in full force and effect on the Closing Date and (ii) a good standing certificate dated as of a recent date for each Loan Party from its jurisdiction of organization. |
| | (h) <u>Legal Opinions</u>.  The Administrative Agent shall have received a legal opinion of (x) Kirkland & Ellis LLP, New York, California and Texas counsel to the Loan Parties and (y) Venable LLP, as Maryland counsel for the Loan Parties, each of which shall be addressed to the Administrative Agent, the Collateral Agent and the Lenders on the Closing Date and shall be in form and substance reasonably satisfactory to the Required Lenders covering such matters relating to the Loan Documents as the Required Lenders shall reasonably request. |
| | (i) <u>Other Filings</u>.  Each of the Chapter 11 Plan and the Chapter 11 Disclosure Statement (as defined in the RSA) shall have been filed with the Bankruptcy Court. |
| | (j) <u>Communications Plan</u>.  The Debtors shall have completed a detailed internal and external communications plan relating to the Chapter 11 Cases and the restructuring contemplated thereunder, to be in form and substance reasonably satisfactory to the Required Lenders. |
| | (k) <u>Patriot Act</u>.  The Administrative Agent (or its counsel) and the Lenders shall have received (i), at least two Business Days prior to the Closing Date, all documentation and other information about the Borrower and the Guarantors as has been requested at least two days prior to the Closing Date by the Administrative Agent or any such Lender that is required by Governmental Authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act and (ii) a Beneficial Ownership Certification. |
| | (l) <u>Funds Flow Statement</u>.  The Administrative Agent shall have received a Funds Flow Statement. |
| | (m) <u>Representations and Warranties</u>.  Each of the representations and warranties made by any Loan Party set forth in <u>Article V</u> hereof or in any other Loan Document shall be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects) on and as of the date of such extension of credit with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date in which case such representations and warranties shall be true and correct in all material respects as of such earlier date (except that any representation and warranty that is qualified as to "materiality" or |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | "Material Adverse Effect" shall be true and correct in all respects as of such earlier date).<br><br>(n) <u>No Default</u>.  On the Closing Date or, in respect of the Rolled Up Loans, the Final Hearing Date, immediately after giving effect to any Loans made on the Closing Date and the application of the proceeds thereof or, in the case of the Rolled Up Loans, the effectiveness of the Roll-Up, no Default or Event of Default hereunder shall have occurred and be continuing.<br><br>(o) <u>Officer's Certificate</u>.  On the Closing Date, the Administrative Agent shall have received a certificate, in form reasonably acceptable to the Administrative Agent, dated the Closing Date and signed on behalf of the Borrower by the chairman of the board, the chief executive officer, the president, the chief financial officer or any vice president of the Borrower, certifying on behalf of the Borrower that, taking into account the penultimate paragraph of this <u>Section 6.01</u>, all of the conditions in <u>Section 6.01(k)</u>, <u>(l)</u> and <u>(n)</u> have been satisfied or waived on such date (other than any certification that any such conditions have been satisfied or waived to the extent subject to the satisfaction of the Administrative Agent (acting at the Direction of the Required Lenders)).<br><br>(p) <u>Final Order</u>.  In respect of the Rolled Up Loans only, the Final Order shall have been entered.<br><br>*See* DIP Credit Agreement, Art. VI, § 6.01. |
| **Interest Rates**<br>Bankruptcy Rule<br>4001(c)(1)(B) | The Borrower shall pay (a) LIBOR plus 10.00 percent paid in cash, subject to a LIBOR floor of 1.50 percent, on the DIP New Money Loans; (b) LIBOR plus 10.00 percent paid in cash, subject to a LIBOR floor of 1.50 percent, on the Priority First Lien New Money Loans rolled into the DIP Roll-Up Loans; and (c) LIBOR plus 10.00 percent PIK, subject to a LIBOR floor of 1.50 percent, on the Priority First Lien Roll-Up Loans rolled into the DIP Roll-Up Loans.<br><br>*See* Restructuring Support Agreement, <u>Exhibit B</u>. |
| **Use of DIP Facility and Cash Collateral**<br>**Bankruptcy Rule**<br>4001(b)(l)(B)(ii) | The Debtors may use the proceeds of the DIP Facility for purposes set forth in Section 5.12 of the DIP Credit Agreement as follows:<br><br>(a) All proceeds of the DIP Term Loans will be used by the Borrower in accordance with <u>Section 7.12</u>.<br><br>(b) No part of any Loan (or the proceeds thereof) will be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock.  Neither the making of any Loan nor the use of the proceeds thereof will violate the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.<br><br>Section 7.12 of the Credit Agreement provides:<br><br>The Loan Parties shall use the proceeds of the DIP Term Loans solely in accordance with the Approved Budget (subject to the Permitted Variance).<br><br>Additionally, pursuant to the Interim Order the Debtors may use the DIP Facility and the Cash Collateral for the following approved purposes:<br><br>(a) In accordance with the terms of this Interim Order and the DIP Documents, proceeds of the DIP Loans shall be used solely for the purposes permitted under the DIP Documents and this Interim Order, and in accordance with the |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | Approved Budget subject to permitted variances as set forth in this Interim Order and the DIP Documents. <br><br>(b) The Debtors are hereby authorized to use all Cash Collateral of the Prepetition Secured Parties, but solely for the purposes set forth in this Interim Order and in accordance with the Approved Budget (subject to permitted variances as set forth in this Interim Order and the DIP Documents) including, without limitation, to make payments on account of the Adequate Protection Obligations provided for in this Interim Order, from the date of this Interim Order through and including the date of termination of the DIP Credit Agreement.  Except on the terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral. <br><br>*See* DIP Credit Agreement, Art. V, § 5.12; Art. VII § 7.12. <br><br>*See* Interim Order ¶¶ 3(c), 16. |
| **Entities with Interests in Cash Collateral** <br> Bankruptcy Rule 4001(b)(l)(B)(i) | Each of the Prepetition Priority/First Lien Agents, for the benefit of itself and the other Prepetition Priority/First Lien Secured Parties, respectively, has an interest in Cash Collateral. <br><br>*See* Interim Order ¶ 8. |
| **Fees** <br> Bankruptcy Rule 4001(c)(1)(B) | Section 3.01 of the DIP Credit Agreement provides: <br><br>(a) <u>Administrative Agent's Fees; Arranger Fees</u>.  The Borrower agrees to pay (i) to the Administrative Agent such fees in the amounts and at the times specified as may be agreed to in writing from time to time by Holdings or any of its Subsidiaries and the Administrative Agent pursuant to the Agent Fee Letter or otherwise and (ii) to the Arranger such fees in the amounts and at the times specified as may be agreed to in writing from time to time by Holdings or any of its Subsidiaries and the Arranger pursuant to the Arranger Fee Letter or otherwise. <br><br>(b) <u>Closing Date Fees</u>.  The Borrower agrees to pay (i) the Commitment Premium of 15 percent on the Closing Date in cash, (ii) the Closing Premium of 6.25 percent, which Closing Premium shall be earned in full on the Closing Date and paid in kind on the Closing Date, and (iii) the New Money DIP Fee of 7.5 percent of the New Capital Stock shall be earned in full on the Closing Date and paid in kind by increasing the Pre-Closing Premium New Money Term Loan Commitments such that the outstanding principal amount of the New Money Term Loan Commitments on the Closing Date, inclusive of the Closing Premium, is as set forth on <u>Schedule 2.01</u> attached hereto and (iii) the New Money DIP Fee. <br><br>The Interim Order provides that the Debtors are authorized to pay: <br><br>All reasonable and documented fees and out-of-pocket expenses of the Prepetition Priority/First Lien Secured Parties, whether incurred before or after the Petition Date, including all reasonable and documented fees and out-of-pocket expenses of counsel to Specified Lender Advisors and other professionals retained as provided for in this Interim Order, including, for the avoidance of doubt, (A) Latham & Watkins, LLP, as counsel to the Prepetition Priority/First Lien Agents, (B) Gibson Dunn, as counsel to the DIP Lenders and the Ad Hoc Group, (C) Porter Hedges, as local counsel to the DIP Lenders and the Ad Hoc Group, (D) FTI, as financial advisor to the DIP Lenders and the Ad Hoc Group, |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | and (E) solely to the extent necessary to exercise and fulfill its obligations under the Prepetition Priority/First Lien Credit Documents, one counsel to the Prepetition Priority/First Lien Agents in each local jurisdiction.<br><br>*See* DIP Credit Agreement, Art. III, § 3.01.<br><br>*See* Interim Order ¶ 8(c)(i).<br><br>*See* Restructuring Support Agreement, **Exhibit B**. |
| **Budget**<br>Bankruptcy Rule 4001 (c)(1)(B) | The use of cash and proceeds from loans under the DIP Facility is subject to a customary budget, the DIP Budget is attached to the Interim Order as **Exhibit 1**.<br><br>*See* DIP Credit Agreement Art. VII, § 7.17.<br><br>*See* Interim Order Exhibit 1. |
| **Reporting Information**<br>Bankruptcy Rule 4001(c)(l)(B) | (a) The Approved Budget shall set forth, on a weekly basis, among other things, Budgeted Cash Receipts, Budgeted Operating Disbursement Amounts, Budgeted Non-Operating Disbursement Amounts, Budgeted Restructuring Related Disbursement Amounts, Budgeted Liquidity and Budgeted Borrower Professional Fees for each Monthly Testing Period, commencing with the First Monthly Testing Period, and shall be approved by, and be in form and substance reasonably satisfactory to, the Required Lenders (it being acknowledged and agreed that the Initial Approved DIP Budget is approved by and reasonably satisfactory to the Required Lenders and is and shall be the Approved Budget unless and until replaced.<br><br>(b) The Approved Budget shall be updated, modified or supplemented by the Borrower no later than the New Budget Delivery Date that corresponds to the Monthly Testing Period set forth on Schedule 1.01 of the DIP Credit Agreement and/or from time to time with the written consent of and/or at the request of the Required Lenders, and each such updated, modified or supplemented budget shall be in form and substance reasonably satisfactory to the Required Lenders in their sole discretion, and no such updated, modified or supplemented budget shall be effective if Required Lenders (or the Specified Lender Advisors at the Direction of the Required Lenders) object in writing within two Business Days of receipt and if no written objection is received within two Business Days of receipt, the updated, modified or supplemented budget shall be deemed an Approved Budget; provided, however, that in the event the Required Lenders, on the one hand, and the Borrower, on the other hand, cannot agree as to an updated, modified or supplemented budget, at all times thereafter the then current Approved Budget shall remain in effect unless and until a new Approved Budget is not objected to by the Required Lenders (or the Specified Lender Advisors on behalf of the Required Lenders). Each Approved Budget delivered to the Lenders shall be accompanied by such supporting documentation as reasonably requested by the Lenders. Each Approved Budget shall be prepared in good faith based upon assumptions believed by the Borrower to be reasonable.<br><br>(c) For each Variance Testing Period, the Borrower shall not permit: (x) the Actual Cash Receipts to be less than Budgeted Cash Receipts, by more than the Permitted Variance, (y) Actual Operating Disbursement Amounts to exceed the Budgeted Operating Disbursement Amounts by more than the Permitted Variance and (z) Actual Non-Operating Disbursement Amounts plus Actual Restructuring Related Amounts (excluding Actual Borrower Professional Fees) to exceed the Budgeted Non-Operating Disbursement Amounts plus Budgeted |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | Restructuring Related Disbursement Amounts (excluding Budgeted Borrower Professional Fees) by more than the Permitted Variance. |
| | (d)  The Borrower shall deliver to the Administrative Agent and the Lenders on or before 5:00 p.m. (New York City time) on Wednesday of each week a certificate which shall include such detail as is reasonably satisfactory to the Required Lenders, signed by a Financial Officer of the Borrower certifying that (i) the Loan Parties are in compliance with the covenants contained in <u>Section 7.17</u> of the DIP Credit Agreement and (ii) no Default or Event of Default has occurred or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, shall be prepared by the Borrower as of the last day of the respective Variance Testing Period or other period then most recently ended, and shall be in a form and substance reasonably satisfactory to the Required Lenders in their sole discretion. |
| | (e)  The Lenders (i) may assume that the Loan Parties will comply with the Approved Budget (subject to Permitted Variances), (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget.  The line items in the Approved Budget for payment of interest, expenses and other amounts to the Administrative Agent and the Lenders are estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents regardless of whether such amounts exceed such estimates.  Nothing in any Approved Budget shall constitute an amendment or other modification of any Loan Document or other lending limits set forth therein. |
| | *See* DIP Credit Agreement, Art. VII, §7.17. |
| **Variance Covenant** Bankruptcy Rule 4001(c)(l)(B) | "<u>Permitted Variance</u>" shall mean a cumulative unfavorable variance (for the avoidance of doubt, any favorable variance shall be a Permitted Variance, and any variance from the Approved Budget that is not prohibited by <u>Section 7.17(c)</u> of the DIP Credit Agreement shall be a Permitted Variance) of no more than the greater of (a) $100,000 and (b) 10% of the applicable receipts and costs reported in the Approved Budget Variance Report and tested pursuant to <u>Section 7.17(c)</u> of the DIP Credit Agreement for such Variance Testing Period. |
| | For each Variance Testing Period, the Borrower shall not permit: (x) the Actual Cash Receipts to be less than Budgeted Cash Receipts, by more than the Permitted Variance, (y) Actual Operating Disbursement Amounts to exceed the Budgeted Operating Disbursement Amounts by more than the Permitted Variance and (z) Actual Non-Operating Disbursement Amounts plus Actual Restructuring Related Amounts (excluding Actual Borrower Professional Fees) to exceed the Budgeted Non-Operating Disbursement Amounts plus Budgeted Restructuring Related Disbursement Amounts (excluding Budgeted Borrower Professional Fees) by more than the Permitted Variance. |
| | *See* DIP Credit Agreement, Art. I; Art. VII, § 7.17(c). |
| **Chapter 11 Milestones** Bankruptcy Rule 4001(c)(1)(B) | <u>Milestones.</u>  Each of the following shall occur, by the times and dates set forth below (as any such time and date may be extended at the Direction of the Required Lenders); <u>provided</u> that as used in this <u>Section 7.18</u>, any "delivery" required by this <u>Section 7.18</u> shall require delivery to the Administrative Agent (which shall promptly furnish the same |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | to each of the Lenders and the Specified Lender Advisors, as well as to any other Person specified below): |
| | (a) On the Petition Date, the Debtors shall file the Prearranged Scheduling Motion seeking entry of the Prearranged Scheduling Order, in form and substance acceptable to the Required Lenders and the Borrower. |
| | (b) By no later than three (3) days following the Petition Date, the Bankruptcy Court shall enter the Interim Order authorizing the DIP Facility. |
| | (c) By no later than thirty-five (35) days following the Petition Date, the Bankruptcy Court shall enter the Final Order authorizing the DIP Facility, in form and substance acceptable to the Required Lenders and the Borrower. |
| | (d) By no later than seventy (70) days following the Petition Date, the Bankruptcy Court shall enter an order confirming the Chapter 11 Plan in form and substance acceptable to the Required Lenders and the Borrower. |
| | (e) By no later than eighty-five (85) days following the Petition Date, the effective date of the Chapter 11 Plan shall have occurred. |
| | *See* DIP Credit Agreement, Art. VII, § 7.18. |
| **Liens and Priorities** Bankruptcy Rule 4001(c)(l)(B)(i) | The liens contemplated by the DIP Credit Agreement will follow the following priority: |
| | (a) the Carve Out; |
| | (b) the DIP Liens; |
| | (c) the Prepetition Priority Adequate Protection Liens; |
| | (d) the Prepetition First Lien Adequate Protection Liens; |
| | (e) the Prepetition Second Lien Adequate Protection Liens. |
| | *See* Interim Order ¶¶ 7–9. |
| **Carve Out** Bankruptcy Rule 4001(c)(1)(B) | The DIP Orders provide a "Carve Out" of certain statutory fees, allowed professional fees, and Carve Out Reserves, all as detailed in the Interim Order. |
| | *See* Interim Order ¶ 9. |
| **Challenge Period** Bankruptcy Rule 4001(c)(l)(B) | The Interim Order provides for a standard and customary challenge period at the earliest of: |
| | (a) except as to any Committee, seventy-five (75) calendar days after entry of the Interim Order, and |
| | (b) in the case of any such adversary proceeding or contested matter filed by any Committee, sixty (60) calendar days after the appointment of such Committee, subject to further extension by written agreement of the Debtors and the Prepetition Priority Agent (acting at the direction of the requisite Prepetition Priority Lenders) and the Prepetition First Lien Agent (acting at the direction of the requisite Prepetition First Lien Lenders), and |
| | (c) except as to any Committee or in the case of a Committee, any such later date as has been ordered by the Court for cause upon a motion filed and served prior to the expiration of the deadline to commence a Challenge (in each case, a "<u>Challenge Period</u>" and the date of expiration of each Challenge Period being a "<u>Challenge Period Termination Date</u>"); |
| | *provided*, *however*, that if, prior to the end of the Challenge Period, (x) the cases convert |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | to chapter 7, or (y) a chapter 11 trustee is appointed, then, in each such case, the Challenge Period shall be extended for a period of sixty (60) days solely with respect to any such trustee, commencing on the occurrence of either of the events described in the foregoing clauses (x) and (y).<br><br>*See* Interim Order ¶ 11. |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | The adequate protection provided to the Prepetition Secured Parties shall be in accordance with the Interim Order.<br><br>*See* Interim Order ¶ 8. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B) | The DIP Credit Agreement and Interim Order contain events of default that are usual and customary for debtor-in-possession financings, including without limitation, failure to comply with the Permitted Variance and failure to satisfy any of the Milestones.<br><br>*See* DIP Credit Agreement, Art. X. |
| **Waiver/Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | Pursuant to the Interim Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement and effectuate the terms of the Interim Order.<br><br>*See* Interim Order, ¶ 8(g). |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtors will indemnify the DIP Lenders, the DIP Agent, and their respective affiliates, successors, and assigns and the officers, directors, employees, agents, attorneys, advisors, controlling persons, and members of each of the foregoing (each an "<u>Indemnified Person</u>") and hold them harmless from and against all reasonable and documented out-of-pocket costs, expenses (including, but not limited to reasonable and document legal fees and expenses), liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the DIP Facility; <u>provided</u> that no such person will be indemnified for costs, expenses, or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the gross negligence, actual fraud, or willful misconduct of such person (or their related persons).<br><br>    (a) To the extent the Administrative Agent (or any affiliate thereof) is not reimbursed and indemnified by the Borrower, and without relieving the Borrower of its obligation to do so, the Lenders will reimburse and indemnify the Administrative Agent (and any affiliate thereof), including without limitation in its capacity as Collateral Agent under the Loan Documents, in proportion to their respective "percentage" as used in determining the Required Lenders (determined as if there were no Defaulting Lenders) on the date such indemnification is sought (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with their respective portions of the Loans and Commitments in effect immediately prior to such date) for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, documented expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by the Administrative Agent (or any affiliate thereof) in any way relating to or arising out of performing its duties hereunder or under any other Loan Document or in any way relating to or arising out of this Agreement or any other Loan Document; <u>provided</u> that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
| --- | --- |
| | Agent's (or such affiliate's) gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision). |
| | (b)  To the extent the Arranger (or any affiliate thereof) is not reimbursed and indemnified by the Borrower, and without relieving the Borrower of its obligation to do so, the Lenders will reimburse and indemnify the Arranger (and any affiliate thereof), in proportion to their respective "percentage" as used in determining the Required Lenders (determined as if there were no Defaulting Lenders) on the date such indemnification is sought (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with their respective portions of the Loans and Commitments in effect immediately prior to such date) for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, documented expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by the Arranger (or any affiliate thereof) in any way relating to or arising out of performing its duties hereunder or under any other Loan Document or in any way relating to or arising out of this Agreement or any other Loan Document; _provided_ that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from the Arranger's (or such affiliate's) gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision). |
| | The Agreements in this <u>Section 11.06</u> shall survive the payment of the Loans and all other amounts payable hereunder. |
| | _See_ DIP Credit Agreement, Art. XI, § 11.06. |
| | _See_ Interim Order ¶ 17(c). |

**Statement Regarding Significant Provisions**

16.     The Interim Order contains certain of the provisions (the "<u>Significant Provisions</u>")[7] identified on Exhibit B to the Complex Case Procedures as summarized in the Attorney Checklist Concerning Motion and Order Pertaining to Use of Cash Collateral attached hereto as **Exhibit C**.

17.     The Interim Order:  (a) grants superpriority administrative expense claims to the DIP Secured Parties (the "<u>DIP Superpriority Claim</u>"); (b) grants superpriority administrative

---

[7]     Significant Provisions refer to those provisions that:  (a) grant cross-collateralization protection (other than replacement liens or other adequate protection) to prepetition secured creditors; (b) deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in section 552(b) of the Bankruptcy Code; (c) bind the bankruptcy estates or any parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or debt or the waiver of claims against the secured creditor; (d) waive or limit the estate's rights under section 506(c) of the bankruptcy code; (e) grant prepetition secured creditors liens on the

expense claims to the Priority/First Lien Lenders, subject only to the Carve Out and the DIP Superpriority Claim; and (c) grants adequate protection to certain of the Prepetition Secured Parties in the form of replacement liens on the DIP Collateral (as defined in the Interim Order). The DIP Facility is critical to the Debtors' continuing operations and essential to facilitating the Restructuring Transactions contemplated by the Plan.

18.     In light of the foregoing, the Debtors submit that the Significant Provisions are appropriate under the facts and circumstances of these chapter 11 cases.  Accordingly, the Significant Provisions in the Interim Order should be approved.

## I.     The Debtors' Prepetition Capital Structure.

19.     As of the Petition Date, CPK has approximately $402.6 million in aggregate principal amount of funded debt obligations.

| Funded and Unfunded Debt | Maturity | Principal Amount Outstanding (in USD millions) |
|---|---|---|
| Priority First Lien Facility | August 2022 | $60.8 |
| First Lien Term Loan Facility | August 2022 | $254.8 |
| Revolving Credit Facility | August 2021 | $12.5 |
| Second Lien Facility | August 2023 | $75.0 |
| Total Debt Obligations | | 403.1 |

### a.   Priority First Lien Facility.

20.     On April 27, 2020, the Company entered into a priority term loan credit agreement (as amended, restated, supplemented or otherwise modified from time to time, the "Priority Term Loan Credit Agreement," and such facility, the "PTL Facility") with Jefferies Finance LLC ("Jefferies"), as administrative agent and collateral agent, and the certain lenders under the existing First Lien Credit Agreement (as defined below) to provide $30 million of new financing, with

---

debtor's claims and causes of action arising under chapter 5 of the Bankruptcy Code; (f) impose deadlines for the filing of a plan or disclosure statement; and (g) grant an administrative claim.

$15 million of initial financing and a $15 million delayed draw term loan. The $15 million initial

term loan was funded into escrow immediately upon closing, while the $15 million delayed draw

term loan was funded into escrow at a later date. Ultimately, the entirety of the delayed draw term

loan was funded into the escrow account and the Company withdrew the entire amount.

21.     The PTL Facility is *pari passu* in lien priority with, and senior in payment priority

to, CPK's obligations under its existing First Lien Credit Agreement, pursuant to a waterfall in a

new *pari passu* intercreditor agreement entered into by the agent under Priority Term Loan Credit

Agreement and the agent under the First Lien Credit Agreement. The PTL Facility was syndicated

to existing first lien lenders post-closing of the PTL Facility pursuant to the Dutch auction

mechanics of the First Lien Credit Agreement. For each dollar of new money an existing lender

provided, a dollar of its existing term loans or outstanding revolving loans (but not revolving

commitments), as applicable, were rolled up into the PTL Facility. The roll-up is *pari passu* in

lien priority with the Priority Term Loan Credit Agreement and the existing obligations under the

First Lien Credit Agreement, but junior in right of payment to the Priority Term Loan Credit

Agreement and senior in right of payment to the obligations under the First Lien Credit Agreement.

22.     As of the date hereof, there is approximately $60.8 million of principal outstanding

under the PTL Facility.

### b.  First Lien Facility.

23.     On August 23, 2016, CPK entered into a $290 million first lien term loan facility

(the "First Lien Term Loan Facility") and a $30 million first lien revolving credit facility with a

$20 million letter of credit sublimit (the "Revolving Credit Facility" and together with the First

Lien Term Loan Facility, the "First Lien Facility"), pursuant to the first lien credit agreement by

and among CPK, as borrower, certain affiliates of CPK, as guarantors, Jefferies, as issuing bank,

certain financial institutions as joint lead arrangers and lenders, and Jefferies as administrative and

collateral agent (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "First Lien Credit Agreement").[8]  The First Lien Facility is guaranteed by CPK's parent company and certain of CPK's subsidiaries and secured by a first priority lien on substantially all of the assets of CPK and the guarantors (subject to certain permitted liens).

24.     On April 24, 2020, the First Lien Credit Agreement was amended to, among other things, tighten basket capacity under the negative covenants, conform the Collateral package to align with the PTL Facility, and reflect certain other terms agreed to with respect to the PTL Facility and to amend the Dutch auction procedures to expressly facilitate the roll-up of certain term loans and revolving loans outstanding under the First Lien Credit Agreement into the PTL Facility.  The Required Lenders under the First Lien Credit Agreement also agreed to forbear with respect to multiple imminent and existing Events of Default.  As of the date hereof, there is $254.8 million of principal outstanding under the First Lien Term Loan Facility and $12.5 million of principal and $12.5 million of letters of credit outstanding under the Revolving Credit Facility.

### c.  Second Lien Facility.

25.     On August 23, 2016, CPK entered into a $75 million term loan facility (the "Second Lien Facility") pursuant to the second lien term loan agreement by and among CPK, as borrower, certain affiliates of CPK, as guarantors, Jefferies as lead arranger, administrative agent, and collateral agent,[9] and certain financial institutions as lenders (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Second Lien Credit

---

[8]     On May 10, 2017, the First Lien Credit Agreement was amended to correct a technical error with respect to one of the defined terms used therein.

[9]     On April 24, 2020, Wilmington Trust, National Association ("Wilmington") succeeded Jefferies as administrative and collateral agent under the Second Lien Credit Agreement pursuant to a successor agent agreement by and among CPK, the guarantors of the Second Lien Facility, Jefferies, and Wilmington.

Agreement").[10]  The Second Lien Facility is guaranteed by CPK's parent company and certain of

CPK's subsidiaries and secured by a second priority lien on substantially all of the assets of CPK

and the guarantors (subject to certain permitted liens).  As of the date hereof, there is approximately

$75.0 million of principal outstanding under the Second Lien Facility.  The Debtors and SYSCO

Corporation are also party to a promissory note and security agreement dated March 30, 2020

providing for $6,985,092.00 of junior secured claims, which is subordinate to the PTL Facility,

the First Lien Facility, and the Second Lien Facility.

### d.  Equity Interests in CPK.

26.     As of the Petition Date, the Debtors' ultimate parent has approximately

167,000,000 shares of common stock outstanding, of which approximately 89% is indirectly held

by Golden Gate Capital and the remainder is held by current and former members of management.

## II.     The Debtors Have a Need for Debtor-in-Possession Financing and Use of Cash Collateral.

27.     The Debtors require immediate access to the DIP Facility in addition to continued

use of the Prepetition Secured Parties' cash collateral (the "Cash Collateral").  As of the Petition

Date, the Debtors' cash on hand is approximately $13.5 million, which is insufficient to operate

their enterprise and continue paying their debts as they come due.  Tibus Decl. ¶ 15.  The Debtors'

business is cash intensive, with significant daily costs required to satisfy obligations to vendors,

suppliers, and employees.  As such, and due to their current limited liquidity, the Debtors require

immediate access to the DIP Facility and the use of Cash Collateral to operate their business,

preserve value, and avoid irreparable harm pending the Final Hearing.  *Id.* at ¶ 13.

---

[10]    On May 10, 2017, the Second Lien Credit Agreement was amended to correct a technical error with respect to
one of the defined terms used therein.

28.     Recent events have underscored the Debtors' need to access the proceeds of the DIP Facility and Cash Collateral.  Specifically, the impact of the COVID-19 pandemic has exacerbated the significant pressure already facing the Debtors in the casual dining space.  First Day Decl. ¶¶ 34–38.  As discussed in greater detail in the First Day Declaration, shutdowns triggered by the ongoing pandemic delivered a sudden, and significant, blow to CPK's liquidity position, while payroll and rent-related expenses persisted at pre-pandemic levels.  *Id.*  As a result of these and other demands, the Debtors are unable to generate sufficient levels of operating cash flow in the ordinary course of business to cover their operating and capital costs and the projected costs of these chapter 11 cases.  Tibus Decl. ¶ 13–14.

29.     The Debtors also rely on the Cash Collateral generated from their operations to, among other things, honor employee wages and benefits, procure goods and services integral to the Debtors' ongoing business operations, fund operational expenses, and maintain favorable relationships with their vendors, suppliers, employees, and customers.  Tibus Decl. ¶ 13.  At the outset of these chapter 11 cases, the Debtors will need this operating revenue to satisfy payroll and contractual obligations, pay suppliers and landlords, meet overhead, and make any other payments that are essential for the continued management, operation, and preservation of the Debtors' business.  *Id.*  The ability to satisfy these expenses when due is essential to the Debtors' continued operation of their business during the pendency of these cases.

30.     Absent funds available from the DIP Facility, access to Cash Collateral, and the cooperation of key business partners at this critical early stage, the Debtors could face a value-destructive interruption to their business and lose support from important stakeholders on whom the Debtors' business depends—which, in turn, would hinder the Debtors' ability to

maximize the value of their estates—and be forced to curtail their operations significantly and to the detriment of the Debtors, their estates, and their creditors.  Tibus Decl. ¶ 14.

III.    **Alternative Sources of Financing Are Not Available on Better Terms.**

31.    The Debtors do not believe it would be prudent to administer these chapter 11 estates on a "cash collateral" basis, rendering postpetition financing a necessity.  Prior to commencing any marketing process, the Debtors recognized that it would be particularly difficult to secure financing because all of the Debtors' material assets are encumbered by existing liens under their prepetition debt, the Debtors' prepetition lenders indicated that they would not consent to a "priming" DIP financing provided by a third party.  Moreover, as a result of the COVID-19 pandemic and its effects on the Debtors' business, the Debtors' liquidity and access to capital deteriorated rapidly while markets for new sources of liquidity and capital tightened significantly. Despite these concerns, the Debtors engaged with parties outside of their existing capital structure to potentially fund these chapter 11 cases.  Erickson Decl. ¶ 10.  Specifically, the Debtors, with the assistance of their advisors, ran a marketing process for postpetition financing and received one third-party proposal.  *Id*.  At the same time, the Debtors engaged in arm's-length financing negotiations with the lenders in their prepetition capital structure.  *Id.* at ¶ 11.  As set forth in the Erickson Declaration, the resulting proposed DIP Facility with the prepetition lenders represents the best presently available financing option for the Debtors under the circumstances.  *Id.* at ¶ 23.

32.    More specifically, the Debtors, with the assistance of their investment banker, Guggenheim Securities, contacted eight third-party financial institutions to solicit proposals for debtor-in-possession financing.  Erickson Decl. ¶ 10.  Of the eight parties contacted, seven declined the opportunity to submit a proposal to provide DIP financing.  *Id.*  Although the Debtors did receive one first round proposal, the third-party lender's proposal required a first priority priming security interest in all of the Debtors' assets, thus requiring a nonconsensual priming of

the Debtors' prepetition lenders' liens. *Id.* That proposal was not viable since the potential additional costs and uncertainty associated with a nonconsensual priming of the Debtors' prepetition lenders' liens and the potential for a priming fight at the outset of the chapter 11 cases outweighed the benefit of that proposal as a source of capital and liquidity for the company.

33.     Simultaneous with this marketing process, the Debtors engaged in arm's-length financing negotiations with certain lenders within their prepetition capital structure. Erickson Decl. ¶ 11. These negotiations were extensive and conducted at arm's length. *Id.* Over the course of several weeks, the parties exchanged numerous term sheets and mark-ups. *Id.* The negotiations centered around, among other things, the size of the fees to be paid in connection with the DIP Facility, as well as the amount of the new money financing. *Id.* These negotiations resulted in concessions by the lenders, including acceptance of many of the changes requested by the Debtors to the terms of the DIP Facility, including but not limited to, increasing the size of the DIP facility and easing certain of the restrictions under the facility's operating covenants. *Id.* Ultimately, the Debtors were able to secure the proposed $107,347,966 DIP Facility, consisting of approximately $46.9 million of new money loans. *Id.* at ¶ 13.[11]

34.     The Debtors, in consultation with their advisors, determined that the Priority/First Lien Ad Hoc Group's financing proposal provides necessary liquidity and avoids the costly and protracted priming fight that would be inevitable under the competing proposal. The proposed DIP Facility is thus in the best interests of the Debtors and their estates.

---

[11]     Represents the face amount of new money loans including the Commitment Premium and Closing Premium. The net amount of new money loans under the DIP Facility is $37,500,000.

## The Terms of the DIP Facility Should Be Approved

35.     The DIP Facility includes $46.9 million in new money obligations and a roll up of approximately $60.4 million of Prepetition Priority Term Loans upon entry of a final order.  The DIP Facility provides adequate protection for the Prepetition Secured Parties in the form of replacement liens and Superpriority Claims.  The adequate protection provided is appropriate.

36.     The roll up of certain of the Prepetition Priority Term Loans upon entry of a final order is a material component of the structure of the DIP Facility and was required by the DIP Lenders as a condition to their commitment to provide postpetition financing and the consensual use of cash collateral.  Erickson Decl. ¶ 13.  Given the circumstances described herein and in the Erickson and Tibus Declarations, the roll up is appropriate under the circumstances and will only become effective upon entry of a final order.  In addition to the roll up, the DIP Facility contains various fees expressly required by the DIP Lenders as a condition to providing financing that are integral to the financing package.  The fees were the subject of arm's-length and good-faith negotiations between the Debtors and the DIP Lenders, is an integral component of the overall terms of the DIP Facility, and is required by the DIP Agents and the DIP Lenders as consideration for the extension of postpetition financing.  *Id.* at ¶¶ 14, 20.  Given the circumstances described herein, the lack of available alternatives, and the high risk environment created by COVID-19, the fees are appropriate under the circumstances.

37.     For these reasons, the Debtors, in consultation with their advisors, determined the DIP Lenders' financing proposal represents the only viable postpetition financing option presently available to the Debtors.  The DIP Facility is a result of extensive, arm's-length negotiations.  Erickson Decl. ¶ 22.  Furthermore, the DIP Facility is necessary for the Debtors to complete a successful restructuring pursuant to the transactions contemplated under the Plan.  Although the Debtors, with the assistance of their advisors, solicited and considered alternative sources of

financing, the proposed DIP Facility is the best presently available financing option to the Debtors under the circumstances.  *Id.* at ¶¶ 16, 18.  The economic terms of the proposed DIP Facility are competitive and reflect the market interest in providing the Debtors with postpetition financing. Accordingly, approval of the DIP Facility is in the best interest of the Debtors' estates and the Debtors respectfully request entry of the DIP Orders approving the DIP Facility.

## **Basis for Relief**

### I.     **The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Documents.**

#### A.     **Entering into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.**

38.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and continue using the Cash Collateral.  Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

39.     Specifically, to determine whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable business person would make a similar

decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

40.     Further, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

41.     The Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment following a thorough process and careful evaluation of alternatives.  Specifically, the Debtors and their advisors determined that the Debtors would require significant postpetition financing to support the administration of their chapter 11 cases and their ongoing operations, while at the same time recognizing the need to avoid a potentially costly priming fight at the outset of these chapter 11 cases.  The Debtors negotiated the DIP Documents in good faith, at arm's length, and with the assistance of their advisors, and they have obtained the best financing available.  As discussed, the Debtors ran a competitive process that yielded one alternative but, ultimately untenable financing proposal.  After extensive negotiations with the Consenting Lenders, the Debtors determined that the proposed DIP Facility was the best available alternative as it provided immediate liquidity and avoided a costly priming fight.

Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

42.     Additionally, the Debtors actively engaged with and sought support from creditors at all levels of their capital structure.  The Priority/First Lien Lenders are DIP Lenders and, as a result, affirmatively consent to the DIP Facility.

**B.     The Roll Up of the Prepetition Priority Term Loans Is Appropriate.**

43.     The proposed refinancing of a portion of the existing Prepetition Priority Term Loans with the proceeds of the DIP Facility upon entry of the final order is an exercise of the Debtors' sound business judgment.  Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  Courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of existing prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value.  *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation).  The business judgment rule shields a debtor's management from judicial second-guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

44.     Where, as here, the Prepetition Priority Lenders are likely oversecured, repaying creditors that stand to receive payment in full with postpetition loans will not harm the Debtors' estates and other creditors.  Rather, the DIP Facility's proposed roll up feature merely affects the

timing, not the amount, of the Prepetition Priority Lenders' recovery.  Further, the roll up of the Prepetition Priority Term Loans is a material component of the consideration required by the DIP Lenders as part of their commitment to provide postpetition financing.  Erickson Decl. ¶ 13. Finally, refinancing the Prepetition Priority Term Loans will not prejudice any party's right to challenge the amount, validity, perfection, enforceability, priority or extent of the Prepetition Priority Term Loans or the liens thereto.  Pursuant to the procedures set forth in the Interim Order, (a) any official committee of unsecured creditors, within sixty (60) calendar days after the appointment of such committee, and (b) except as to any committee, within seventy-five (75) calendar days after entry of the Interim Order, may bring a challenge proceeding seeking to avoid, object to, or otherwise challenge the validity, enforceability, extent, priority, or perfection of the (i) mortgages, security interest, and liens of the Prepetition Agents and the Prepetition Secured Parties, or (ii) the Prepetition Obligations.  These procedures were developed to ensure that no non-Debtor party in interest would be prejudiced by the relief requested herein.  *See* Interim Order ¶ 11.

45.     Finally, the DIP Facility would not be available absent the roll up.  Without access to the DIP Facility, the Debtors would be unable to continue as a going concern and bridge to the comprehensive restructuring contemplated by the Plan.  Given these circumstances, the roll up is reasonable, appropriate, and a sound exercise of the Debtors' business judgment.

**C.     The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Lenders.**

46.     The Debtors propose to obtain financing under the DIP Facility, in part, by providing superpriority claims and liens pursuant to section 364(c) of the Bankruptcy Code. Significantly, the Debtors propose to provide first priority liens on substantially all of the Debtors'

assets, including previously unencumbered property and "priming" liens on all of the Prepetition Collateral.

47.     In the event that a debtor demonstrates that it is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court:

> [M]ay authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

48.     11 U.S.C. § 364(c); *see also In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).   Courts have articulated a three-part test to determine whether a debtor is entitled to financing pursuant to section 364(c) of the Bankruptcy Code.   Specifically, courts look to whether:

> a.     the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;
>
> b.     the credit transaction is necessary to preserve the assets of the estate; and
>
> c.     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Group*, 71 B.R. at 549.

49.     No party contacted as part of the above-described process was interested in providing, or willing to provide, postpetition financing to the Debtors on an unsecured basis. Indeed, no constituency was willing to provide postpetition financing on anything other than a

superpriority or priming basis with respect to all of the Debtors' assets. All parties that submitted proposals appreciated that, in order to avoid costly and time consuming litigation regarding such priming liens, they would need to refinance the PTL Facility at the outset of these cases. Put simply, the DIP Lenders were not willing to provide the DIP Facility on any other terms, and no other existing stakeholder or third-party has presented a proposal without such priming liens. Further, the Debtors have not discovered sufficient unencumbered assets to secure sufficient debtor-in-possession financing to fund a non-consensual chapter 11 case. Accordingly, the DIP Facility's structure is appropriate in light of the Debtors' financing needs and the lack of viable non-priming debtor-in-possession financing alternatives.

50.     Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (a) the Prepetition Secured Parties have consented or (b) the Prepetition Secured Parties' interests in collateral are adequately protected. Here, the requisite Prepetition Secured Parties have consented to the priming liens securing the DIP Facility. Further, the Prepetition Secured Parties will receive adequate protection of the Prepetition Collateral under the DIP Orders consistent with the Intercreditor Agreements, as described further below. Accordingly, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is both warranted and appropriate under the circumstances.

      **D.      No Comparable Alternative to the DIP Facility Is Reasonably Available.**

51.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code.

*In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *Sky Valley, Inc.*, 100 B.R. at 113; *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

52.     Here the Debtors conducted a competitive and comprehensive debtor-in-possession marketing process that resulted in only one third-party financing proposal. Following arm's-length negotiations with the Consenting Lenders, the Debtors determined that the DIP Facility is the best available alternative under the circumstances to fund these chapter 11 cases. The DIP Facility is supported by a majority of the holders of the Debtors' senior secured debt, will avoid expensive litigation at the outset of these cases, provides the Debtors with flexibility to pursue the restructuring transaction outlined in the Plan, and represents the lowest cost alternative available to the Debtors.

**II.    The Use of Cash Collateral Is Warranted and Should Be Approved.**

53.    The Debtors' use of property of their estates, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code,[12] which provides in relevant part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

54.    11 U.S.C. § 363(c)(1).  Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).

55.    Generally, what constitutes adequate protection is decided on a case-by-case basis. *See In re Columbia Gas Sys., Inc.*, No. 91-803, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *see also In re Realty Southwest Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its

---

[12]    Section 363(a) of the Bankruptcy Code defines "cash collateral" as follows:

> Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

collateral during the reorganization process") (citation omitted); *see also In re Cont'l Airlines Inc.*, 154 B.R. 176, 180–81 (Bankr. D. Del. 1993).

56.     The Debtors intend to provide the Prepetition Secured Parties with adequate protection in the form of (a) replacement liens and (b) Superpriority Claims, subject to the Carve Out in accordance with the Intercompany Agreements.  Further, the Prepetition Secured Parties will inherently benefit from the Debtors' proposed use of the Cash Collateral, which will prevent avoidable diminution in value of the Cash Collateral and enhance the likelihood of preserving the Debtors' overall going concern value as the Debtors continue to negotiate with all of their key stakeholders.  Preservation of the Debtors' business as a going concern in and of itself serves to provide such parties "adequate protection" for Bankruptcy Code purposes.  *See 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (noting that, in determining whether protection is "adequate," courts consider "whether the value of the debtor's property will increase as a result of the" use of collateral or provision of financing); *In re Sky Valley, Inc.*, 100 B.R. 107, 114 (Bankr. N.D. Ga. 1988) ("an increase in the value of the collateral . . . resulting from superpriority financing could result in adequate protection." (citation omitted)), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117 (N.D. Ga. 1989).

57.     The proposed adequate protection in the proposed Interim Order is necessary and sufficient for the Debtors to continue to use Cash Collateral.  Accordingly, the adequate protection is (a) fair and reasonable, (b) necessary to satisfy the requirements of sections 363(c)(2) and 363(e) of the Bankruptcy Code, and (c) in the best interests of the Debtors and their estates.

**III.     The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agent and the DIP Lenders under the DIP Documents.**

58.     Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain fees, expenses, and other payments to the DIP Agent and the DIP Lenders.  The Debtors

have also agreed to pay the fees and expenses of counsel and other professionals retained as provided for in the DIP Documents.  In particular, the Debtors have agreed to pay:

a. ***Interest Rates.***  The Borrower shall pay (a) LIBOR plus 10.00 percent paid in cash, subject to a LIBOR floor of 1.50 percent, on the DIP New Money Loans; (b) LIBOR plus 10.00 percent paid in cash, subject to a LIBOR floor of 1.50 percent, on the Priority First Lien New Money Loans rolled into the DIP Roll-Up Loans; and (c) LIBOR plus 10.00 percent PIK, subject to a LIBOR floor of 1.50 percent, on the Priority First Lien Roll-Up Loans rolled into the DIP Roll-Up Loans.

b. ***Commitment Premium.***  The Borrower shall pay a commitment premium of 15 percent.

c. ***Closing Premium.***  The Borrower shall pay a closing premium of 6.25 percent.

d. ***New Money DIP Fee.***  The Borrower shall provide 7.5 percent of the New Common Stock, subject to dilution by the Management Incentive Plan.

e. ***Professional Fees.***  The Borrower shall pay the reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Documents and the Interim Order (whether incurred before or after the Petition Date) including, for the avoidance of doubt, (a) Gibson, Dunn & Crutcher (as counsel), FTI Consulting, Inc. (as financial advisor), and Porter Hedges LLP (as local bankruptcy counsel) to the DIP Lenders and an ad hoc group of Prepetition Priority/First Lien Lenders; and (b) Latham & Watkins, LLP, as counsel to the DIP Agent, which such fees and expenses shall not be subject to the approval of the Court, nor shall any recipient of any such payment be required to file with respect thereto any interim or final fee application with the Court provided that  any fees and expenses of a professional shall be subject to the provisions of Paragraph 17 of the Interim Order.

59.     As set forth in the Erickson Declaration, the fees and expenses were negotiated at arm's length and are, in aggregate, generally consistent with debtor-in-possession financings of this type. Erickson Decl. ¶ 20.  These fees, moreover, were expressly required by the Prepetition Secured Parties as a condition to providing financing.  *Id.* at ¶ 14.  The Debtors considered the amounts described above when determining in their sound business judgment that the DIP Facility constituted the best terms on which the Debtors could obtain the postpetition financing necessary

to continue their operations and prosecute these chapter 11 cases.  The Debtors do not believe that a loan with terms similar to those in the DIP Facility is available to the Debtors for lower fees. The fees and expenses provided for under the DIP Facility are reasonable and within market practice for debtor-in-possession financings of this size and type, particularly in the current high-risk COVID-19 environment.  Accordingly, the Court should authorize the Debtors to pay the fees and expenses provided under the DIP Documents in connection with the DIP Facility.

## IV.    The DIP Agent and the DIP Lenders Should Be Afforded Good-Faith Protection under Section 364(e).

60.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

61.    The DIP Facility is the result of (i) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing, and (ii) extensive arm's-length, good-faith negotiations with the DIP Lenders.  The terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, the Debtors ran a competitive proposal process under the circumstances before selecting the DIP Lenders' proposal as the winning bidder. Accordingly, the Court should find that the obligations arising under the DIP Facility and other

financial accommodations made to the Debtors have been extended by the DIP Agent and the DIP Lenders in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and therefore the DIP Agent and the DIP Lenders are entitled to all of the protections afforded thereby.

**V.      The Automatic Stay Should Be Modified on a Limited Basis.**

62.      The Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the DIP Orders and authorize the Debtors to make, and the recipients to retain and apply, payments.  The proposed Interim Order further provides that the automatic stay is modified to the extent necessary to implement and effectuate the terms of the Interim Order.  Finally, the proposed Interim Order provides that the automatic stay shall be vacated and modified, subject to certain limitations, to the extent necessary to permit the DIP Agent and DIP Lenders to exercise certain remedies upon the occurrence of an event of default by the Debtors under the DIP Documents.

63.      Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.

**VI.     Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.**

64.      Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the court is empowered to conduct an interim expedited hearing on the motion at which it may authorize a debtor to use cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  *See*

Bankruptcy Rule 4001(b)(2).  Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).  Furthermore, the Complex Case Procedures provide that "on motion by the Debtors, a hearing will routinely be conducted within three business days to consider . . . cash collateral use[.]"  Complex Case Procedures, ¶ 4.A.

65.    The Debtors require immediate access to the DIP Facility.  As of the Petition Date, the Debtors' total cash on hand is approximately $13.5 million, which is insufficient to operate their enterprise and continue paying their debts as they come due.  Tibus Decl. ¶ 15.  The Debtors' business is cash intensive, with significant daily costs required to satisfy obligations to vendors, suppliers, and employees.  *Id.* at ¶¶ 13–14.  As such, and due to their current limited liquidity, the Debtors require immediate access to postpetition financing and the use of Cash Collateral to operate their business, preserve value, and avoid irreparable harm pending the Final Hearing.  *Id.* at ¶ 15.

66.    The Debtors, with the assistance of their advisors, developed the DIP Budget.  Tibus Decl. ¶ 16.  The DIP Budget establishes that the Debtors will have adequate liquidity during this interim period if allowed to utilize the Cash Collateral and access the DIP Facility.  *Id.*  The DIP Budget contains line items for each category of cash flows anticipated to be received or disbursed during the time period for which the DIP Budget is prepared.  *Id.*  The DIP Budget includes all reasonable, necessary, and foreseeable expenses to be incurred in connection with the operation of their business for the period set forth in the DIP Budget.

67.    The Debtors are seeking limited relief to, among other things, satisfy payroll and contractual obligations, pay suppliers and landlords, meet overhead, and make any other payments

that are essential for the continued management, operation, and preservation of the Debtors' business.  Tibus Decl. ¶ 13.  The ability to satisfy these expenses when due is essential to the Debtors' continued operation of their business during the pendency of these cases.  *Id.*

68.    Failure to obtain access to the DIP Facility and Cash Collateral will result in immediate and irreparable harm to the Debtors and their stakeholders, and will diminish the value of the Debtors' estates.  Tibus Decl. ¶ 17.  Without the approval of the DIP Facility and use of Cash Collateral, the Debtors will be unable to continue to operate in the ordinary course and preserve and maximize the value of their assets for the benefit of all parties in interest.  *Id.*

69.    Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code and Bankruptcy Rule 4001(b), the Debtors request that the Court conduct an expedited hearing on this motion, and enter the proposed Interim Order authorizing the Debtors to enter into the DIP Facility and use the Cash Collateral.

## **Request for Final Hearing**

70.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

## **Emergency Consideration**

71.    The Debtors request emergency consideration of this motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  An immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  The failure to receive the requested relief during the first 21 days of these chapter 11 cases could disrupt the Debtors' operations at this critical juncture and

imperil the Debtors' restructuring.  The Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested herein on an emergency basis.

### Reservation of Rights

72.     Nothing contained herein is intended or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

73.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Notice

74.     The Debtors have provided notice of this motion to the following parties or their respective counsel:  (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Ad Hoc Priority/First Lien Lender Group; (d) counsel to the Second Lien Agent; (e) the office of the attorneys general for the states in which the Debtors operate; (f) the United States Attorney's

Office for the Southern District of Texas; (g) the Internal Revenue Service; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Orders,
granting the relief requested herein and such other relief as the Court deems appropriate under the
circumstances.

Dated:  July 30, 2020  　　　　　/s/ Matthew D. Cavenaugh
Houston, Texas  　　　　　　　  **JACKSON WALKER L.L.P.**
　　　　　　　　　　　　　　　 Matthew D. Cavenaugh (TX Bar No. 24062656)
　　　　　　　　　　　　　　　 Kristhy M. Peguero (TX Bar No. 24102276)
　　　　　　　　　　　　　　　 Genevieve Graham (TX Bar No. 24085340)
　　　　　　　　　　　　　　　 Veronica A. Polnick (TX Bar No. 24079148)
　　　　　　　　　　　　　　　 1401 McKinney Street, Suite 1900
　　　　　　　　　　　　　　　 Houston, Texas 77010
　　　　　　　　　　　　　　　 Telephone:  　(713) 752-4200
　　　　　　　　　　　　　　　 Facsimile:  　(713) 752-4221
　　　　　　　　　　　　　　　 Email:  　　　mcavenaugh@jw.com
　　　　　　　　　　　　　　　 　　　　　　kpeguero@jw.com
　　　　　　　　　　　　　　　 　　　　　　ggraham@jw.com
　　　　　　　　　　　　　　　 　　　　　　vpolnick@jw.com

　　　　　　　　　　　　　　　 -and-

　　　　　　　　　　　　　　　 Joshua A. Sussberg, P.C. (*pro hac vice* pending)
　　　　　　　　　　　　　　　 Matthew C. Fagen (*pro hac vice* pending)
　　　　　　　　　　　　　　　 Francis Petrie (*pro hac vice* pending)
　　　　　　　　　　　　　　　 **KIRKLAND & ELLIS LLP**
　　　　　　　　　　　　　　　 **KIRKLAND & ELLIS INTERNATIONAL LLP**
　　　　　　　　　　　　　　　 601 Lexington Avenue
　　　　　　　　　　　　　　　 New York, New York 10022
　　　　　　　　　　　　　　　 Telephone:  　(212) 446-4800
　　　　　　　　　　　　　　　 Facsimile:  　(212) 446-4900
　　　　　　　　　　　　　　　 Email:  　　　joshua.sussberg@kirkland.com
　　　　　　　　　　　　　　　 　　　　　　matthew.fagen@kirkland.com
　　　　　　　　　　　　　　　 　　　　　　francis.petrie@kirkland.com

　　　　　　　　　　　　　　　 *Proposed Co-Counsel for the Debtors and Debtors in Possession*

## **Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Local Rule 9013-1(i).

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

## **Certificate of Service**

I certify that on July 30, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

**<u>Exhibit A</u>**

**[Reserved]**

**<u>Exhibit B</u>**

**[Reserved]**

**Exhibit C**

**Attorney Checklist Concerning Motion and Order Pertaining to Use of Cash Collateral**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CALIFORNIA PIZZA KITCHEN, INC., *et al.*,[1] | ) | Case No. 20-33752 (MI) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**ATTORNEY CHECKLIST CONCERNING MOTIONS
AND ORDERS PERTAINING TO USE OF CASH COLLATERAL AND
POST-PETITION FINANCING (WHICH ARE IN EXCESS OF TEN (10) PAGES)**

Motions and orders pertaining to cash collateral and post-petition financing matters tend to be lengthy and complicated.  Although the Court intends to read such motions and orders carefully, it will assist the Court if counsel will complete and file this checklist.  All references are to the Bankruptcy Code (§) or Rules (R).

**PLEASE NOTE:**

"*"     Means generally not favored by Bankruptcy Courts in this District.

"**"     Means generally not favored by Bankruptcy Courts in this District without a reason and a time period for objections.

If your motion or order makes provision for any of the following, so indicate in the space provided:

**CERTIFICATE BY COUNSEL**

This is to certify that the following checklist fully responds to the Court's inquiry concerning material terms of the motion and/or proposed order:

Yes, at Page/Exhibit
Y means yes; N means no
N/A means not applicable
(Page Listing Optional)

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  California Pizza Kitchen, Inc. (0623); California Pizza Kitchen of Annapolis, Inc. (4806); CPK Holdings Inc. (2486); CPK Hospitality, LLC (3536); CPK Hunt Valley, Inc. (6751); CPK Management Company (1196); CPK Spirits, LLC (3614); and CPK Texas, LLC (3574).  The location of the Debtors' service is: 12181 Bluff Creek Drive, 5th Floor, Playa Vista, California 90094.

1.   Identification of Proceedings:

   (a)  Preliminary or final motion/order (circle one)................................................. N/A

   (b)  Continuing use of cash collateral (§ 363) ...................................................... Y

   (c)  New financing (§ 364) ................................................................................. Y

   (d)  Combination of §§ 363 and 364 financing ................................................... Y

   (e)  Emergency hearing (immediate and irreparable harm) ................................. Y

2.   Stipulations:

   (a)  Brief history of debtor's businesses and status of debtor's prior
        relationships with lender ............................................................................. Y

   (b)  Brief statement of purpose and necessity of financing. ................................ Y

   (c)  Brief statement of type of financing (i.e., accounts receivable, inventory).... Y

   (d)  Are lender's pre-petition security interest(s) and liens deemed valid, fully
        perfected and non-avoidable......................................................................... Y

        (i)  Are there provisions to allow for objections to above? ........................... Y

   (e)  Is there a post-petition financing agreement between lender and
        debtor? ........................................................................................................ Y

        (i)  If so, is agreement attached?................................................................... Y

   (f)  Is there is an agreement that lender's post-petition security interests and
        liens deemed valid, fully perfected and non-avoidable? ............................... Y

   (g)  Is lender undersecured or oversecured (circle one) ..................................... N/A

   (h)  Has lender's non-cash collateral been appraised? ....................................... N

        (i)  Insert date of latest appraisal ................................................................. N/A

   (i)  Is debtor's proposed budget attached?......................................................... Y

   (j)  Are all pre-petition loan documents identified? ............................................ Y

   (k)  Are pre-petition liens on single or multiple assets? (circle one) ................... N/A

   (l)  Are there pre-petition guaranties of debt? ................................................... Y

        (i)  Limited or unlimited? (circle one)............................................................. N/A

3.   Grant of Liens:

   (a)  Do post-petition liens secure pre-petition debts?......................................... Y

   (b)  Is there cross-collateralization? ................................................................... N

   (c)  Is the priority of post-petition liens equal to or higher than existing liens? ... Y

   (d)  Do post-petition liens have retroactive effect? ............................................. N

   (e)  Are there restrictions on granting further liens or liens of equal or higher
        priority?......................................................................................................... Y

   (f)  Is lender given liens on claims under §§ 506(c), 544-50 and §§ 522? ........... N

        (i)  Are lender's attorneys fees to be paid?.................................................... Y

2

*(ii)* Are debtor's attorneys fees excepted from § 506(c)?.............................. Y

(g)   Is lender given liens upon proceeds of causes of action under §§ 544, 547 and 548?................................................................................................... Y

**4.**   Administrative Priority Claims:

(a)   Is lender given an administrative priority? ..................................... Y

(b)   Is administrative priority higher than § 507(a)? ............................. Y

(c)   Is there a conversion of pre-petition secured claim to post-petition administrative claim by virtue of use of existing collateral?......................... Y

**5.**   Adequate Protection (§361):

(a)   Is there post-petition debt service? ................................................. Y

(b)   Is there a replacement/addition 361(/) lien? (circle one or both)................... N/A

(c)   Is the lender's claim given super-priority? (§ 364(c) or (d)) [designate] ............................................................

Y - Both

(d)   Are there guaranties? ....................................................................... Y

(e)   Is there adequate Insurance coverage? ........................................... Y

(f)   Other? ............................................................................................... Y

**Debtors' comment**:   Adequate protection includes (i) payment of certain reasonable and documented fees and out-of-pocket and expenses to professionals, (ii) payment of certain postpetition interest and fees at the contract rate, and (iii) financial reporting obligations.

**6.**   Waiver/Release Claims v. Lender:

(a)   Debtor waives or release claims against lender, including, but not limited to, claims under §§ 506(c), 544-550, 552, and 553 of the Code?................... Y

(b)   Does the debtor waive defenses to claim or liens of lender?......................... Y

**7.**   Source of Post-Petition Financing (§ 364 Financing):

(a)   Is the proposed lender also the pre-petition lender? ...................................... Y

(b)   New post-petition lender?.................................................................. N

(c)   Is the lender an insider? ............................................................... N

8.  **Modification of Stay:**

   (a)  Is any modified lift of stay allowed? ............................................................. Y

   (b)  Will the automatic stay be lifted to permit lender to exercise self-help upon
        default without further order? ...................................................................... N

   (c)  Are there any other remedies exercisable without further order of court? ..... Y

   (d)  Is there a provision that any future modification of order shall not affect
        status of debtor's post-petition obligations to lender?.................................... Y

9.  **Creditors' Committee:**

   (a)  Has creditors' committee been appointed?...................................................... N

   (b)  Does creditors' committee approve of proposed financing? .......................... N/A

10. **Restrictions on Parties in Interest:**

   (a)  Is a plan proponent restricted in any manner, concerning modification of
        lender's rights, liens and/or causes? ............................................................. Y

   (b)  Is the debtor prohibited from seeking to enjoin the lender in pursuit of
        rights? .............................................................................................................. Y

   (c)  Is any party in interest prohibited from seeking to modify this order? .......... Y

   (d)  Is the entry of any order conditioned upon payment of debt to lender?......... N

   (e)  Is the order binding on subsequent trustee on conversion? ........................... Y

11. **Nunc Pro Tunc:**

   (a)  Does any provision have retroactive effect?.................................................. Y

12. **Notice and Other Procedures:**

   (a)  Is shortened notice requested?....................................................................... Y

   (b)  Is notice requested to shortened list? ............................................................ N

   (c)  Is time to respond to be shortened? .............................................................. N

   (d)  If final order sought, have 15 days elapsed since service of
        motion pursuant to Rule 4001(b)(2)? ........................................................... N/A

   (e)  If preliminary order sought, is cash collateral necessary to avoid
        immediate and irreparable harm to the estate pending a final hearing? ......... Y

   (f)  Is a Certificate of Conference included? ...................................................... N

   (g)  Is a Certificate of Service included?............................................................. Y

   (h)  Is there verification of transmittal to U.S. Trustee included
        pursuant to Rule 9034? .................................................................................. N

   (i)  Has an agreement been reached subsequent to filing motion? ...................... N/A

        (i)  If so, has notice of the agreement been served pursuant to Rule
             4001(d)(4)? ............................................................................................. N/A

4

*(ii)* Is the agreement in settlement of motion pursuant to Rule 4001(d)(4)? .. N/A

*(iii)* Does the motion afford reasonable notice of material provisions of
agreement pursuant to Rule 4001(d)(4)? ................................................ N/A

*(iv)* Does the motion provide for opportunity for hearing pursuant to Rule
9014?.................................................................................................... N/A

[*Remainder of page intentionally left blank*]

Dated:  July 30, 2020          */s/ Matthew D. Cavenaugh*
Houston, Texas                 **JACKSON WALKER L.L.P.**
                               Matthew D. Cavenaugh (TX Bar No. 24062656)
                               Kristhy M. Peguero (TX Bar No. 24102276)
                               Genevieve Graham (TX Bar No. 24085340)
                               Veronica A. Polnick (TX Bar No. 24079148)
                               1401 McKinney Street, Suite 1900
                               Houston, Texas 77010
                               Telephone:    (713) 752-4200
                               Facsimile:    (713) 752-4221
                               Email:        mcavenaugh@jw.com
                                             kpeguero@jw.com
                                             ggraham@jw.com
                                             vpolnick@jw.com

                               -and-

                               Joshua A. Sussberg, P.C. (*pro hac vice* pending)
                               Matthew C. Fagen (*pro hac vice* pending)
                               Francis Petrie (*pro hac vice* pending)
                               **KIRKLAND & ELLIS LLP**
                               **KIRKLAND & ELLIS INTERNATIONAL LLP**
                               601 Lexington Avenue
                               New York, New York 10022
                               Telephone:    (212) 446-4800
                               Facsimile:    (212) 446-4900
                               Email:        joshua.sussberg@kirkland.com
                                             matthew.fagen@kirkland.com
                                             francis.petrie@kirkland.com

                               *Proposed Co-Counsel for the Debtors and Debtors in Possession*